STUART G. GROSS (#251019)
sgross@grosskleinlaw.com
**GROSS & KLEIN LLP**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t (415) 671-4628
f (415) 480-6688

JOSEPH W. COTCHETT (#36324)
jcotchett@cpmlegal.com
PHILIP L. GREGORY (#95217)
pgregory@cpmlegal.com
PAUL N. MCCLOSKEY (#24541)
pmccloskey@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA  94010
t (650) 697-6000
f (650) 697-0577

SHARON E. DUGGAN (#105108)
foxsduggan@aol.com
**ATTORNEY AT LAW**
370 Grand Avenue Suite 5
Oakland, CA 94610
t (510) 271-0825
f (510) 271-0829

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FRIENDS OF DEL NORTE**; **ENVIRONMENTAL PROTECTION INFORMATION CENTER**; and **CENTER FOR BIOLOGICAL DIVERSITY**, ,<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF TRANSPORTATION**; **MALCOLM DOUGHERTY**, in his official capacity as Director of the State of California Department of Transportation; NOAA's **NATIONAL MARINE FISHERIES SERVICE**; **CHRIS OLIVER**, in his official capacity as Assistant Administrator for Fisheries, **FEDERAL HIGHWAY ADMINISTRATION**, and **WALTER C. "BUTCH" WAIDELICH, JR**., in his official capacity as Executive Director of the Federal Highway Administration.<br><br>Defendants. | Case No.<br><br><br>**COMPLAINT** |

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1
2

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   PARTIES ........................................................................................................... 12

      A.  Plaintiffs ................................................................................................. 12

      B.  Defendants............................................................................................... 15

III.  JURISDICTION17

IV.   VENUE .............................................................................................................. 18

V.    INTRADISTRICT ASSIGNMENT................................................................... 18

VI.   FACTUAL BACKGROUND ........................................................................... 18

      A.  The Narrow and Windy Smith River Canyon and Heavily Wooded Areas Along US 199 and SR 197 .................................................................. 18

            2.   The Smith River and Rogue River Are "Critical Habitat" for Unique Populations of Threatened SONCC Coho Facing A "High Risk of Extinction"...................... 20

            3.   The Smith River and  Is Designated as "Essential Fish Habitat" for Coho and Chinook Salmon Under the MSA ........................................................ 26

            4.   The Health and Scenic Character of the Smith River and Rogue River Is Also Very Important to the Residents of the Area and Its Visitors ........................................ 28

      B.  The Proposed Project Will Involve Extensive Construction, Endangering the Smith River, the SONCC Coho, and the Other Fish and Animals It Supports ........................ 31

      C.  Caltrans' Project To Create a Large Truck Network Throughout Northern California.. 33

      D.  The 197/199 Project's Other Impacts upon the Environment......................................... 36

VII.  IN DESIGNING AND/OR ANALYZING THE PROPOSED PROJECT AND ITS IMPACTS, CALTRANS, NMFS, AND THE FWHAW FAILED TO COMPLY WITH THE ESA, THE MSA, THE WILD AND SCENIC RIVERS ACT, NEPA, AND THE DEPARTMENT OF TRANSPORTATION ACT .............................................................. 40

      A.  Caltrans and NMFS Failed to Comply with Section 7 of the ESA in Their Consultation Concerning the Proposed Project's Impacts on Threatened SONCC Coho, Green Sturgeon, Eulachon, and Designated SONCC Critical Habitat ...................................... 40

      B.  Caltrans and NMFS Failed to Comply With the MSA In Their Consultation Concerning the Proposed Project's Impacts on the Designated Essential Fish Habitat of Pacific Salmon ..................................................................................................................... 42

      C.  Caltrans Failed to Comply With the Wild and Scenic River Act Concerning the Proposed Project's Impacts on the Wild and Scenic Smith River or Rogue River........ 44

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

i

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

D.  Caltrans Failed to Comply With NEPA in Its Analysis of the Proposed Project's Impacts on the Human Environment ................................................................................................ 45

E.  Caltrans Failed to Comply With the Requirements of Section 4(f) of the Department of Transportation Act Concerning the Proposed Project's Acquisition of, and Impact On, Lands Within the Six River National Forest the Smith River National Recreation Area, and the Rogue River-Siskiyou National Forest ............................................................................. 52

VIII. PLAINTIFFS HAVE COMPLIED WITH ALL PROCEDURAL REQUIREMENTS ...... 53

A.  Irreparable Harm and Arbitrary and Capricious Action ................................................ 53

B.  Exhaustion of Administrative Remedies ........................................................................ 54

C.  Standing .......................................................................................................................... 54

D.  Attorneys' Fees .............................................................................................................. 55

IX.  CLAIMS FOR RELIEF ........................................................................................................ 55

FIRST CLAIM FOR RELIEF - Violations of Section 10(e)(2)(C) of the APA, 5 U.S.C. § 706(2)(C) ...................................................................................................................................... 55

SECOND CLAIM FOR RELIEF - Violations of Section 10(e)(1) of the APA, 5 U.S.C. § 706(1) .......................................................................................................................................... 56

THIRD CLAIM FOR RELIEF -Violations of the ESA, 16 U.S.C. § 1536 .............................. 57

FOURTH CLAIM FOR RELIEF - Violations of the APA, 5 U.S.C. § 701, *et seq.* ................ 58

FIFTH CLAIM FOR RELIEF - Violations of the APA, 5 U.S.C. § 701, *et seq.* .................... 58

SIXTH CLAIM FOR RELIEF - Violation of the APA, 5 U.S.C. § 701, *et seq.* ..................... 59

SEVENTH CLAIM FOR RELIEF - Violation of the APA, 5 U.S.C. § 701, *et seq.* ............... 60

EIGHTH CLAIM FOR RELIEF - Violation of the APA, 5 U.S.C. § 701, *et seq.* .................. 61

NINTH CLAIM FOR RELIEF - Violation of the APA, 5 U.S.C. § 701, *et seq.* ..................... 62

TENTH CLAIM FOR RELIEF - Violation of the APA, 5 U.S.C. § 701, *et seq.* ..................... 63

ELEVENTH CLAIM FOR RELIEF - Violations of APA, 5 U.S.C. § 701, *et seq.* ................. 64

TWELFTH CLAIM FOR RELIEF - Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 ..... 65

X.  PRAYER FOR RELIEF ......................................................................................................... 67

COMPLAINT

Plaintiffs Friends of Del Norte, the Environmental Information Center, and the Center for Biological Diversity (collectively, "Plaintiffs"), challenge final agency actions taken by Defendants California Department of Transportation, its Director Malcolm Dougherty, in his official capacity (collectively with the California Department of Transportation, "Caltrans"), NOAA's National Marine Fisheries Service, and its Assistant Administrator Chris Oliver (collectively with NOAA's National Marine Fisheries, "NMFS"), the Federal Highway Administration, and its Executive Director Walter C. "Butch" Waidelich, Jr. (collectively with the Federal Highway Administration, the "FHWA") for their acts and omissions in connection with the approval and authorization of a project captioned as "197/199 Safe STAA Access Project" (the "Proposed Project"), and allege on information and belief, except as indicated, as follows:

## I.    **INTRODUCTION**

1.    This is a case of a road versus a river.  Caltrans plans to perform major roadwork along the pristine and ecologically important Smith River, in northwestern California. Neither Caltrans nor NMFS have come close to meeting their respective legal obligations to adequately analyze the proposed roadwork's environmental impact.



GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

2.      Located in Del Norte County, the Smith River is the last major undammed river in California.  The Smith River flows freely and naturally, for its entire length – the only major river system in California to do so.  The Tolowa people named the river "Hiouchi," which means "Blue Queen," and the river's waters remain exceptionally clear, sapphire-blue, and emerald-green.  Approximately 300 miles of the Smith River are designated wild and scenic, under the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271 *et seq.*, more than any other river in our Nation.



3.      While the Smith River and its basin are important and irreplaceable habitat for numerous animal and plant species, the clean, free-flowing river is a particularly important habitat of anadromous salmonid species.

4.      The Smith River has been designated "critical habitat" under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1533, for the Southern Oregon Northern California Coast Evolutionary Significant Unit of coho salmon ("SONCC coho"), which the Federal government has listed as threatened with extinction under the ESA.  More specifically, according to the Final Recovery Plan for the Southern Oregon/Northern California Coast Evolutionarily Significant Unit of Coho Salmon (Oncorhynchus kisutch), issued by NFMS in 2014 ("NMFS 2014 SONCC Coho Recovery Plan"), the Smith River supports a "functionally independent population" of

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

SONCC coho that faces a "***high risk of extinction***," unless a number of stresses and threats currently facing the fish are ameliorated; threats related to erosion, road runoff and other effects of roads and road building being high on the list of such stresses and threats. In fact, the study concluded that the Smith River population of SONCC coho "is likely below the depensation threshold." In layman's terms, a depensation threshold refers to the tipping point of a population, a situation in which, because of low population numbers, a population is not able to recover and replace individual animals lost from the population. In other words, the Smith River population of SONCC coho is so small that any loss of fish from the population substantially increases the likelihood that the population will collapse and disappear forever.



5.    The Smith River has also been designated as an essential fish habitat ("EFH") for both coho and Chinook salmon under the Magnuson-Stevens Fishery Conservation and Management Act (the "MSA"), 16 U.S.C. §§ 1801 *et seq.*

Gross & Klein LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

6.      In addition to coho and Chinook salmon, the Smith River and its watershed are home to many other animal species listed by the Federal government and/or California State government, including listed cutthroat trout, threatened green sturgeon, threatened eulachon, steelhead trout, and numerous reptiles, amphibians, mammals, and invertebrates.

7.      Further reflecting the invaluableness of the ecology of the Smith River and its environs, in 1990, the Smith River National Recreation Area was established to ensure the protection of the Smith River and the ecological diversity supported by its crystal clear waters and the lush coastal redwood forests along its shores and its surrounding hills.  When Congressman Doug Bosco introduced legislation to establish the recreation area, he referred to the Smith River as "the Crown Jewel of California's Wild and Scenic Rivers."  The U.S. Department of Agriculture and U.S. Department of the Interior designated the river a "key watershed" in the aquatic conservation strategy of their Northwest Forest Plan.

8.      In addition, as Caltrans has only belatedly acknowledged, in its most recent biological assessment and essential fish habitat assessment concerning the Proposed Project's impacts on SONCC coho, green sturgeon, eulachon, and SONCC coho critical habitat, issued on January 27, 2017 (the "2017 BA/EFHA"), the Proposed Project would also affect the ecology of the Rogue River, in Oregon. This river is also home to very important populations of threatened SONCC coho, green sturgeon, and eulachon, as well as the SONCC coho critical habitat and salmon EFH.

9.      The major roadwork that Caltrans seeks to conduct within this pristine, fragile, and irreplaceable ecological context, is part of its larger project to create a network of roads through coastal Northwestern California, along which large trucks, referred to as "STAA trucks," would be given unrestricted access along rural roads from Oregon to the San Francisco Bay ("NW STAA Network").[1]  Specifically, the Proposed Project calls for major roadwork along U.S. Highway 199 ("US 199") and California State Route 197 ("SR 197").  The five locations of

---

[1]  Another part of this project is the Richardson Grove Project, concerning which this Court, in a related action, *Bair et al. v. Caltrans,* No. 10-4360 WHA (N.D. Cal.), invalidated a previous environmental assessment by Caltrans.

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

proposed roadwork along US 199 are within the narrow and windy Smith River Canyon, right above the Smith River. The two locations of proposed roadwork along SR 197 are very near the Smith River's bank, as the river leaves the mountains and expands into its estuary, an area of importance for rearing and spawning of the Smith River's highly vulnerable population of SONCC coho and of profound environmental sensitivity.

10.     In its Environmental Assessment, Section 4(f) Evaluation (the "EA"), and its Finding of No Significant Impact (the "FONSI," collectively with the EA, the "EA/FONSI") for the Proposed Project, Caltrans claims that as a result of the proposed work at these locations, "the safety and operation of US 199 and SR 197 would be enhanced." However, this claim is dubious at best. Indeed, there is a substantial likelihood that the Proposed Project will significantly increase the risk of accidents along SR 197 and US 199, accidents that are likely to cause not only ecological disasters, given the closeness of the highway to the Smith River, but also significant human fatalities.

11.     In fact, Caltrans' true motivation for the Proposed Project is to create an alternate industrial corridor for large STAA trucks traveling between the San Francisco Bay and Oregon, reclassifying SR 197 and US 199, as routes on which large STAA trucks are allowed to pass without restriction, is just one small part of extensive road work that Caltrans is conducting along this envisioned corridor.

12.     However, in order to avoid assessing the environmental impact of its project to build the NW STAA Network, as the single project it is, Caltrans, has artificially separated the project into smaller proposed projects based on geographic segment.

13.     Thus, in the EA/FONSI, Caltrans officially identifies, as the purpose and need for the Proposed Project, facilitation of STAA truck access between Del Norte County and I-5. This is improper not only because it excludes from consideration the environmental impacts of NW STAA Corridor Effort, as a whole, but also because it artificially narrows the range of alternatives that Caltrans considered in the EA/FONSI.

14.     Furthermore, Caltrans admits in its NEPA Re-Evaluation of the Proposed Project (the "Re-Evaluation"), issued on August 17, 2017, that by the time the Proposed Project is

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

complete, other roadwork by it on SR 299 between Eureka and Redding will have opened that road to STAA access, creating an STAA accessible linkage between Crescent City and points on I-5 at Redding and south that is 47 miles shorter than that which would be created by the Proposed Project. Caltrans, however, did not update its statement of purpose and need for the Proposed Project contained in the EA/FONSI, based on this new information. Rather, it continues to rely, as justification for a project that is likely to cause very significant environmental harms, on a four and half year old claim that "[a]lternative access [from Del Norte County] to the interstate highway system is much less direct" than that which would be provided by the Proposed Project, a claim that its Re-Evaluation directly contradicts.

15.    Based on this highly dubious statement of need, Caltrans proposes to create a route for large truck traffic on roads that are wholly inappropriate to be made part of an alternative route for large truck traffic. US 199 hugs the walls of the twisty and steep Smith River Canyon, through which the Smith River flows before turning north towards its estuary above Crescent City.  SR 197 follows the river north as it expands into its estuary, an area where the river widens and its banks are covered in coastal redwood forests. The Project's goal is to make this twisty narrow road above one of the most unique and precious rivers in the U.S. a route for large trucks hauling everything from beer to petroleum, hay, and toxic chemicals, without substantially changing the road's twisty and narrow character.



6

16.    Based on the Proposed Project's setting alone – along one of the crown jewels of the National Wild and Scenic River system, the only undammed river in California, designated critical habitat for a unique population of threatened SONCC coho salmon facing a high risk of extinction, designated essential fish habitat for both coho and Chinook salmon, and a major source of water and recreation for local residents and visitors alike – Caltrans, generally, and NMFS, specifically with reference to the SONCC coho and their critical habitat, as well as green sturgeon, and eulachon, should have taken a close and hard look at the Proposed Project's likely environmental consequences. This hard look was furthermore required by the very substantial risks of severe environmental harm posed by the Proposed Project, and the more specific threats it posed to threatened SONCC coho, their critical habitat, and the essential habitat of coho and Chinook salmon.  It was definitely required as a result of the Smith River's designation as a Wild and Scenic River.

17.    However, neither Caltrans nor NMFS took that required hard look.

18.    Caltrans did not complete an environmental impact statement ("EIS") concerning the Proposed Project, which was required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. given the substantial questions that exist concerning the Proposed Projects impacts on the human environment, but rather only an environmental assessment or "EA."

19.     Even if *arguendo* it was proper for Caltrans to have completed only an EA, rather than an EIS, the EA is woefully inadequate, in multiple ways, both intrinsically, as well as because of Caltrans' failure to have updated the EA based on the events that have occurred since the EA/FONSI was issued over four and half years ago, including further studies conducted by Caltrans.

20.    These same and similar inadequacies exist concerning Caltrans' analysis of the Proposed Project's impacts on the Six River National Forest, and the Rogue River-Siskiyou National Forest, and the Smith River National Recreation Area, which it was required to conduct under Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303 (also codified at 28 U.S. § 138), as well as in Caltrans' analysis of the Proposed Project's impacts on

the Smith River, which it was required to conduct under the Wild and Scenic Rivers Act, 16 U.S.C. §1278.

21.    More specifically concerning the Proposed Project's impacts on the Smith River's listed fish species—especially SONCC coho, but also green sturgeon and eulachon (collectively, the "Subject Fishes")—as well as its impacts on SONCC coho critical habitat and the EFH of coho and Chinook salmon ("Pacific Salmon EFH"), Caltrans and NMFS failed to meet their burdens under the ESA and the MSA.

22.    The burdens that these laws impose reflect the preciousness of species that are threatened with extinction and the impossibility of undoing the impacts of a project that pushes them over the brink. Accordingly, the laws require an even harder look be taken regarding a project's impacts on these species and that an added level of care be taken in this analysis.

23.    Caltrans and NMFS, however, instead engaged in a consultation under the MSA and Section 7 of the ESA that was bungling, haphazard, and internally contradictory.

24.    Accordingly, in a previous action brought concerning this matter, *Souza, et al. v. Caltrans, et al.* ("*Souza*"), No. 13-4407 (JD), Dkt. No. 87, this Court granted a motion by the plaintiffs—who are substantially the same as Plaintiffs in this this action—for a preliminary injunction concerning the Proposed Project (the "*Souza* PI Order"). In doing so, the Court held that collection of documents prepared in 2012 that Caltrans claimed constituted its Biological Assessment for Impacts to Coho Salmon (*Oncorhynchus kisutch*), Designated Critical Habitat, and Essential Fish Habitat Assessment for 197/199 Safe STAA Access Projects (collectively, the "2012 Fish BA/EFHA") were "contradictory and unclear."

25.    In the *Souza* PI Order, the Court noted that Caltrans' biological assessment ("BA") dated February 13, 2012 acknowledged that the work called for at the location designated as "PCN-2" (defined below) "is likely to adversely affect" SONCC coho critical habitat in the area. The document further acknowledged that such work "may affect SONCC coho salmon" and that "since harassment may occur, and this action may have an adverse affect [sic] on these fish, formal consultation with NMFS under Section 7 of the Endangered Species Act of 1973 (Amended) is required." The document, however, elsewhere claimed that the work at PCN-2 "is

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    not likely to adversely affect SONCC coho salmon; but may adversely affect SONCC coho

2    critical habitat."

3         26.    Adding to the confusion, after NMFS responded to Caltrans' February 13, 2012

4    BA with the indication that it believed that informal consultation was adequate, Caltrans, on

5    February 21, 2012, abandoned its previous findings that formal consultation was required and that

6    SONCC coho critical habitat would be adversely affected, without explanation, and requested

7    informal consultation.

8         27.    In a follow-up revised BA and cover letter, issued by Caltrans on March 29, 2012,

9    the internal consistency continued, with Caltrans repeating its findings that the work at PCN-2

10   "may have an adverse affect on [SONCC coho]," that "formal consultation" was therefore

11   required, and that the work at the location "is likely to adversely affect" SONCC coho critical

12   habitat," but then elsewhere requesting *informal* consultation from NFMS and stating that the

13   Proposed Projects "was not likely to adversely affect SONCC coho or coho critical habitat."

14        28.    In response to that March 29, 2012 biological assessment, NMFS issued, on May

15   7, 2012, a "letter of concurrence" (the "2012 LOC"), in which NMFS inexplicably concurred in

16   Caltrans' (non-existent) finding of no likely adverse impact on SONCC coho and their critical

17   habitat, purporting to excuse Caltrans from the obligation to engage in formal consultation with

18   NMFS and purporting to excuse itself from the obligation to prepare a biological opinion.

19        29.    Adding further disorder to the process, following NFMS's issuance of its 2012

20   LOC, in response to Caltrans' March 29, 2012 BA, Caltrans prepared a *further* BA, in August

21   2012, which contained the same contradictory findings.

22        30.    Accordingly, the Court held in the *Souza* PI Order that: "The BAs and the LOC

23   that are before this Court show contradictions and critical gaps in reasoning that give rise to

24   serious questions about whether NMFS has discharged its obligation to rationally identify

25   potential impacts, reasonably explain the basis for its conclusions or concurrence, and evaluate all

26   the relevant factors and evidence." The Court further held that it could not "rubber-stamp a

27   haphazard consultation process."

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

31. The Court further found that there was a likelihood of irreparable harm based on testimony from a Dr. Chris Frissell, a fish scientist and aquatic ecologist, that "it appears likely that the Proposed Project will increase erosion and short - and long - term delivery of sediments into the Middle Fork Smith River, threatening the SONCC coho and its critical habitat," and such "long - term increases in sediment delivery are 'highly likely to occur' and 'highly likely impacts' include reduction of available spawning and rearing habitat, increased egg mortality, reduction in fishes' growth rates, and reduction in fishes' physiological functions, among other things."

32. Subsequent to the *Souza* PI Order, Caltrans reinitiated consultation with NMFS and the parties entered into a stipulated dismissal that preserved the injunction.

33. That consultation resulted in Caltrans' issuance, on January 27, 2017, of the 2017 BA/EFHA, in responses to which NMFS issued a letter of concurrence, on June 28, 2017 (the "2017 LOC"). The respective issuance of these documents, as well as the issuance by Caltrans of the Re-Evaluation and its original issuance of the EA/FONSI, constitute final agency actions by Defendants, and are challenged here by Plaintiffs.

34. Caltrans' 2017 BA/EFHA and NMFS' 2017 LOC contain many of the same shortcomings that affected the 2012 BA/EFHA and the 2012 LOC, and reflect the same unprincipled result-driven approach. As detailed herein and in Plaintiffs' notice of intent to sue, which is attached hereto as Exhibit 1 and incorporated by reference, the 2017 BA/EFHA contains numerous inadequacies and inaccuracies, as well as a brazenly opportunistic disregard of previously gathered empirical evidence. NMFS not only improperly relied on this inadequate and inaccurate 2017 BA/EFHA, as a basis on which to concur in the 2017 BA/EFHA's arbitrary and capricious conclusion that the Proposed Project is not likely to adversely affect the Subject Fishes or SONCC coho critical habitat, it also actively lobbied Caltrans to disregard previously gathered empirical evidence, so as to avoid the obligation to prepare a biological opinion that would have been triggered if this evidence had not been disregarded.

35. Further adding to the illegality of Caltrans' actions challenged here is the fact that in taking such actions it acted in excess of the delegation of authority from the FHWA made pursuant to 23 U.S.C. § 327 and the Memorandum of Understanding (the "Caltrans/FHWA

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

MOU" or the "MOU") between Caltrans and FHWA, by which the FHWA assigned to Caltrans certain of its legal responsibilities concerning the Proposed Project. Section 3.3.2 of the MOU specifically excludes from scope of the allowable assignment of legal responsibilities, review under NEPA, the ESA, and the MSA of "[a]ny project that crosses State boundaries."

36.    Caltrans, in its 2017 BA/EFA, admits that the Proposed Project crosses the California/Oregon State boundary. It states:

> The "action area" includes the entire SR 197 corridor, and US 199 from its junction with SR 197 to its junction with Interstate-5 at Grants Pass, Oregon. This includes all terrestrial and aquatic features within the Smith River and Rogue River basins that may be affected by the proposed action, including but not limited to an increase in truck traffic along SR 197 and US 199.

37.    Accordingly, Caltrans had no authority to analyze the environmental impacts of the Proposed Project, under federal environmental law (including NEPA, the ESA, and the MSA). Rather, that authority remained that of the FHWA, who is correspondingly sued here for its failure to engage in these mandatory actions in regards to the Proposed Project.

38.    Federal law prohibits Defendants from placing at risk the profoundly precious, rare, and irreplaceable natural resources of the Smith River and its surrounding environs in such a haphazard, arbitrary, and capricious way. Accordingly, Plaintiffs hereby challenge: Caltrans' approval of the 197/199 Project, its preparation, adoption and issuance of the EA/FONSI, the Re-Evaluation, and the 2017 BA/EFHA, and its conduct in connection therewith; NMFS' preparation, adoption and issuance of the 2017 LOC and its conduct in connection therewith; and FHWA failure to perform its mandatory obligations to analyze the environmental impact under federal environmental law, including under NEPA, the ESA, and the MSA.

39.    Plaintiffs seek an order by this Court enjoining Caltrans from taking any further action on the 197/199 Project until it, NMFS, and the FHWA meet all applicable legal requirements.  Unless this Court enjoins Caltrans from taking any further action on the 197/199 Project, the wild and scenic Smith River, the plants and animals that depend up on it – including its near extinct population of SONCC coho – and the river's other associated beneficial uses face injury beyond saving.  Absent an immediate injunction, the last truly pristine river in California could be forever damaged.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1    II.    **PARTIES**

2        A.    **Plaintiffs**

3        40.    Plaintiff **FRIENDS OF DEL NORTE** ("Friends") is a non-profit public interest

4    group established in 1973 in Crescent City and Gasquet, California, designed to protect the local

5    environment and educate our citizenry on the benefits of planning for living in a pristine setting.

6    For forty years, Friends has volunteered resources to foster public dialogue about natural

7    resources throughout the region, by attending federal, state, and local meetings and public

8    hearings working to influence elected leaders in planning for a healthy future in Del Norte County

9    and its bioregion.  In part through monitoring local planning issues, Friends' two hundred local

10    and northern California members have tirelessly worked to protect the pristine qualities of the

11    wild and scenic Smith River and its salmon and steelhead fisheries habitat, the scenic corridors of

12    Highways 199 and 101, ancient redwood forests, the Lake Earl Coastal Lagoon, and the wild

13    Pacific coastline.  Friends believes that, without deliberate attention and care, these great natural

14    treasures will be compromised or degraded over time and lost to future generations.  Friends is

15    proud of its record of success in helping to foster the 40,000 acre expansion of Redwood National

16    and State Parks, the 180,000 acre Siskiyou Wilderness Area, the Smith River National Recreation

17    Area in the Six Rivers National Forest, long-term protection of the Point St. George Heritage

18    Area through acquisition by Del Norte County, better management of Lake Earl Coastal Lagoon

19    resulting in higher biodiversity, and participation at the stakeholder level to successfully promote

20    the creation of the Marine Life Protection Act for Del Norte, Humboldt, and Mendocino counties.

21    Over the years, Friends has worked to protect the scenic qualities of our local highways and to

22    plan the Cushing Creek realignment project on Highway 101 to save old growth redwood trees

23    bordering this scenic highway.  Friends will continue to work with federal, state, and local

24    agencies in planning to protect our natural resources.  Friends actively participated in the review

25    and comment process for the 197/199 Project being challenged herein.

26        41.    Plaintiff **ENVIRONMENTAL PROTECTION INFORMATION CENTER**

27    ("EPIC") is a non-profit public interest organization formed to promote environmental values and

28    environmental protection.  EPIC is located in California and has approximately 2,000 members,

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

who live throughout California.  EPIC is beneficially interested in the aesthetic enjoyment and

continued productivity of land, forest, and other water resources, in the preservation of wildlife

and protected species including the Marbled Murrelet, the Northern Spotted Owl, and

anadromous salmonids at self-perpetuating population levels, in protection of old growth

redwoods and Douglas fir, watersheds, and other natural resources and our environment.

Members of EPIC travel throughout California for personal, aesthetic, and recreational pursuits,

including hiking, bird watching, and enjoying California's incredible beauty.  Members of EPIC

regularly visit and enjoy northern California natural resources, including the remarkably beautiful

and majestic wild and scenic Smith River and parks and lands along it and within the Highways

197 and 199 corridors.  EPIC members depend for their livelihood, health, culture, and well-being

on the viability of vegetation and land throughout California.  EPIC's members rely upon water

from throughout California.  Members of EPIC also observe, study, recreate, gather, or otherwise

enjoy the unique biologic, scientific, and aesthetic benefits of the Smith River and Patrick Creek,

and the corridors and lands accessed by Highways 197, 199, and 101.  EPIC members experience

these benefits as important and unique State and public resources.  EPIC fully participated in the

review and comment process for the 197/199 Project in an effort to protect these important

resources.

42.    Plaintiff **CENTER FOR BIOLOGICAL DIVERSITY** ("CBD") is a non-profit,

public interest corporation with more than 42,000 members. CBD has offices in Joshua Tree, San

Francisco, and Los Angeles, California; as well as offices in Arizona, New Mexico, Oregon,

Vermont, and Washington, D.C.  CBD is actively involved in wildlife and habitat protection

issues throughout the United States and has members throughout our country, thousands of whom

reside in California.  CBD's members and staff include individuals with educational, scientific,

spiritual, recreational, and other interests in protection of natural resources, including the Marbled

Murrelet, the Northern Spotted Owl, and protected salmonid species.  CBD's members and staff

enjoy the biological, recreational, and aesthetic values of the public lands and parks, where

protected species such as the Northern Spotted Owl live, and rivers which provide refuge for

protected salmon species such as the coho, Chinook, and steelhead.  CBD's members and staff

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

have participated in efforts to protect and preserve the habitat essential to the continued survival of these species.  CBD brings this action on its own behalf and on behalf of its adversely affected members and staff. CBD fully participated in the review and comment process for the 197/199 Project in an effort to protect these important resources.

43.    Plaintiffs sue on behalf of themselves, and their members and their supporters. Plaintiffs are comprised of residents of the State of California who are united by common interests of law and fact.  Each Plaintiff is an "interested person" in the aesthetic enjoyment and protection of California's public and protected lands, including the wild and scenic Smith River, state and county parks, and fish and wildlife species at self-perpetuating population levels, in the protection of our environment, and in the protection of water and air quality.

44.    Plaintiffs are committed to taking all possible steps to preserve the unique and precious resources which would be impacted by this Project, including the wild and scenic Smith River, the Smith River National Recreation Area, the Smith River's unique and near-extinct population of SONCC coho, the critical habitat of those SONCC coho and the Pacific Salmon EFH of the Smith River. These Plaintiffs and their members are informed and believe the Proposed Project would cause irreparable harm to precious ecological resources provided by the wild and scenic Smith River, including critical habitat for its SONCC coho and other listed species, community water sources, world class sport fishing, and remarkable scenic and aesthetic values.  Moreover, these Plaintiffs and their members are informed and believe the Proposed Project would otherwise adversely impact the quality of human life by taking private property, decreasing existing buffers between highway right-of-ways and adjacent homes and businesses, and increasing the risk of accidents and fatal traffic accidents along US 199 and SR 197, along which many live, work, and/or travel.  Plaintiffs have standing to sue and have exhausted any and all administrative remedies prior to filing this Complaint.  The above-described health, recreational, scientific, cultural, inspirational, educational, aesthetic, and other interests of Plaintiffs will be adversely and irreparably injured by Defendants.  These are actual, concrete injuries to Plaintiffs and their members that would be redressed by the relief sought herein. Plaintiffs have no adequate remedy at law.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1      **B.    Defendants**

2      45.     Defendant **CALIFORNIA DEPARTMENT OF TRANSPORTATION**

3  ("Caltrans") is a public and state agency within the State of California. Caltrans is the lead agency

4  for the 197/199 Project under NEPA and is the action agency under Section 7 of the ESA.

5  Caltrans is using federal funding from the Federal Highway Administration ("FHWA") for the

6  197/199 Project.  Pursuant to the MOU that Caltrans has executed with the FHWA, the FHWA

7  assigned to, and Caltrans assumed the delegation of, certain authorities, pursuant to 23 U.S.C. §

8  327, to provide environmental review, consultation, or other such action pertaining to the review

9  or approval of certain projects as required by federal environmental laws, including NEPA, 42

10  U.S.C. § 4331 *et seq*., Section 7 of the ESA, 16 U.S.C. § 1536, Section 4(f) of the Department of

11  Transportation Act of 1966, codified at 23 U.S.C. § 138 and 49 U.S.C. § 303, Section 7 of the

12  Wild and Scenic Rivers Act, 16 U.S.C. § 1278, and the implementing regulations of these

13  statutes. In purported pursuance to the MOU, Caltrans is the agency which prepared and adopted

14  the EA/FONSI for the Proposed Project under NEPA and Section 4(f) and Re-Evaluated the

15  EA/FONSI under NEPA, and is the agency that prepared and adopted the 2017 BA/EFHA under

16  the ESA and MSA. Caltrans approved the 197/199 Project and adopted the final EA/FONSI on

17  April 10, 2013. Caltrans caused to be published a Federal Register Notice on April 24, 2013,

18  giving notice of its decisions. Subsequently on June 6, 2013, Caltrans issued a Project Report,

19  purporting to be a Project Approval. On August 17, 2017, Caltrans issued its Re-Evaluation of the

20  EA/FONSI, determining that the EA/FONSI remained valid with the additional information

21  contained in the Re-Evaluation. It further determined that no additional public review was

22  warranted under 23 C.F.R. 771.111(h)(3). No Federal Register Notice was published concerning

23  the Re-Evaluation. Caltrans prepared and approved, on January 27, 217, the 2017 BA/EFHA, and

24  provided it to NMFS, on March 30, 2017, in purported compliance with obligation under the

25  MSA and Section 7 of the ESA.

26      46.     Defendant **MALCOLM DOUGHERTY** is the Director of the State of California

27  Department of Transportation.  As Director, Mr. Dougherty is responsible for maintenance and

28  operations of roadways comprising the California state highway system.  Mr. Dougherty is sued

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1   in his official capacity.  References herein to Caltrans shall be understood to including Mr.

2   Dougherty in his official capacity.

3       47.    Defendant **NATIONAL MARINE FISHERIES SERVICES** ("NMFS") is a

4   Federal agency, a division of the National Oceanic and Atmospheric Administration ("NOAA")

5   and the Department of Commerce.  NMFS is responsible for the stewardship and management of

6   the nation's living marine resources and their habitat within the United States' Exclusive

7   Economic Zone, which extends seaward 200 nautical miles from the coastline (about 370

8   kilometers), including the anadromous fish species in their habitats in the rivers and streams of

9   the United States.  In consultation processes under Section 7 of the ESA that concern anadromous

10  fish and/or their river and stream habitats, NMFS occupies the role as the consulting agency.

11  NMFS also is the agency with which other agencies consult concerning impacts to EFH under the

12  MSA.  Accordingly, NFMS was the consulting agency with which Caltrans consulted concerning

13  the Proposed Project's anticipated effects on the Subject Fishes, including SONCC coho, and on

14  SONCC coho critical habitat, under Section 7 of the ESA, and was the consulting agency with

15  which Caltrans consulted concerning the Proposed Project's anticipated effects on Pacific Salmon

16  EFH under the MSA.

17      48.    Defendant **CHRIS OLIVER** is the Assistant Administrator for Fisheries for

18  NOAA. As Assistant Administrator for Fisheries for NOAA, Mr. Rauch oversees the

19  management and conservation of marine fisheries and the protection of marine mammals, sea

20  turtles, and coastal fisheries habitat within the United States exclusive economic zone.  Mr. Rauch

21  is sued in his official capacity.  References herein to NMFS shall be understood to include Mr.

22  Oliver in his official capacity.

23      49.    Defendant the **FEDERAL HIGHWAY ADMINISTRATION** ("FHWA") is a

24  federal agency and a division of the federal Department of Transportation. The FHWA is required

25  to engage in the review and/or consultation, in accordance with federal environmental laws—

26  including without limitation NEPA, Section 4(f) of the Transportation Act, the ESA, and the

27  MSA—of undertakings eligible for financial under title 23 U.S.C. The Proposed Project is such

28  an undertaking.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

50.    Defendant **WALTER C. "BUTCH" WAIDELICH** is the Executive Director of the FHWA. As Executive Director, Mr. Waidelich is responsible for the review and/or consultation, in accordance with federal environmental laws of undertakings eligible for financial under title 23 U.S.C. Mr. Waidelich is sued in his official capacity.  References herein to the FHWA shall be understood to including Mr. Dougherty in his official capacity.

## III.    JURISDICTION

51.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States.  This Court also has jurisdiction to review Caltrans' actions in this case pursuant to 23 U.S.C. § 327(d) and the Caltrans/FHWA MOU.  As stated in the Caltrans/FHWA MOU, Caltrans has consented to and accepted the exclusive jurisdiction of the Federal courts for any matter arising out of or relating to action for compliance, and/or enforcement of any of the responsibilities assigned by the FHWA and assumed by Caltrans, including compliance with the APA, 5 U.S.C. §§ 701 *et. seq.*, NEPA, 42 U.S.C. § 4331 *et seq.*, 16 U.S.C. § 1536, Section 4(f) of the Department of Transportation Act of 1966, codified at 23 U.S.C. § 138 and 49 U.S.C. § 303, Section 7 of the Wild and Scenic Rivers Act, 16 U.S.C. § 1278, and implementing regulations of these statutes.  The State of California has consented to federal jurisdiction and waived any claim of sovereign immunity pursuant to California Streets and Highways Code § 820.1.

52.    NMFS has a duty as a consulting agency to comply with Section 7 of the ESA, 16 U.S.C. § 1536. On June 28, 2017, NMFS took final agency action and issued a letter of concurrence in response to its review of the 2017 BA/EFHA.

53.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201.  Final agency action exists that is subject to this Court's review under the Administrative Procedure Act, 5 U.S.C. § 702 ("APA").  This Court may grant declaratory relief, and additional relief, including an injunction, pursuant to 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. § 705 and § 706(2)(A) & (D).

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

17

IV.    **VENUE**

54.    Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e), because a substantial part of the events or omissions giving rise to the claims at issue in this action occurred in this judicial district.  The 197/199 Project is located within this judicial district.  Plaintiffs reside and have offices in this judicial district and certain of their organizational members reside within this judicial district.

V.    **INTRADISTRICT ASSIGNMENT**

55.    This action substantially arises out of actions planned to be taken in the county of Del Norte. Thus, under Civil L.R. 3-2(d) this action is to be assigned to the San Francisco Division or the Oakland Division.

VI.    **FACTUAL BACKGROUND**

A.    **The Narrow and Windy Smith River Canyon and Heavily Wooded Areas Along US 199 and SR 197**

56.    The Smith River is the most pristine river in California.  It is one of the crown jewels of the National Wild and Scenic River system.  Approximately 300 miles of the Smith River are designated wild and scenic, more than any other river in our nation.  The emerald-green Smith River flows freely and naturally, without a single dam, for its entire length – the only major river system in California to do so.  The Smith River is characterized by exceptionally clear water, a vigorous anadromous fishery, and steep, forested mountains, themselves home to numerous species.  The Smith River has, in particular, been designated as "Critical Habitat" under the ESA for SONCC coho and as "Essential Fish Habitat" for both coho and Chinook salmon under the MSA.  These features make the Smith River profoundly important to both animals and humans.

1.    **The Smith River, Its Tributaries, and Their Environs Are an Extremely Important, Fragile, and Rare Habitat for Numerous Listed Species**

57.    The Smith River, its tributaries, and their environs are home to numerous fishes, birds, amphibians, reptiles, invertebrates, and mammals many of which are listed by the Federal and/or California State governments as endangered, threatened, or of concern ("Special Status Animals").

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

58.    Looking only at the "Biological Study Area" or "BSA," an area defined by Caltrans in relation to the Proposed Project in the EA/FONSI that includes only "the Middle Fork and Main Stem of the Smith River within the project vicinity," the EA/FONSI, identifies over 20 Special Status Animals in the path of the Proposed Project.

59.    As a result of Caltrans' belated recognition that the scope of the Proposed Project extends across the California/Oregon border and into the additional environmentally sensitive area of the Rogue River Basin, as well as because of the change of status of several species that has occurred in the seven plus years since preparation of the Natural Environmental Study ("NES") on which the EA/FONSI was based, the Re-Evaluation additionally identifies four such animals as present.

**Special Status Animals Identified by Caltrans as in the Path of the Proposed Project**

| FISH | BIRDS | MAMMALS | AMPHIBIANS/ REPTILES | INVERTEBRATES |
|---|---|---|---|---|
| • Coho salmon—S. OR/N. CA Coast ESU<br>• Coastal cutthroat trout<br>• Chinook salmon— S. OR & N. CA Coastal ESU[2]<br>• Green sturgeon<br>• Pacific lamprey | • Bald eagle<br>• American peregrine falcon<br>• Northern goshawk<br>• Osprey<br>• Marbled murrelet<br>• Northern spotted owl<br>• Yellow billed cuckoo – western DPS<br>• Little willow flycatcher | • Pacific fisher<br>• American marten<br>• Humboldt marten<br>• Silver-haired bat<br>• Sonoma tree vole | • Del Norte salamander<br>• Western tailed frog<br>• Western pond turtle<br>• Northern red-legged frog<br>• Foothill yellow-legged frog<br>• Southern torrent salamander | • Pristine pyrg (snail) |

60.    The Smith River, Rogue River and their tributaries contain wild coho that are part of the Southern Oregon Northern California Coast Evolutionary Significant Unit ("SONC") ESU.

---

[2]  The abbreviation "ESU" stands for "evolutionarily significant units."  It is a term for a population of organisms that is considered distinct for purposes of conservation, including special status designations under the Federal and California Endangered Species Acts.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

50 C.F.R. § 223.102(c)(11). On May 6, 1997, NMFS listed coho in the SONCC ESU as threatened with extinction under the ESA. 62 Fed. Reg. 24,588 (May 6, 1997); *see also* 70 Fed. Reg. 37,160 (June 28, 2005). On May 5, 1999, NMFS designated critical habitat for the SONCC coho ESU. 64 Fed. Reg. 24,049 (May 5, 1999). Critical habitat for the SONCC coho ESU includes the Smith River, the Rogue River and their tributaries below longstanding, naturally impassable barriers. 50 C.F.R. § 226.210(b).

61.     For each of these Special Status Animals, the Smith River and Rogue River Basins are an important habitat, and each depends, in particular, on the rivers' phenomenal water quality for their health and survival.

**2.      The Smith River and Rogue River Are "Critical Habitat" for Unique Populations of Threatened SONCC Coho Facing A "High Risk of Extinction"**

62.     The Smith River and Rogue River are particularly recognized as a key habitat for protected anadromous fishes, including the threatened coho and Chinook salmon, listed cutthroat trout, as well as steelhead trout. This is reflected in the fact that the Smith River and Rogue River are not only designated as "Critical Habitat" for threatened coho salmon under the ESA, but also and "Essential Fish Habitat" for both Chinook and coho salmon under the MSA. Furthermore, according to a recent NMFS study, the functionally independent population of SONCC coho salmon in the Smith River and the potentially independent population in the Rogue River are both facing a "high risk of extinction" and are likely already below the depensation threshold.

63.     ESA § 3(5)(A), 16 U.S.C. § 1532(5)(A), in its relevant section defines "critical habitat" of a threatened or endangered species as "(i) the specific areas within the geographical area occupied by the species . . . on which are found those ***physical or biological features (I) essential to the conservation of the species*** and (II) which may require special management considerations or protection . . . " (emphasis added). "Conservation" in this context means both survival of the threatened or endangered species as well as its recovery.

64.     In 1999, NMFS designated areas including the Smith River and Rogue River basin, particularly areas in the action area of the Proposed Project, as critical habit for the SONCC coho. 64 Fed. Reg. 24049; 16 C.F.R. §§ 226.210-226.211.

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

65.    In doing so, the "primary constituent elements" or "PCEs" of this habitat that are "essential for the conservation of" SONCC coho in their various life states were defined, in 16 C.F.R. § 226.211(c), as follows:

a.    Freshwater spawning sites with water quantity and quality conditions and substrate supporting spawning, incubation, and larval development;

b.    Freshwater rearing sites with:

i.    Water quantity and floodplain connectivity to form and maintain physical habitat conditions and support juvenile growth and mobility;

ii.    Water quality and forage supporting juvenile development; and

iii.    Natural cover such as shade, submerged and overhanging large wood, log jams and beaver dams, aquatic vegetation, large rocks and boulders, side channels, and undercut banks.

c.    Freshwater migration corridors free of obstruction and excessive predation with water quantity and quality conditions and natural cover such as submerged and overhanging large wood, aquatic vegetation, large rocks and boulders, side channels, and undercut banks supporting juvenile and adult mobility and survival.

d.    Estuarine areas free of obstruction and excessive predation with:

i.    Water quality, water quantity, and salinity conditions supporting juvenile and adult physiological transitions between fresh- and saltwater;

ii.    Natural cover such as submerged and overhanging large wood, aquatic vegetation, large rocks and boulders, and side channels; and

iii.    Juvenile and adult forage, including aquatic invertebrates and fishes, supporting growth and maturation.

66.    A species qualifies as "threatened" if it is "likely to become an endangered species within the foreseeable future through all or a significant portion of its range."  16 U.S.C. §

COMPLAINT

1532(20).  The SONCC coho that inhabit the Smith River are recognized as a functionally distinct population and those that inhabit the Lower Rogue River are recognized as potentially functionally independent. Both populations are at a far greater risk of extinction than even this "threatened" listing for the ESU, generally, would indicate.

67.    According to the NMFS 2014 Final SONCC Coho Recovery Plan, recent spawn surveys "suggest that the total population size [of Coho salmon] for the Smith River basin may be less than the moderate-risk threshold for this population and at a level that puts it at ***<u>high risk of extinction</u>***." (emphasis added). More specifically, the Smith River's population is likely already below its depensation threshold of 325 spawners. Below this threshold, as a result "of extremely low population sizes[,] . . . the survival and production of eggs or offspring will suffer because it may be difficult for spawners to find mates or predation pressure is likely to be significant. This situation accelerates a decline towards extinction." For the Smith River SONCC coho population to be termed "recovered," i.e. to face a "low risk of extinction", annual spawner numbers must rise to approximately 6800. In other words, the population would need to increase by 20 times.

68.    According the NOAA ESA Listing Criteria Memo, "depensation" refers to phenomenon wherein certain factors "tend to *decrease* population growth rates at low levels of abundance." (Emphasis added).  It continues:

> For example, it can be more difficult for individuals to find mates at low levels of abundance. The gene pool tends to be smaller at low levels of abundance, which can result in a loss of average fitness. Also, at low levels of abundance, a species is likely to be composed of one or only a few populations, making the species more vulnerable to catastrophic events such as floods or droughts. When depensatory factors prevail, even with the elimination of anthropogenic factors, ***<u>the species tends toward extinction</u>***. The abundance level below which depensatory factors prevail is called the depensatory threshold (in cases where there is no abundance level below which depensatory factors prevail, the depensatory threshold is zero).

(Emphasis added).

69.    The NMFS 2014 Final SONCC Coho Recovery Plan presents a similarly gloomy picture of the statue of the SONCC coho population in the Lower Rogue River. It states that the "population is at high risk of extinction" and identifies it as below its depensation threshold, as well.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

70.    The significance of any threat to the survival of the Smith River SONCC coho population is increased by both its isolation from other populations that might otherwise contribute individuals to the population and the importance of the Smith River population to the survival of the ESU, as a whole.

71.    According to the NMFS 2014 Final SONCC Coho Recovery Plan, the Smith River SONCC coho salmon population is a "'Functionally Independent' population within the Central Coastal diversity stratum; historically having had a high likelihood of persisting in isolation over 100-year time scales, and with population dynamics or extinction risk over a 100-year time period that are not substantially altered by exchanges of individuals with other populations." In other words, SONCC coho from other watersheds do not migrate into the Smith River watershed in any numbers that are likely to make such migrants a potential source of support for population growth.

72.    On the other hand, the Smith River SONCC coho population is extremely important for the survival of the ESU as whole both because the Smith River is the largest watershed in the Central Coastal stratum and because, historically, the Smith River SONCC coho population has been a very important source of migrants that support populations of SONCC coho in other watershed. For this and other reasons, including the role the population plays in maintaining "stratum and ESU viability," NMFS has designated it as a "core" population.

73.    The NMFS 2014 Final SONCC Coho Recovery Plan identifies **impaired water quality** as the only "stress" ranked as "high" for Smith River's SONCC coho salmon population, overall, and specifically during four of the coho's five life stages identified by the Plan:  fry, juvenile, smolt, and adult. And the Plan lists impaired water quality as a "very high" stress for the Lower Rogue River's SONCC coho population, overall, and at three coho life stages, specifically: fry, juvenile, and smolt.

74.    The Plan identifies **road runoff** as a source of such impaired water quality. Indeed, roads have the dubious distinction of being a "high" "threat" for the Smith River's SONCC coho population, overall, and for all five of the life stages the salmon, specifically. And the Plan identifies roads as a "very high" threat to the Lower Rogue River SONCC coho

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

population, overall, and for three of its life stages, specifically, the only threat to achieve that ranking. In fact, the Plan identifies roads as "a critical threat to most coho salmon life history phases in the Lower Rogue River sub-basin."

75. Specifically as to US 199, a previous draft of the Plan states:

The proximity of Highway 199 to stream channels beyond the urban center has also resulted in substantial sediment deposits, which are attributed to causing some of the reaches to go dry in the summer and potential passage problems in other times of the year. Erosion and the associated sediment delivery to streams affect multiple life stages, including the egg life stage, because fine sediment can smother eggs. Fry, juveniles and adults are adversely affected by road-related sedimentation due to the decreases in pool quality and quantity and the simplification of spawning and rearing habitat. When sediment builds up, the channel widens and becomes shallower, pools fill, and gravel is buried, making streams less favorable for spawning and rearing.

76. The Final Plan does not explain why NMFS removed this language form that version.

77. Elsewhere the Recovery Plan states: "Excluding the coastal plain, 90 percent of the basin has high or extreme erosion potential (CDFG 1980), as evidenced by the high number of landslides and debris torrents found throughout the watershed." Sedimentation related to these geomorphologic factors creates problems in the river, particularly in its estuary, with the following results: "pools are filled, gravels cemented, and stream habitat simplified, creating stress for both adults and juveniles through decreases in available spawning and rearing habitat. Salmon eggs and fry are particularly susceptible to any introduction of fine sediment because it can smother redds [salmon nests] and kill eggs by depriving them of oxygen."

78. More generally, According to other recent NOAA studies: ***Road runoff from highways appears to contain one*** or more unidentified compounds shown to be highly toxic to coho salmon and perhaps other salmon as well. Researchers at NOAA's Northwest Fisheries Science Center determined that such compounds in road runoff are the cause of "pre-spawn mortality," the die-off of female spawners before they can lay their eggs. The study found, in fact, that in some streams 90% of female spawners were dying in streams after a rainfall. Other

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

studies have shown that 65% of coho embryos[3] exposed to this toxic stormwater had severe physical abnormalities, such as malformed fins, bleeding on the brain, and swelling around the heart. Such malformed fish typically die at an early age.

79.    Studies have identified road runoff as a major source of "polycyclic aromatic hydrocarbons" or "PAHs" (also referred to as "polyaromatic compounds" or "PACs") in the environment, especially water bodies in vicinity of highways and roads, as a result *inter alia* of exhaust from the combustion of fossil fuels, leaching from the road surface materials (particularly asphalt), oil and fuel spills (small and large), and tire wear.

80.    Roads pose another problem to the survival of the Smith River's and Lower Rogue River's extremely vulnerable coho salmon populations:  road-stream crossing barriers create what the NMFS 2014 Final SONCC Coho Recovery Plan describes as a "high threat to the population" of the Smith River. The Plan identifies the Upper Smith River basin as the location where most road-stream crossing barriers exist, including 6 locations on SR 197 and another 6 on US 199.

81.    While SONCC coho are known to inhabit areas throughout the Smith River and Lower Rogue, including areas of the rivers throughout the identified action area, and despite the fact that the likely results of the Proposed Project are of the type known to have adverse impacts on SONCC coho and their habitat, Caltrans arbitrarily and capriciously only conducted a survey for SONCC coho in the vicinity of one location in the action area, the Patrick Creek Narrows Location No. 2.

82.    That snorkel survey conducted by Caltrans in July 2010 found hundreds of juvenile SONCC coho present in one area of the Smith River where the Proposed Project calls for work to occur. However, remarkably, in a transparently opportunistic effort to avoid the additional scrutiny under the ESA, NEPA, and the MSA that this empirical evidence mandates, in

---

[3]  Coho embryos are also referred to as "alevin."  The alevin stage is the next stage in the salmon's life after the egg stage.  The alevin is a newly hatched salmon.  It has a big yolk sac hanging from its head.  In this yolk sac there are protein, vitamins, minerals, and sugars that give the salmon its nutrients.

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

its 2017 BA/EFHA, Caltrans has chosen to disregard this evidence based on circumstantial evidence, but without conducting any further snorkel survey.

83.    Indeed, no other snorkel surveys on the Smith River or in the Lower Rouge River were conducted as part of Caltrans or NFMS as part of its analysis of the project's impacts. This is despite the fact that just downstream from two of the other locations where roadwork will be done are the significant spawning grounds of the Smith River population of SONCC coho, and that other areas of both rivers that are within the action area—including in the vicinity of other work zones where extensive excavation of steep hillsides and tree removals will occur are very important locations for SONCC coho at various life-stages, especially the juvenile stage.

84.    The Project is likely to result in an adverse modification of this critical habitat and the SONCC coho that depend upon it for their survival by *inter alia* causing short-term and long-term increases of sedimentation of the Smith River, causing short-term and long-term increases of PAH-laden and/or otherwise toxic road runoff into the Smith River and Lower Rogue River, and causing long-term increases of toxic spills into the Smith River and Lower Rogue River that are traffic accident related.  Caltrans arbitrarily and capriciously failed to analyze these and other direct and indirect impacts on the Smith River and Lower Rogue River populations of SONCC coho or the fish's critical habitat in the rivers and the Smith River's estuary, either individually or cumulatively with the other threats and stresses facing these highly threatened populations of SONCC coho, including without limitation those identified in the NMFS 2014 Final SONCC Coho Recovery Plan or those identified in the report discussed herein.

**3.    The Smith River and  Is Designated as "Essential Fish Habitat" for Coho and Chinook Salmon Under the MSA**

85.    The Smith River and Rogue River, including areas within the action area of the Proposed Project has also been designated as "Essential Fish Habitat" for coho and Chinook salmon under the MSA since 2000 ("Pacific Salmon EFH").

86.    The MSA, 16 U.S.C. § 1802(10), defines "Essential Fish Habitat" or "EFH" as "those waters and substrate necessary to fish for spawning, breeding, feeding or growth to

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

maturity." The MSA requires regional fishery management councils to include within their

fishery management plans identification of habitats that meet this definition.

87.    According to the 1999 document in which the Pacific Fishery Management

Council's ("PFMC") decision to designate the Smith River and Lower Rogue River as EFH for

coho and Chinook salmon ("1999 PFMC Salmon EFH Report"), the following criteria was used

in reaching this decision: "EFH for the Pacific coast salmon fishery means those waters and

substrate necessary for salmon production needed to support a long-term sustainable salmon

fishery and salmon contributions to a healthy ecosystem."

88.    The PFMC, in the 1999 PFMC Salmon EFH Report, further made clear that "[a]ny

reasonable attempt to encourage the conservation of EFH must take into account actions that

occur outside of EFH, such as upstream and upslope activities that may have an adverse effect on

EFH." It further identified "habitat alterations" among "major contributors to the decline of

salmon in the region." In fact, the PFMC recognized that, in comparison with efforts to reducing

ocean fishing pressure, preservation and conservation of salmon habitat, including the Smith

River and Lower Rogue River, is of primary importance in protecting coho and Chinook salmon

stocks, noting *inter alia* "[o]cean survival by adults, for example, is of little value if appropriate

tributary habitat is not available for spawning and early life history survival of offspring." The

PFMC further specifically identified the importance of preserving the health of undammed coho

and Chinook habitat, including the Smith River, given the pervasiveness of dams in other

watersheds identified as Pacific Salmon EFH and the detrimental role dams have had in reducing

salmon populations.

89.    The 1999 PFMC Salmon EFH Report furthermore identified several other sources

of impact to salmon, including (a) compaction of soils and the creation of impervious surfaces as

the result of road building; (b) road run-off and vehicle fuel spills; (c) removal/alteration of

riparian vegetation as the result of road building; (d) alteration of amounts or rates of woody

debris input as the result of road building; (e) decrease/increase in sediment delivery as the result

of road building; and (f) streambank or shoreline alteration.

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

90.     The 1999 PFMC Salmon EFH Report identified *inter alia* the following impacts on coho and Chinook salmon associated with habitat alterations that result from road building:

- Alteration of water quality related to increased water temperature;
- Alteration of water quality related to decreased water temperature;
- Alteration of water quality related to dissolved oxygen changes;
- Alteration of water quality related to nutrient changes;
- Alteration of water quality related to sedimentation caused by either surface erosion and/or mass failures/landslides;
- Alteration of stream habitat related to changes in substrate;
- Alteration of stream habitat related to changes in pool frequency and quality;
- Alteration of stream habitat related to changes in off-channel habitat;
- Loss of production of "large wood" from alteration of riparian forests;
- Loss of "production of food organisms and organic matter" from alteration of riparian forests;
- Loss of "shading" from alteration of riparian forests;
- Loss of "vegetative rooting systems and streambank integrity" from alteration of riparian forests;
- Chemical contamination; and
- Chemical contamination inside of an estuary."

91.     As discussed herein, the Proposed Project is likely to result in alterations of Pacific Salmon EFH in the Smith River and Rogue River, including as identified in the 1999 PFMC Salmon EFH Report. However, Caltrans failed to adequately evaluate and address these alterations or any conservation mechanisms to be taken in relation thereto.

### 4.   The Health and Scenic Character of the Smith River and Rogue River Is Also Very Important to the Residents of the Area and Its Visitors

92.     In addition to providing critical and essential habitat for various animals, including, in particular, anadromous fishes, the health of the Smith River and that of the Rogue

COMPLAINT

River are also fundamentally important to the human residents of the neighboring areas and their visitors.

### a.    The Smith River and Its Vicinity

93.    The Smith River is the domestic drinking water supply for the community of Crescent City.  Because of its purity, the Smith River needs little processing other than percolation through the river's sand bank.  Gasquet, Hiouchi, and other towns along the Smith River also completely rely on its ultra-pure water.

94.    The Smith River's natural fishery is one of its greatest assets, with more than 175 miles of anadromous fish habitat.  The Smith River has exceptional runs of salmon and steelhead, beginning in late October until late April or May, which attract anglers from around the world.

95.    The fishing is not easy, but rewards are great.  Thus, the Smith River is the prized destination of anglers, boaters, and others seeking to enjoy its natural beauty.  The Smith River's unique position makes it a freshwater enthusiast's Mecca.  As the longest undammed river system in California and a major spawning area for up-swimming fish, a fisherman looking to land a world-class salmon or steelhead travels to the Smith River.  The state's largest recorded Chinook salmon was caught in the Smith River, along with the second biggest steelhead.  Kayakers find rapids from Class I to V and compete in world-class competitions.  For those who do not want to haul a boat or pole around, they can swim or snorkel in one of the river's turquoise pools.

96.    The Smith River Scenic Byway is one segment of the National Scenic Byways program.  The majority of the Byway follows the Middle Fork of the Smith River.  The Smith River National Scenic Byway along Highway 199 passes through four miles of impressive redwood forests, winds 27 miles along the Middle Fork of the awesome river for which it is named, and then continues into the State of Oregon.  The Byway presents spectacular views of rugged canyons, turbulent rapids, and the confluence of the South and Middle Forks of the Smith River, as well as historic and picturesque recreation sites such as Patrick Creek Campground.  Together with several other roadways, US 199 is part of the "Mystic Corridor" connecting Crater Lake National Park in Oregon to the redwoods and the California coast near Crescent City.

97.     The Smith River along US 199 is part of the Smith River National Recreation Area, established in 1990 as the "heart" of one of the largest wild and scenic rivers in the United States, to ensure the preservation, protection, enhancement, and interpretation of the Smith River's wild and scenic river, ecological diversity, and recreation opportunities.  As the largest single undammed Wild and Scenic River system in the United States, the Smith River National Recreation Area plays a major role in preserving the quality and quantity of freshwater fisheries habitat.  Management emphasis for the Middle Fork of the Smith River along US 199 is on maintaining wildlife values and providing a full range of recreation uses, with particular emphasis on the scenic and recreation values associated with the Smith River, old growth redwoods, and US 199.

98.     US 199 follows the course of the Middle Fork of the Smith River.  The Smith River canyon along US 199 is narrow, steep, and windy, covered in many places by sheer rock or forest.  US 199 clings to the Smith River canyon's sides with numerous sharp and blind corners, with turn-outs used by visitors.  Between the small rural communities of Hiouchi and Gasquet, US 199 winds precariously above the Smith River, with narrow curves and traffic lanes.  Just past the southern confluence of the Middle and South Forks, the Smith River leaves the National Recreation area and flows through Redwood National and State Parks, along SR 197, offering stunning view of giant redwoods and great summer floating in Class 1 and 2 waters.  SR 197 follows the main stem of the Smith River to the junction with Highway 101 north of Crescent City.

99.     SR 197, which is also known as North Bank Road, threads through an area blanketed by large old growth redwoods, and Douglas firs, along the Smith River's Main Fork as the river widens into its estuary.  SR 197 is only 7 miles long, beginning with an intersection at US 199 in Jedediah Smith Redwoods State Park.  Moving northward, the road quickly exits the park, roughly paralleling the Smith River located to the west side of the road.  The road then follows the river northward and then northwestward, with several local roads meeting SR 197 in the evergreen forest area.  There are more than 70 private driveways which enter SR 197. The road meets its northern terminus at U.S. Route 101 just south of the Oregon border.

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

100.    SR 197 borders the beautiful and popular Ruby Van Deventer County Park, located on the Smith River and just downstream from an important and popular fishing area.  It provides exceptional recreational and camping opportunities, and is relied on during fishing season as a prime location for boat trailer parking and drift boat take-out.  A sign advises those exiting the Park to SR 197 to "use extreme caution entering highway."

### b.    The Rogue River and Its Vicinity

101.    The Rogue River is one of the first eight rivers to be designated as National Wild and Scenic Rivers as part of the original National Wild and Scenic Rivers Act.

102.    The river has supported human populations for at least 8,500 years. The river is known to renowned for its cleanliness and biodiversity, flowing largely through forests.

103.    The river has been described as containing "extremely high-quality salmonid habitat and has one of the finest salmonid fisheries in the west." Salmonids that inhabit the river include not only SONCC coho, but also Chinook salmon, steelhead, cutthroat trout, pacific lamprey, green sturgeon, and white sturgeon.

104.    The river is a popular location for white water boating and sport fishing, and supplies drinking water for many people, including the population of Grants Pass, a city of approximately 35,000, through which Highway 199 passes on its way over the Rogue River and on to I-5.

### B.    The Proposed Project Will Involve Extensive Construction, Endangering the Smith River, the SONCC Coho, and the Other Fish and Animals It Supports

105.    Caltrans proposes extensive construction activities at seven locations along the Smith River – two locations on SR 197 very near the edge of the Smith River estuary, a recognized area of rearing and spawning by the SONCC coho, and five locations on US 199 in the Smith River Canyon – solely for the purpose of permitting large STAA trucks to access these routes.  So-called "STAA trucks" are truck-and-trailer combinations that are longer than the "California legal" truck-and-trailer combination. Caltrans used a computer modeling software program called "Autoturn" to determine which locations needed to be addressed to permit STAA

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

access.  Autoturn was also used to determine approval of "exceptions to mandatory design standards," which constitute Caltrans' decision to deviate from standards for minimum curve radius, minimum paved shoulder width, horizontal clearance requirements to a fixed object, minimum stopping horizontal and vertical sight distances, and superelevation limits, as prescribed by Caltrans' Highway Design Manual.

106.    The work called for by the Proposed Project is extensive and destructive to the natural environment; however, even if done, neither US 199 nor SR 197 would be safe as a major trucking route for these large trucks.  Indeed, the Proposed Project's plans are rife with these "exceptions to mandatory design standards."

107.    While Caltrans has improperly analyzed the impacts of the work at each of these locations at which it proposes to do work, separately, it has stated that if the work at any one of these locations cannot move forward, the entire project likely cannot proceed. In other words, the work at the various locations are successive, interdependent steps that make up the Proposed Project as a whole; thus, there impacts must be analyzed as whole in making the determinations required under NEPA, the ESA, and the MSA.  However, Caltrans failed to do this analysis.  In fact, while the descriptions of proposed work at each of location contain non-exhaustive descriptions of the impacts that various components of the work would have a particular location, the EA/FONSI does not discuss any of these impacts flowing from any of the work at each, except in the context of the work called for at the Patrick Creek Narrows No. 2 location. Rather, Caltrans erroneously determined that, because the work at these other locations would not involve in-stream work, the work at these locations would have no impact on SONCC coho, their habitat, or the habitat of Chinook habitat and/or other animals, without analyzing any of these other sources of impacts either individually, in combination with the impacts of other components of the Proposed Project as a whole, or cumulatively with other human activities.  In fact, all of the construction and demolition work called for in connection with the Proposed Project, separately, collectively, and cumulatively with other human activity, would result in both short and long-terms impacts on the Smith River, the Lower Rogue River, and the organisms on which it depends, including, without limitation sedimentation impacts and PAH-laden and/or otherwise

Gross & Klein LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

COMPLAINT

1  toxic road runoff impacts.  These impacts pose a significant and real risk of pushing the Smith

2  River's and Rogue River's unique populations of threatened SONCC coho over the edge to

3  extinction.

4      **C.    Caltrans' Project To Create a Large Truck Network Throughout Northern California**

5

6      108.    While Caltrans chose to analyze the environmental impact of the Proposed Project

7  as separate free-standing project – and, in practice, actually analyzed the impact of the work at

8  each of the seven locations at which roadwork would occur separately from one another in

9  contravention of legal requirements – the Proposed Project is actually part of a larger effort being

10 pursued by Caltrans to establish an STAA truck network throughout Northwestern California, of

11 which The 197/199 Project is but one of several components being implemented and/or pursued

12 ("NW California STAA Network"). Creation of this NW California STAA Network would pose

13 the likelihood of increased STAA truck traffic on rural Northwestern California routes, including

14 US 199 and SR 197.

15     109.    Indeed, while Caltrans in its EA/FONSI denied that the Proposed Project would

16 result in any increased traffic, it now admits, in the 2017 BA/EFA, that it will likely result in

17 increased truck traffic, especially during the winter months when I-5 is closed at Grants Pass.

18     110.    Caltrans is seeking to create this network by attempting a series of "fixes" along

19 Routes 101, 299, and 197/199.  Caltrans made changes near Big Lagoon, in Humboldt County,

20 which enabled the STAA designation of Route 101 between Eureka and Crescent City.  Caltrans

21 is near completion of changes on Route 299, which links Redding at Interstate 5 in Northern

22 California, to Arcata at Route 101.  These changes would enable STAA access to and from

23 Interstate 5 in Northern California.  Caltrans attempted a proposed project in Richardson Grove

24 State Park on Route 101 near the Humboldt/Mendocino county line.  The Richardson Grove

25 project proposed, among other things, cutting the roots of ancient redwood trees within the state

26 park.  The Richardson Grove project was previously stopped by federal court litigation for failure

27 to provide adequate NEPA review, and California State Court litigation for failure to provide an

28 adequate review under the California Environmental Quality Act.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

111.    If Caltrans is permitted to continue developing its NW California STAA Network, in a piecemeal fashion, the effort would pose significant and unexamined cumulative effects. These cumulative effects would include an increase of large truck traffic throughout Northwestern California, on roadways that often pass through the middle of small communities like Hiouchi and Gasquet and which are not entirely safe for these vehicles in conjunction with other traffic, as well as rural areas of Oregon along highway 199. Given the amazing natural beauty and relatively unspoiled quality of Northwestern California and rural Oregon, much of this proposed NW California STAA Network would all pass through irreplaceable environmentally sensitive areas like the Smith River Canyon, Richardson Grove State Park, and the Rogue River basin, which are wholly inappropriate locations through which to run major arteries for freight. The cumulative impacts of the proposed NW California STAA Network on the health, safety, and welfare of the people of Northwestern California and its other environmental impacts are not examined in the EA/FONSI of the 197/199 Project or in any other analogous document examining the environmental impacts of the NM California STAA Network as a whole.

112.    In the vicinity of the 197/199 Project, creation of the NW California STAA Network, including opening SR 197 and US 199 to STAA truck traffic, would result in an increase in truck traffic down US 199 through the Smith River Canyon and SR 197 toward the Smith River Estuary. This increased truck traffic would occur, in particular, during the winter, when river waters are highest, when salmon spawning and hatching activity is greatest, and when rains in the area are heaviest.

113.    Specifically, a NW California STAA Network that, through US 199, linked Interstate 5, north of the California border, with the San Francisco Bay Area to the south would effectively reroute trucks seeking to avoid winter storms and chain restrictions from inland Interstate 5 to this coastal route.  Truckers on Interstate 5 are often required during winter months to chain their trucks and trailers due to snow or to stop from passing until conditions improve. Such a delay can happen as many as seven different times on a trip from the middle of Oregon to the middle of California. In particular, trucks are frequently prevented from going over the

Siskiyou Summit near the Oregon/California border – the highest point on Interstate 5 and approximately 50 miles southeast from the intersection of US 199 and Interstate 5.

114.    The Proposed Project would create a new STAA bypass through the Rogue River Valley down the Smith River Canyon on US 199/SR 197 to US 101.  All told, the bypass would be only 44 miles longer than the 420 mile trip using Interstate 5 from Grants Pass to San Francisco. In light of the many hours that can be lost by truckers dealing with closures and chain-up requirements at the Siskiyou Summit and other locations along Interstate 5, the proposed change in status of US 199/SR 197, combined with the opening of an STAA route from Crescent City to San Francisco, would add a viable and likely choice for truckers seeking to avoid chaining, closures, and snowy conditions.  This change would result in increased amounts of truck traffic on US 199/SR 197 during the winter when rains are heaviest, the rains providing an increased medium for transmission of PAH-laden and/or otherwise toxic road runoff in the Smith River and an increased risk of accidents – and attendant impacts – as the result of decreased visibility and road traction.

115.    The winter is also the period during which there are the highest numbers of spawning and recently hatched threatened SONCC coho and Chinook salmon or alevin in the Smith River and Rogue River.  These literally are the futures of these fish populations, which, in the case of the SONCC coho population of the Smith River, is facing a high risk of extinction.

116.    The combination of these factors substantially increases the Proposed Project's probable impact on SONCC coho and Chinook salmon, other fish species, the critical habit of SONCC coho, and the Pacific Salmon EFH.  These impacts would include *inter alia* an increased likelihood of contact between spawning salmon, alevins, and other fish and PAH-laden and/or otherwise toxic road runoff, which are known to be particularly toxic to spawning coho and recently hatched fish.  It would also increase the likelihood of contact between spawning salmon, alevins, and other fish and toxic spills from accidents involving large trucks on SR 197/US 199, including motor fuel spills, which contain high levels of PAHs.  According to the NMFS 2014 Final SONCC Coho Recovery Plan, impaired water quality resulting from roads in the Smith River Basin presents a high risk to survival of Smith River SONCC coho population and a very

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    high risk to survival of the Lower Rogue River SONCC coho population. And it identifies

2    reducing pollutants in the Smith River watershed as among among the recovery actions

3    recommended by the Plan.  Neither the EA/FONSI nor the 2017 BA/EFHA adequately analyze

4    these impacts or the incompatibility of these impacts with the NMFS 2014 Final SONCC Coho

5    Recovery Plan's strategy for saving the Smith River's and Lower Rogue River's unique

6    population of SONCC coho from extinction.

7           **D.    The 197/199 Project's Other Impacts upon the Environment**

8           117.    In addition to the foregoing described environmental impacts, the Proposed Project

9    would also have other impacts on the human environment, including without limitation the

10   following:

11          118.    The Smith River provides unique and remarkable fishing and recreational

12   opportunities.  The Project would impact fishing at various locations, including at Ruby Van

13   Deventer County Park on Highway 197, at Patrick's Creek Narrows # 1, PM 20.5 where two

14   prime recorded fishing holes are located just 50 and 100 yards downstream, and just above the

15   Narrows Project at a popular frequently used fishing spot.

16          119.    More generally, the Proposed Project's impact on water quality and its deleterious

17   impacts to fish, some of which are described elsewhere herein, would impact fishing

18   opportunities in the Smith River and Lower Rogue River.  For example, spills of chemical, fuels,

19   oil, or any number of other things on this roadway could be deadly to fish spawning in the Smith

20   River and their offspring, and the increase in truck traffic increases the incidence of these

21   accidents.  Furthermore, increases in PAH-laden and/or otherwise toxic road runoff would have

22   similar deadly effects on spawning fish and their offspring, as would various other impacts of the

23   Proposed Project including increased sedimentation, changes in water flow, changes in shading,

24   changes in riparian vegetation, etc.

25          120.    The Project would cause substantial impacts on the quality of human life, by

26   taking private property, decreasing existing buffers between highway right-of-ways and adjacent

27   homes and businesses, increasing the risk of fatal traffic due to increased heavy truck traffic,

28   increasing risk of toxic spills into the Smith River and Rogue River from increased heavy truck

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

traffic (threatening community water sources, world class sport fishing, and critical habitat for listed species), and degrading scenic values.

121.    Caltrans failed to address safety hazards in areas with highest accident rate (including between Gasquet and Hiouchi), for which no improvements are proposed to mitigate effects; and Caltrans nowhere analyzed any of the safety impacts of the Proposed Project on the inhabitants of Grants Pass or any other Oregon community through which Highway 199 passes.

122.    The Proposed Project documents fail to address the increased risk of truck cargo spills from increase in truck traffic, threatening the only water supply for Gasquet, Crescent City, and Grants Pass and polluting of the pristine wild and scenic Smith River and Rogue River.

123.    The Proposed Project would create an increase of heavy truck traffic on roads that local residents and businesses depend on for daily access, and on US 199, which is also a significant Scenic Byway that attracts many visitors annually for bird watching, sightseeing, camping, river rafting, boating and sport fishing – activities that would be disrupted by additional heavy truck traffic.  The Project would also result in increasing numbers of large trucks traveling the roadway that bisects the small communities of Hiouchi and Gasquet in California and Oregon communities along Highway 199, including Grants Pass, Selma, and Cave Junction.

124.    The Proposed Project would result in an increase in heavy truck use on a section of roadway whose main value is in providing access to environmental and recreation resources along the scenic Smith River Canyon, as well as access to the redwood forests that comprise one of California's two UNESCO World Heritage sites (the other being Yosemite).  Enjoyment of these scenic drives and the natural resources that surround them would be marred by driver concerns about long heavy trucks careening around curves in areas that would still have considerable variability in lane widths, shoulder widths, and sight distances.  There is already a documented history of truck accidents on US 199, including fatalities and diesel spills threatening the Smith River.  The existing roadway is so narrow and twisting that the improvements Caltrans has proposed at seven locations along the roadway to allow STAA truck access cannot all meet Caltrans' engineering design guidelines and would require mandatory design exceptions.

125. The Project conflicts with adopted plans and policies pertaining to the protection of scenic, recreational, and biological resources in the Smith River corridor, such as the Smith River National Recreation Area Management Plan, the NMFS 2014 Final SONCC Coho Recovery Plan, and/or the 1999 PFMC Salmon EFH Report. The Smith River National Recreation Area Management Plan states: "the management emphasis for the middle Fork-Hwy 199 management area shall be on maintaining wildlife values and providing for a full range of recreation uses, with particular emphasis on the scenic and recreation values association with the Smith River, old growth redwoods, and California state highway 199." Designation of US 199 as part of the STAA truck network would not be consistent with this management priority or those outlined in the NMFS 2014 Final SONCC Coho Recovery Plan and/or the 1999 PFMC Salmon EFH Report.

126. Caltrans' own Route Concept Report prepared in 1989, long after the passage of the Surface Transportation Act of 1982 allowing 53' truck trailers, acknowledges "the geophysical constraints of the relatively narrow, steep and rocky Smith River Canyon." The Report concludes that environmental concerns and ecological sensitivities make SR 199 "a poor candidate for extensive upgrading." That report recommended leaving SR 199 "basically a 2-lane conventional highway, with passing lanes." The report recommended developing additional passing lanes as necessary only to maintain acceptable level of service. Finally, the report concluded: "This Route Concept should serve as a guide for long range planning of improvements to US 199. It would protect the State's investment in the Route, while recognizing environmental and financial constraints which would not allow the programming of extensive improvements for this highway."

127. The Proposed Project's roadway features would adversely affect the safety of other roadway users. Improvements likely would tend to increase traffic speed. Given outstanding narrow conditions, increased traffic speed would increase propensity of run-off incidents and increase the width of recovery area needed to avoid crashes. Changes in speed characteristics from the Proposed Project would cause greater crash incidents, resulting in the various impacts

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   attendant therewith.  Exceptions to design standards involve significant compromise to design

2   standards.

3          128.    There is no evidence that Caltrans has considered the actual distribution of speeds

4   driven at the pinch points and their approaches.  Moreover, Caltrans has seriously understated

5   traffic and truck volumes on US 199.  Caltrans has relied on understated estimates of both overall

6   traffic and truck traffic, currently and in the future.  It, moreover, has issued conflicting

7   statements concerning whether the Proposed Project would increase truck traffic on US 199 and

8   SR 197, claiming in the EA/FONSI that it would have no such effect but then admitting in the

9   2017 BA/EFA that it would likely have that effect.

10          129.    There are substantial questions whether the Proposed Project would threaten the

11  pristine Smith River and Rogue River and the endangered and threatened species that depend

12  upon they, particularly given *inter alia* the amount of earth and rock excavation and road work

13  which would occur within the Smith River protected corridors, the ongoing and potentially

14  increased hazards from the introduction of STAA trucks onto Routes 197 and 199, and the

15  increased PAH-laden and/or otherwise toxic road runoff that would result from the Proposed

16  Project.

17          130.    There are substantial questions whether the 197/199 Project would substantially

18  increase large truck traffic along Routes 197 and 199, especially when viewed in context with

19  Caltrans' project to create a NW California STAA Network.

20          131.    There are substantial questions whether the 197/199 Project would have a

21  significant and negative affect on public safety, including because of the existing narrow

22  conditions on SR 197 and US 199, and Caltrans' decision to not make changes to locations along

23  US 199 known to be the site of frequent accidents, and the lack of any analysis by Caltrans of the

24  effect on public safety in the Oregon portion of the Proposed Project's action area.

25          132.    There are substantial questions whether the 197/199 Project would have a

26  significant negative effect on old growth trees, including Douglas Fir trees that are slated for

27  removal.  This issue is problematic when viewed cumulatively with the impacts of other

28  components of Caltrans' project to create a NW California STAA Network.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

133.    The 197/199 Project was, and remains, highly controversial, with hundreds of people opposing the Proposed Project, advocating changes, and urging that Caltrans adhere to safety measures and protect the Smith River and the critical and essential habitat it provides.

**VII.    IN DESIGNING AND/OR ANALYZING THE PROPOSED PROJECT AND ITS IMPACTS, CALTRANS, NMFS, AND THE FWHAW FAILED TO COMPLY WITH THE ESA, THE MSA, THE WILD AND SCENIC RIVERS ACT, NEPA, AND THE DEPARTMENT OF TRANSPORTATION ACT**

134.    As result of several factors, including, without limitation, the setting of the Proposed Project – along two of the most beautiful and ecologically important rivers in California and Oregon and within a National Recreation Area and two National Forests – a number of Federal laws required that a heightened level of care be employed in designing and analyzing the Proposed Project and its impacts. These statutes include the ESA, the MSA, the Wild and Scenic Rivers Act, NEPA, and the Department of Transportation Act.

135.    Because the Proposed Project cross state boundaries, Caltrans had no authority to conduct the review of the Proposed Project's compliance with these and other federal environmental laws. Rather, that was the mandatory obligation of the FHWA, which the FHWA wholly failed to satisfy; and actions taken by Caltrans to review the Proposed Project's compliance with federal law was *ultra vires* and illegal.

136.    If *arguendo,* Caltrans had the authority to conduct the review, its deeply flawed execution of that authority came nowhere close to meeting the heightened level of care required by any of these laws, nor did that of NMFS.

**A.    Caltrans and NMFS Failed to Comply with Section 7 of the ESA in Their Consultation Concerning the Proposed Project's Impacts on Threatened SONCC Coho, Green Sturgeon, Eulachon, and Designated SONCC Critical Habitat**

137.    In 1997, NMFS listed SONCC coho as threatened with extinction under the ESA, and reaffirmed that listing in 2005.  Since time immemorial, SONCC coho have been born, matured, and then returned to spawn in the Smith River, the Rogue River and their tributaries. Thus, in 1999, NMFS designated the Smith River, the Rogue River and their tributaries as critical

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1    habitat for the SONCC coho ESU.  The action area of the Proposed Project Locations is within

2    the area designated as SONCC critical habitat.

3        138.    In 2004, the Northern Distinct Population Segment ("DPS") of green sturgeon was

4    listed by NMFS as a species of concern.  69 Fed. Reg. 73.  In 2006, NMFS determined that the

5    Southern DPS of green sturgeon warranted listing as threatened under the ESA.  Green sturgeon

6    of both are known visit the Rogue River, including areas within the action area of the Proposed

7    Project, and fish from the Northern DPS spawn in the Rogue River and visit the Smith River,

8    including areas within the action area of the Proposed Project.

9        139.    In 2010, the Southern DPS of eulachon was listed as threatened under the ESA.

10   The species inhabit the Smith River and Rogue River, including areas within the action area of

11   the Proposed Project.

12       140.    Section 7(a)(2) of the ESA commands all federal agencies and, as in this case,

13   State agencies that have assumed the applicable obligations of a federal agency, to "insure that

14   any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

15   continued existence of any endangered species or threatened species or result in the destruction or

16   adverse modification of habitat of such species . . . " 16 U.S.C. § 1536(a)(2).  An adverse

17   modification of critical habitat includes modifications that threaten not just the survival of a

18   threatened or endangered species but also its recovery.

19       141.    Following this Court's PI Order and the Stipulated Dismissal, Caltrans re-initiated

20   the consultation process with NMFS under the ESA and the MSA, resulting in the Caltrans 2017

21   BA/EFA and the NMFS 2017 LOC.

22       142.    NMFS, as well as Caltrans, to the extent that it rather than the FHWA was the

23   appropriate agency to engage in the ESA § 7 consultation for the Proposed Project, failed to

24   properly fulfill their respective roles in this process. Caltrans failed to adequately conduct its

25   biological assessment and its conclusions therein that the Proposed Project is unlikely to

26   adversely affect the Subject Fishes or SONCC coho critical habit are arbitrary capricious; and

27   NMFS acted arbitrarily and capriciously when it improperly relied on, and concurred with, that

28   biological assessment.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

143.    The shortcomings of the 2017 BA/EFHA and the conclusions reached by Caltrans therein are detailed in Plaintiffs' Notice of Intent to Sue, dated November 4, 2017, which is attached hereto as Exhibit 2 and which is incorporated herein by reference in its entirety. These include without limitation failure to adequately analyze many elements of the Proposed Project on the Subject Fishes and SONCC coho critical habitat and failure to employ the best available science.

144.    NMFS arbitrarily and capriciously failed to require formal consultation concerning the Proposed Project's likely effects on SONCC coho, green sturgeon, and eulachon, as well as SONCC coho critical habitat, failing *inter alia* to employ the best available science. NMFS should have issued a biological opinion concerning these likely effects.  NMFS' failure to do so is all the more arbitrary and capricious in light of its authorship of both the NMFS 2014 Final SONCC Coho Recovery Plan and recent studies linking road runoff to severe effects on spawning coho.

### B.    Caltrans and NMFS Failed to Comply With the MSA In Their Consultation Concerning the Proposed Project's Impacts on the Designated Essential Fish Habitat of Pacific Salmon

145.    In 2000, the Pacific Fisheries Management Council, pursuant to the enabling regulations of the MSA, 50 C.F.R. §§ 600.805 *et seq.*, designated the Smith River and Rogue River as Essential Fish Habitat for Coho and Chinook salmon.  This was done in Chapter 1 of Appendix A to the 14th Amendment to the Pacific Coast Salmon Plan, adopted in 1997.  All of the action area of the Proposed Project Locations are included within this designation.

146.    Section 305(b)(2) of the MSA, U.S.C. § 1855(b)(2), and its enabling regulations, 50 C.F.R. §§ 600.920 *et seq.*, requires that Federal agencies and any non-federal entities to which federal programs have been delegated – in this case, Caltrans pursuant to the Caltrans/FHWA MOU – consult with the NMFS "with respect to any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency [or delegate] that may adversely affect any essential fish habitat."  (Emphasis added).  The purpose of this consultation is to protect habitat that managed fish species – in this case, Pacific coho and Chinook salmon – need to complete their life cycles.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

147.    NMFS, as well as Caltrans, to the extent that it rather than the FHWA was the appropriate agency to engage in the MSA consultation for the Proposed Project, met their respective obligations in this process.  Each agency acted in a manner that was arbitrary, capricious, an abuse of discretion, and/or was otherwise not in compliance with the law, including without limitation the MSA.

148.    For its part, Caltrans' failings in this regard parallel its failings in analyzing the Proposed Project's impacts on SONCC coho, green sturgeon, and SONCC coho critical habitat.

149.    Caltrans' analysis of the potential adverse effects of the Proposed Project also failed to use the best scientific data available concerning the impacts of road building and/or road runoff on Pacific Salmon EFH or measures that could be taken to avoid, minimize, or offset such effects, including without limitation those contained in the NMFS 2017 Final SONCC Coho Recovery Plan, the 1999 PFMC Salmon EFH Report, and/or recent studies by NMFS and/or others. In short, the same basic shortcomings that afflicted Caltrans' analysis of the Proposed Project's potential impacts on SONCC coho, green sturgeon, and SONCC critical habitat afflicted its analysis of the Proposed Project's potential adverse effects on Pacific Salmon EFH.

150.    When it received this deficient assessment from Caltrans, NMFS should have required that Caltrans engage in expanded consultation:  based on this deficient consultation there are significant grounds to believe that the Proposed Project may result in substantial adverse effects to Pacific Salmon EFH and/or that additional analysis is needed to assess the effects of the action.  *See* 50 C.F.R. § 600.920(h)(3).  NMFS also should have used the best scientific data available – including without limitation its own studies concerning the effects of road building and road runoff on SONCC coho – in determining whether expanded consultation was needed. Instead, in the same 2017 LOC, NMFS arbitrarily, capriciously, in an abuse of discretion, and/or in violation with the law, including without limitation the MSA, failed to require Caltrans engage in expanded consultation procedures concerning the Proposed Project's potential adverse effects on Pacific Salmon EFH.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

C.    **Caltrans Failed to Comply With the Wild and Scenic River Act Concerning the Proposed Project's Impacts on the Wild and Scenic Smith River or Rogue River**

151.    The Smith River was designated a Wild and Scenic River under the Wild and Scenic River Act first in January, 1981 and again in November 1990 with the creation of the Smith River National Recreation Area.  The primary value for which the Smith River was federally designated is its "outstanding, remarkable" anadromous fishery; secondary factors of the designation are its notable recreational and scenic values.  All of the Smith River within the action areas of the Proposed Project are designated, as are three tributaries of the Smith River that within the action area:  Monkey Creek, Patrick Creek, and Kelly Creek.

152.    The Rogue River was designated a Wild and Scenic River as part of the Wild and Scenic River Act's original enactment, in 1968.

153.    Section 7 of the Wild and Scenic Rivers Act imposes a duty on federal agencies and their designees to protect the free-flowing condition and other values of designated rivers.  "[N]o department or agency of the United States shall assist by loan, grant, license or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established . . ."  16 U.S.C. § 1278 (a).  Absent congressional intervention, projects may not be authorized or commenced which have an adverse effect on the values for which the river is designated.

154.    Implementation of Section 7 of the Wild and Scenic Rivers Act requires rigorous and consistent evaluation procedures to protect river resources, and the determination as to effect of the project lies with one of the four federal river-administering agencies.  The United States Forest Service and National Park Service are the federal river-administering agencies for the Wild and Scenic Smith River and Rogue River.

155.    The Proposed Project is a water resources project for which consultation under Section 7 of the Wild and Scenic Rivers Act with and determination by the U. S. Forest Service for work on US 199 and by the National Park Service for work on SR 197 is required.

156.    Caltrans has violated its obligations under the Wild and Scenic River Act by: failing to disclose and provide for meaningful and informed consultation all relevant and

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

necessary information about the Proposed Project and its impacts, including without limitation

relevant and necessary information concerning the Proposed Project and its impacts on the Smith

River's "outstanding, remarkable" anadromous fishery; and failing to engage in any consultation

under Section 7 of the Wild and Scenic Rivers Act concerning the impact of the Proposed Project

on the Rogue River.

**D.      Caltrans Failed to Comply With NEPA in Its Analysis of the Proposed Project's Impacts on the Human Environment**

157.    NEPA establishes a national policy to "prevent or eliminate damage to the

environment and biosphere."  42 U.S.C § 4321.  NEPA recognizes "the critical importance of

restoring and maintaining environmental quality," declares the federal government has a

continuing responsibility to use "all practicable means" to minimize environmental degradation,

and directs that "to the fullest extent possible ... the policies, regulations and public laws of the

United States shall be interpreted and administered in accordance with the policies set forth in this

Act." 42 U.S.C. §§ 4331(a), 4332(1).  NEPA also recognizes the right of each person to enjoy a

healthful environment.  42 U.S.C. § 4331(c).

158.    NEPA Regulations for Implementing the Procedural Provisions of the National

Environmental Policy Act are codified at 40 C.F.R. §§ 1500 *et seq*.  The Federal Highway

Administration has adopted its own NEPA regulations, which are codified at 23 C.F.R. Part 771.

These are binding on all agencies or their designees, which must comply with NEPA.

159.    NEPA requires all agencies to prepare a detailed environmental impact statement

("EIS") on every proposal for a major federal action that could potentially have a significant

effect on the quality of the human environment.  42 U.S.C. § 4322(2)(c).  Under NEPA, an

agency must prepare an EIS when an action may have a significant environmental effect, 40

C.F.R. § 1508.3, or where there is a substantial question raised as to whether an action may have

an environmental effect.

160.    The Proposed Project is a major federal action significantly affecting the quality of

the human environment for which an EIS should have been prepared by FHWA or, in the

COMPLAINT

alternative, Caltrans, if arguendo it had the authority to conduct the analysis of the Proposed

Project under NEPA, despite the fact that it crosses a State border.

161.    The Proposed Project is an action requiring an EIS because, among other things:

a.    there are substantial questions whether the Proposed Project may cause a significant degradation of some human environmental factor and have significant environmental impacts, as outlined in this Complaint, including without limitation within the meaning of the context and intensity criteria set forth in 40 C.F.R. § 1508.27;

b.    the Proposed Project would have more than a minimal impact on lands protected under Section 4(f) of the Department of Transportation Act; and

c.    the Draft EA and the EA/FONSI, in conjunction with Caltrans' responses to comments and other information in the administrative record, raise a substantial question as to whether the Proposed Project may have a significant effect on the environment.

162.    Caltrans failed to provide a convincing set of reasons why the Proposed Project's potential impact on the human environment would not be significant, particularly in relation to the Proposed Project's potential short- and long-term impacts on:  the Smith River's and Rogue River's near extinct populations of SONC coho; the critical habitat of SONCC coho in the Smith River and Rogue River; the Pacific Salmon EFH in the Smith River and Rogue River; safety of drivers of the US 199 and SR 197; riparian vegetation, including several old growth Douglas firs; the Wild and Scenic Smith River and Rogue River and its corridors and natural, scenic, and aesthetic resources; domestic water supplies; and quality of human life.

163.    In fact, neither the EA/FONSI nor the Re-Evaluation contain *any* analysis of the Proposed Project's potential impact on the human environment in the Oregon portions of the action area, let alone a convincing statement of reasons why such impact would not be significant.

164.    Numerous questions exist concerning whether the 197/199 Project may cause significant degradation of some human environmental factor, including without limitation: the Wild and Scenic Smith River and Rogue River; the Smith River's and Rogue River's near extinct

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1    populations of SONC coho; the critical habitat of SONCC coho in the Smith River and Smith

2    River; the Pacific Salmon EFH in the Smith River and in the Rogue River; other fishes

3    (anadromous or otherwise) and protected species that inhabit the rivers and their environs and

4    those habitats; riparian vegetation, including several old growth Douglas firs; safety of drivers of

5    the US 199 and SR 197; the Smith River National Recreation Area; the National Scenic Byway;

6    the National Forests through which the roads cross; the Smith River's and Rogue River's pure

7    and remarkable water; and the action area's scenic and recreational resources, including sport

8    fishing and whitewater boating.

9        165.    NEPA also requires, whether an agency prepares an EIS or an EA, that the agency

10   *inter alia*:  (a) adequately consider, analyze, and disclose the individual and cumulative

11   environmental impacts of the proposed action and alternatives to it, 42 U.S.C. § 4332(2)(c), 23

12   C.F.R. §§ 771.105, 771.119, 40 C.F.R. §§ 1508.9, 1502.16; (b) adequately establish the purpose

13   and need for the proposed action under review, 23 U.S.C. § 139(f), 40 C.F.R. §§ 1508.9(b),

14   1502.13; (c) rigorously explore and objectively evaluate all reasonable alternatives to the

15   proposed action, 42 U.S.C. § 4332(2)(C)(iii), 23 C.F.R § 771.105, 40 C.F.R. §§ 1508.9, 1502.14;

16   (d) rigorously explore and objectively evaluate appropriate mitigation measures not already

17   included in the proposed action or alternatives,  23 C.F.R. § 771.119(b); 40 C.F.R § 1502.14(f);

18   and (e) present for, and respond to, comments on any proposed major federal action that could

19   significantly affect the quality of the human environment, 40 C.F.R. § 1503.2, and under certain

20   circumstances when an EA is prepared make the EA available for a minimum of 30 days before a

21   no significant impact is made and the action approved, 40 C.F.R. §§ 1505.1, 1501.4(e)(2).

22       166.    Because the Proposed Project crosses State borders the FHWA was required to

23   perform these actions concerning the Proposed Project, which it failed to do.

24       167.    In the alternative, Caltrans, if arguendo it had the authority to conduct the analysis

25   of the Proposed Project under NEPA, failed to satisfy these requirements in numerous ways in the

26   EA/FONSI and Re-Evaluation, including without limitation those outlined in this Complaint.  In

27   summary, these shortcomings include without limitation the following.

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

168.    Caltrans issued and approved an EA/FONSI which failed to provide the required analysis of individual and cumulative environmental effects of the Proposed Project, including but not limited to, the Proposed Project's effects on: the resource values of the Wild and Scenic Smith River and Rogue River; the Smith River's and the Rogue River's near extinct population of SONCC coho; the Smith River's and Rogue River's population of green sturgeon; the Smith River's and Rogue River's population of eulachon; the critical habitat of SONCC coho in the Smith River and Rogue River; the Pacific Salmon EFH in Smith River and Rogue River; other fishes (anadromous or otherwise) and protected species that inhabit the Smith River and the Rogue River and its environs as well as those habitats; the Smith River National Recreation Area; safety of drivers of the US 199 and SR 197; extent of right-of-ways; water quality and domestic water resources; conflicts with governing plans and policies for the Smith River National Recreation Area; and the area's scenic and recreational resources, including sport fishing and whitewater boating.

169.    Caltrans failed to provide a valid discussion, or to document the purpose and need of the 197/199 Project.  These failings included without limitation:  (a) failing to present an adequate description of the proposed action; (b) failings to present a clear statement of the objectives that the Proposed Project is intended to achieve, including safety concerns; (c) failing to involve the public adequately in defining the ultimate purpose and need for the Proposed Project; and (d) failing to adequately disclose key components of the Proposed Project such as the engineering and design criteria used to develop and define the Proposed Project, and the interrelationships among the 197/199 Project and other Caltrans STAA truck access projects in Northwestern California and Caltrans' project to create a NW California STAA Network, as whole.  As to the latter failing, in particular, by ignoring other projects for STAA truck access and Caltrans' project to create a NW California STAA Network, as whole, Caltrans improperly defined the Proposed Project's purpose and need so narrowly as to preclude analysis of a reasonable range of alternatives that would avoid significant environmental impacts.

170.    Furthermore, while in the EA/FONSI, Caltrans claims that as the purpose and need for the Proposed Project is facilitation of STAA truck access between Del Norte County and I-5,

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1    in the Re-Evaluation, issued four years later, Caltrans admits that another STAA route that will

2    soon open up between Del Norte County and I-5 is 47 miles shorter and that, as a result, much of

3    any need for such STAA access between Del Norte County and I-5 would be satisfied by that

4    route.

5            171.    Caltrans also failed to adequately identify and discuss cumulative impacts related

6    to the 197/199 Project, including but not limited to:

7                    a.      impacts of the Proposed Project on SONCC coho, SONCC coho critical

8                            habit, and/or Pacific Salmon EFH cumulatively with other impacts of State,

9                            Federal, or other human activities, including without limitation those

10                           identified in the NMFS 2014 Final SONCC Coho Recovery Plan, and the

11                           1999 PFMC Salmon EFH Report;

12                   b.      impacts of the Proposed Project cumulatively with the impacts of other

13                           components of Caltrans' project to create a NW California STAA Network,

14                           including without limitation impacts related to cumulative increases in

15                           truck traffic throughout the region as well as within in particular portions

16                           of the proposed NW California STAA Network such as along US 199 and

17                           SR 197.

18                   c.      impacts of the Proposed Project cumulatively with existing safety concerns

19                           on Routes 197 and 199, which threaten natural and environmental

20                           resources as well as human health, safety, and welfare;

21                   d.      impacts of the Proposed Project cumulatively with other impacts on

22                           wildlife and protected species within the Smith River basin;

23                   e.      impacts of the Proposed Project cumulatively with other impacts on

24                           wildlife and protected species within the Rogue River basin;

25                   f.      impacts of the Proposed Project related to increases in heavy and large

26                           truck traffic – with its related noise, air, and water quality impacts –

27                           throughout the Rogue River basin or throughout the Smith River Canyon

28                           and the redwood forests, which comprise one of California's two UNESCO

Gross & Klein LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

COMPLAINT

World Heritage sites – including without limitation impacts on the Smith
River's threatened and remarkable fish resources, bird watching,
sightseeing, camping, river rafting, boating, and sport fishing –
cumulatively with the impacts of the other Federal, State, and/or other
human activities;

172.     Caltrans also failed to consider and describe an adequate range of alternatives.
Other unconsidered reasonable alternatives that would reduce the significant adverse
environmental effects of the 197/199 Project include without limitation:

    a.    restricting all soil and rock excavation to the west side of the roadway, to
avoid any potential introduction of debris into the Wild and Scenic Smith
River;

    b.    limiting access by STAA trucks to certain times of the year, to prevent use
of Routes 197/199 as an alternate route during snow events on Interstate-5;

    c.    reducing permitting speed to reflect need for slower traffic along both
Routes 197/199; and

    d.    creating an alternate route to avoid SR 197 and US 199 entirely.

173.     Caltrans also failed to provide the required appropriate mitigation measures,
including but not limited to measures that would:

    a.    provide walk-ways on SR 197 and into Hiouchi on US 199 for school
children, other pedestrians, and bicyclists;

    b.    protect old growth redwoods and Douglas fir trees from cutting;

    c.    prohibit work from being done on the river side of road to ensure no
degradation of the Smith River; and

    d.    protect the Smith River's near extinct population of SONCC coho, their
critical habitat, green sturgeon, and the Pacific Salmon EFH in the Smith
River

174.     The 197/199 Project is a major federal action significantly affecting the quality of
the human environment. Numerous comments submitted to Caltrans throughout the

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1 environmental review process identified the 197/199 Project significant impacts.  Yet, Caltrans

2 either ignored these comments or glossed over their substance with conclusory responses.  Due to

3 Caltrans' disregard, the Proposed Project's identified potential impacts related to fish and wildlife,

4 water quality, air quality, and plant populations, safety, as well as its cumulative impacts, must

5 therefore still be considered significant.  Caltrans has not successfully mitigated the impacts of

6 the 197/199 Project in the manner or to the extent required by law.

7      175.    Caltrans failed to document and respond to comments regarding subjects including

8 without limitation:

9        a.    the Proposed Project purpose and need;

10        b.    the Proposed Project description;

11        c.    Project impacts related to safety, fish, fish habitat, traffic, water quality, air

12            quality, scenic resources, and growth inducement;

13        d.    the lack of adequate study and documentation to support the EA/FONSI;

14        e.    Project inconsistency with governing plans and policy documents;

15        f.    the inadequate Section 4(f) analysis;

16        g.    the lack of a valid and adequate public review and comment process;

17        h.    the lack of response to scientific data and evidence submitted; and

18        i.    the need for an EIS.

19     176.    Furthermore, Caltrans issued a Draft EA which was fundamentally and

20 dramatically deficient. Caltrans' Draft EA was so deficient it rendered public comment

21 effectively meaningless, in violation of NEPA requirements to provide members of the public

22 with sufficient environmental information to permit them to weigh in and to inform agency

23 decision-making.

24     177.    Furthermore, the Proposed Project, due to its significant effects on the

25 environment, is the type of project that normally would require an EIS.  This Project also is

26 without precedent, in that it involves widening and realigning a Scenic Byway through a pristine

27 National Recreation Area along the Wild and Scenic Smith River, in a manner that could

28 seriously harm near-extinct fish, water quality, and other resources.  Accordingly, Caltrans was

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   required to make the EA available for 30 days prior to adoption of a FONSI pursuant to 40 C.F.R.

2   § 1501.4(e)(2)(i) and (ii).

3       178.    Caltrans further violated NEPA and associated regulations by failing to prepare a

4   revised EA or EIS, but rather just a Re-Evaluation, given *inter alia*: (a) the many years that have

5   elapsed since the EA/FONSI was prepared and issued by Caltrans; (b) Caltrans' recent

6   recognition that the action area of the Proposed Project includes not just areas of California in the

7   vicinity of US 199 and SR 197, but also areas of Oregon along US 199; (c) the lack of any

8   discussion of the impacts of the Proposed Project on the human environment in those areas of

9   Oregon; (d) Caltrans reversal, in the 2017 BA/EFHA, of its claim, in the EA/FONSI, that the

10  Proposed Project would not increase truck traffic on US 199 or SR 197; and (e) Caltrans

11  admission, for the first time in the 2017 BA/EFHA, that the purported need of the Proposed

12  Project will soon be satisfied by a different STAA route between Del Norte County and I-5.

13      179.    If *arguendo* it was legal to have issued the Re-Evaluation rather than a revised EA

14  or EIS, it violated NEPA and associated regulations to have failed to circulate the Re-Evaluation

15  for public comment and review based on the same and other factors detailed in the paragraph

16  immediately above.

17      **E.    Caltrans Failed to Comply With the Requirements of Section 4(f) of the
        Department of Transportation Act Concerning the Proposed Project's**
18      **Acquisition of, and Impact On, Lands Within the Six River National Forest
        the Smith River National Recreation Area, and the Rogue River-Siskiyou**
19      **National Forest**

20      180.    Caltrans' 197/199 Project calls for acquisition of, and impact on, lands within the

21  Six River National Forest, the Smith River National Recreation Area, and the Rogue River-

22  Siskiyou National Forest.

23      181.    Section 4(f) of the Department of Transportation Act requires specific

24  consideration and analysis of environmental impacts of transportation activities that are proposed

25  to take place in parks, recreation areas, wildlife refuges, and other public lands or areas with

26  historical significance, and prohibits an agency from using any public land meeting this criteria

27  unless there has been a determination that "(1) there is no feasible and prudent alternative to the

28  use of such land, and (2) such program includes all possible planning to minimize harm ...

COMPLAINT

1    resulting from such use."  23 U.S.C. § 138, 23 C.F.R. Part 774.  The "no feasible and prudent

2    alternative" 4(f) standard allows less discretion for an agency to reject alternatives than under

3    NEPA.

4        182.    Caltrans used a "programmatic" Section 4(f) determination for the Proposed

5    Project, rather than conduct a complete analysis, claiming among other things that the Proposed

6    Project is a federally funded improvement of an existing highway and that the amount and

7    location of land used does not impair the use of the remaining section 4(f) land.  By using the

8    programmatic Section 4(f) determination, Caltrans improperly narrowed its analysis of

9    alternatives to conclude there would be no significant environmental impact.

10       183.    Caltrans violated its obligations under Section 4(f) by, among other things, using

11   the "programmatic" Section 4(f) and by failing to properly evaluate feasible and prudent

12   alternatives to the proposed action, which include and are not limited to:

13       a.      the no build alternative;

14       b.      restricting all soil and rock excavation to the west side of the roadway, to avoid

15   any potential introduction of debris into the Wild and Scenic Smith River; and

16       c.      reducing permitting speed to reflect need for slower traffic along both Routes

17   197/199.

18       184.    Caltrans also violated Section 4(f) by failed to include all possible planning to

19   minimize harm, and to maintain or enhance the natural beauty of the lands traversed, including by

20   not limited to those discussed in this Complaint.

21   **VIII.   PLAINTIFFS HAVE COMPLIED WITH ALL PROCEDURAL REQUIREMENTS**

22       **A.      Irreparable Harm and Arbitrary and Capricious Action**

23       185.    At all times mentioned herein, the FHWA or Caltrans have been able to deny the

24   approvals and reject certification of the EA/FONSI, the Re-Evaluation, and 2017 BA/EFHA for

25   the Proposed Project.  Notwithstanding such ability, FHWA and Caltrans have failed and

26   continues to fail to perform its duty to deny and reject the Proposed Project.  If Caltrans is not

27   ordered to withdraw its approval of the Proposed Project and the EA/FONSI, the People of

28   California, as well as the land, watershed, wildlife, economic, and environmental values subject

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1    to and affected by the Proposed Project, would suffer immediate, irreparable, and permanent

2    damage.

3        186.    Plaintiffs bring this action on the ground that each Plaintiff and their members and

4    staff would suffer irreparable injuries if Defendants' actions herein are not set aside immediately.

5    Such injuries include, but are not limited to, injuries to Plaintiffs' aesthetic, spiritual, scientific,

6    recreational, and educational interests caused by deterioration of protected resources, the wild and

7    scenic Smith River and Rogue River and their environmental settings, degradation of wildlife and

8    fisheries habitat, including for anadromous fisheries, SONCC coho, green sturgeon, eulachon,

9    SONCC critical habitat, and the Pacific Salmon EFH, as well as impacts associated with

10    construction, safety impacts and impacts to air quality.

11        **B.    Exhaustion of Administrative Remedies**

12        187.    Plaintiffs through their representatives and members have performed all conditions

13    precedent to the filing of this Complaint by raising each and every issue known to them before

14    Caltrans in compliance with NEPA, the Department of Transportation Act, the Wild and Scenic

15    Rivers Act, the ESA, and the APA, including by participating in the public meetings and hearings

16    hosted by Caltrans and submitting written comments.  Plaintiffs are not required to exhaust their

17    administrative remedies.  To attempt to do so would be futile, because Plaintiffs do not have

18    adequate administrative remedies and/or because Plaintiffs lacked a full and fair opportunity to

19    exhaust certain claims.

20        188.    Plaintiffs are serving by mail a copy of the filed Complaint on the California State

21    Attorney General.

22        **C.    Standing**

23        189.    Plaintiffs are individuals, groups of citizens, taxpayers, and residents of the State

24    of California. Plaintiffs have participated in the review of the Proposed Project.  Plaintiffs and

25    their members and staff visit and rely on the natural and other resources of the wild and scenic

26    Smith River and Rogue River, the Smith River National Recreation Area, the Smith River

27    National Scenic Byway, and other public parks and lands, for their economic livelihood,

28    enjoyment, recreation, education, and spiritual experiences.  Plaintiffs' interests would be

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

concretely and particularly injured by the effects of the Proposed Project on the environment.

Individual Plaintiffs have standing to bring this action on their own behalf, and Organizational

Plaintiffs have standing to bring this action on behalf of their injured members and staff.

**D.    Attorneys' Fees**

190.    In pursuing this action, Plaintiffs are entitled to their reasonable fees, costs, and

expenses associated with this litigation under the applicable law, including, *inter alia,* to the

Equal Access to Justice Act, 28 U.S.C. § 2412, California Code of Civil Procedure § 1021.5, the

ESA, 16 U.S.C. § 1540(g)(4), and other authority

**IX.    CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Violations of Section 10(e)(2)(C) of the APA, 5 U.S.C. § 706(2)(C)**

**Acting in Excess of Statutory Authority**

**(Against Defendants Caltrans and Malcom Doughtery)**

191.    Plaintiffs incorporate by reference all the allegations contained in the previous

paragraphs as though fully set forth herein.

192.    Pursuant to 5 U.S.C. § 706(2)(C), a reviewing court shall hold unlawful and set

aside agency action found to be in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right.

193.    Caltrans, inclusive of Malcom Dougherty, acted in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right, in violation of the APA.

194.    Section 327 of Title 23 makes any delegation of authority from the FHWA to a

State transportation agency, such as Caltrans, subject to the terms of a written agreement between

the FHWA and the State transportation agency.

195.    Section 327 of Title 23 further provides that any authority not explicitly delegated

by the FHWA to the State transportation agency through such a written agreement remains that of

the FHWA.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

196.    The MOU, by which FHWA delegated certain authorities to Caltrans, excludes from the authorities delegated the authority to conduct the review, for compliance with federal environmental law, a project that crosses State boundaries.

197.    The Proposed Project crosses state boundaries.

198.    Accordingly, Caltrans does not, and did not have the authority to conduct the review of the Proposed Project for compliance with federal environmental law.

199.    Thus, actions taken by Caltrans to conduct the federal environmental review of the Proposed Project, in lieu of its conduct by the FHWA were in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and violate Section 10(e)(2)(C) of the APA. This includes without limitation: the preparation and issuance under NEPA and Section 4(f) of the Transportation Act of the EA/FONSI and Re-Evaluation; the preparation and issuance of 2017 BA/EFHA under the ESA and MSA, and the engagement in consultation with NMFS related thereto; and its engagement in consultation under the Wild and Scenic Rivers Act.

200.    Such actions constitute final agency action because they were the consummation of the agency's decision-making process, and were not merely tentative or interlocutory in nature, and are an action from which legal consequences flow.

201.    Due to Caltrans' knowing and conscious agency action in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, Plaintiffs and their members have suffered legal wrongs and have been adversely affected and aggrieved within the meaning of 5 U.S.C. § 702.

202.    Defendants' actions outside the scope of their jurisdiction and/or authority are reviewable under the APA.  5 U.S.C. §§ 704, 706.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(e)(1) of the APA, 5 U.S.C. § 706(1)

### Failure to Take Mandatory Action

### (Against Defendants FHWA and Walter C. "Butch" Waidelich)

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

203.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

204.    Pursuant to Section 10(e)(1) of the APA, 5 U.S.C. § 706(1), this Court must compel an agency to take actions that it has unlawfully failed to take.

205.    The FHWA, inclusive of its Executive Director Walter C. "Butch" Waidelich are required to conduct a review of, and/or consultation concerning, the Proposed Project under federal environmental law, including without limitation NEPA, Section 4(f) of the Transportation Act, the ESA, the MSA, and the Wild and Scenic Rivers Act.

206.    These actions are mandatory and non-discretionary and have not been assigned to Caltrans or any other person.

207.    The FHWA has failed to take these actions.

208.    Due to the FHWA's knowing and conscious failures to act, Plaintiffs and their members have suffered legal wrongs and have been adversely affected and aggrieved within the meaning of 5 U.S.C. § 702.

209.    FHWA's failures to act actions are reviewable under the APA.  5 U.S.C. §§ 704, 706.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## THIRD CLAIM FOR RELIEF

### Violations of the ESA, 16 U.S.C. § 1536

**Failure to Adequately Engage in Endangered Species Action Section 7 Consultation**

**(Against Defendants Caltrans and Malcom Doughtery)**

210.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

211.    To the extent that Caltrans had the legal authority to conduct an analysis of, and consultation concerning, the Proposed Project under Section 7 of the ESA, and in the alternative to Plaintiffs First and Second Claims for Relief, Caltrans engaged in a consultation with NMFS concerning SONCC coho, green sturgeon, eulachon, and SONCC coho critical habitat and issuing the 2017 BA/EFHA based thereon—including the conclusions contained therein—in a manner

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

that violated Section 7 of the ESA, that was arbitrary and capricious, that was an abuse of discretion, and that was not based on the best available science.

212.    Based on the foregoing, Caltrans has violated the ESA within the meaning of 16 U.S.C. § 1540(g).

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## FOURTH CLAIM FOR RELIEF

### Violations of the APA, 5 U.S.C. § 701, *et seq.*

### Failure to Adequately Engage in Endangered Species Action Section 7 Consultation

### (Against Defendant NMFS)

213.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

214.    As set forth herein, NMFS' decision to issue a letter of concurrence in response to Caltrans' 2017 BA/EFHA, rather than requiring that Caltrans engage in formal consultation and issuing a biological opinion, was arbitrary, capricious, an abuse of discretion, and/or in violation of the law, including without limitation, ESA § 7.

215.    Due to NMFS' knowing and conscious acts and omissions, Plaintiffs and their members have suffered legal wrongs and have been adversely affected and aggrieved within the meaning of 5 U.S.C. § 702.

216.    NMFS' acts and omissions are reviewable under the APA.  5 U.S.C. §§ 704, 706.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## FIFTH CLAIM FOR RELIEF

### Violations of the APA, 5 U.S.C. § 701, *et seq.*

### Failure to Adequately Engage in MSA Section 305 Consultation

### (Against Defendant NMFFS)

217.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

218.    In conducting its consultation required under Section 305 of the MSA, U.S.C. § 1855(b)(2), and its enabling regulations, 50 C.F.R. §§ 600.920 *et seq.*, with Caltrans concerning

COMPLAINT

58

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

the potential adverse effects of the Proposed Project on Pacific Salmon EFH, NFMS acted in a manner that was arbitrary, capricious, an abuse of discretion, and/or was otherwise not in compliance with the law, including without limitation the MSA, in ways including without limitation those described in this Complaint.  NMFS should have required that Caltrans engage in expanded consultation and should have used the best scientific data available in determining whether expanded consultation was needed.  The decision by NFMS not to require Caltrans engage in expanded consultation procedures concerning the Proposed Project's potential adverse effects on Pacific Salmon EFH was not made based on the best scientific data available and was arbitrary, capricious, an abuse of discretion, and/or in violation with the law, including without limitation the MSA.

219.    Due to NMFS' knowing and conscious acts and omissions, Plaintiffs and their members have suffered legal wrongs and have been adversely affected and aggrieved within the meaning of 5 U.S.C. § 702.

220.    NMFS' acts and omissions are reviewable under the APA.  5 U.S.C. §§ 704, 706.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SIXTH CLAIM FOR RELIEF

### Violation of the APA, 5 U.S.C. § 701, *et seq.*

### Failure to Adequately Engage in Section 7 of the Wild and Scenic Rivers Act Consultation

### (Against Defendant Caltrans)

221.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

222.    To the extent that Caltrans had the legal authority to conduct an analysis of, and consultation concerning, the Proposed Project under Section 7 of the of the Wild and Scenic Rivers Act, and in the alternative to Plaintiffs First and Second Claims for Relief, Caltrans has violated its obligations under Section 7 of the Wild and Scenic River Act, 16 U.S.C. § 1278, by failing to disclose and provide for meaningful and informed consultation all relevant and necessary information about the Proposed Project and its impacts.

COMPLAINT

223.    Accordingly, Caltrans took actions in the context of its consultation under Section 7 of the Wild and Scenic River Act that were arbitrary, capricious, an abuse of discretion, and/or were otherwise not in compliance with the law, including without limitation Section 7 of the Wild and Scenic River Act.

224.    Due to Caltrans' knowing and conscious acts and omissions, Plaintiffs and their members have suffered legal wrongs and have been adversely affected and aggrieved within the meaning of 5 U.S.C. § 702.

225.    Caltrans' acts and omissions are reviewable under the APA.  5 U.S.C. §§ 704, 706.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SEVENTH CLAIM FOR RELIEF

### Violation of the APA, 5 U.S.C. § 701, *et seq.*

### Failure to Prepare and EIS as Required by NEPA

### (Against Defendant Caltrans)

226.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

227.    The Proposed Project is a major federal action significantly affecting the quality of the human environment for which Caltrans must prepare an EIS, under NEPA and its implementing regulations.

228.    To the extent that Caltrans had the legal authority to conduct an analysis of, and consultation concerning, the Proposed Project under Section 7 of the of the Wild and Scenic Rivers Act, and in the alternative to Plaintiffs First and Second Claims for Relief, Caltrans failed to provide a convincing set of reasons why the Proposed Project's potential impact on the human environment would not be significant.

229.    Numerous substantial questions exist concerning whether the Proposed Project may cause significant degradation of some human environmental factor.

230.    Accordingly, Caltrans' decision not to prepare an EIS but to instead issue an EA/FONSI and approve the Proposed Project based thereon was arbitrary, capricious, an abuse of discretion, and/or otherwise not in compliance with the law, including without limitation NEPA.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

231.    Due to Caltrans' knowing and conscious acts and omissions, Plaintiffs and their members have suffered legal wrongs and have been adversely affected and aggrieved within the meaning of 5 U.S.C. § 702.

232.    Caltrans' acts and omissions are reviewable under the APA.  5 U.S.C. §§ 704, 706.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## EIGHTH CLAIM FOR RELIEF

### Violation of the APA, 5 U.S.C. § 701, *et seq.*

### Failure to Prepare an Adequate EA as Required by NEPA

### (Against Defendant Caltrans)

233.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

234.    To the extent that Caltrans had the legal authority to conduct an analysis of the Proposed Project under NEPA, in the alternative to Plaintiffs First and Second Claims for Relief, and assuming for sake of this claim only that preparation of an EA was all that was required of Caltrans here, Caltrans' EA still failed to comply with NEPA and its implementing regulations.

235.    Caltrans failed to adequately consider, analyze, and disclose the individual and cumulative environmental impacts of the Proposed Project.

236.    Caltrans failed to adequately establish the Proposed Project's purpose and need.

237.    Caltrans failed to rigorously explore and objectively evaluate all reasonable alternatives to the Proposed Project.

238.    Caltrans failed to provide the required appropriate mitigation measures.

239.    Caltrans failed to adequately document and respond to comments.

240.    Caltrans failed to make the EA available to the public for a minimum of 30 days before issuing a finding of no significant impact and approving the Proposed Project.

241.    Caltrans failed to adequately evaluate the individual impacts of the Proposed Project.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

242.    Caltrans failed to adequately evaluate the cumulative impacts of the Proposed Project in relation to impacts from other activities, including components of Caltrans' Project to Create a STAA Truck Network throughout Northern California.

243.    Caltrans failed to establish a purpose or need for the 197/199 Project.

244.    Caltrans failed to adequately evaluate alternatives to the 197/199 Project.

245.    Accordingly, Caltrans' decision to issue the EA/FONSI and approve the Proposed Project based thereon was arbitrary, capricious, an abuse of discretion, and/or otherwise not in compliance with the law, including without limitation NEPA.

246.    Due to Caltrans' knowing and conscious acts and omissions, Plaintiffs and their members have suffered legal wrongs and have been adversely affected and aggrieved within the meaning of 5 U.S.C. § 702.

247.    Caltrans' acts and omissions are reviewable under the APA.  5 U.S.C. §§ 704, 706.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## NINTH CLAIM FOR RELIEF

**Violation of the APA, 5 U.S.C. § 701, *et seq.***

**Failure to Prepare an Revised EA or EIS as Required by NEPA**

**(Against Defendant Caltrans)**

248.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

249.    To the extent that Caltrans had the legal authority to conduct an analysis of the Proposed Project under NEPA, in the alternative to Plaintiffs First and Second Claims for Relief, Caltrans was required to issue a revised EA or EIS, rather than the Re-Evaluation, concerning the Proposed Project.

250.    Accordingly, Caltrans' decision to issue the Re-Evaluation and proceed with the Proposed Project based thereon was arbitrary, capricious, an abuse of discretion, and/or otherwise not in compliance with the law, including without limitation NEPA.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

251.     Due to Caltrans' knowing and conscious acts and omissions, Plaintiffs and their members have suffered legal wrongs and have been adversely affected and aggrieved within the meaning of 5 U.S.C. § 702.

252.     Caltrans' acts and omissions are reviewable under the APA.  5 U.S.C. §§ 704, 706.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## TENTH CLAIM FOR RELIEF

### Violation of the APA, 5 U.S.C. § 701, *et seq.*

### Failure to Comply with Section 4(f) of the Department of Transportation Act

### (Against Defendant Caltrans)

253.     Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

254.     To the extent that Caltrans had the legal authority to conduct an analysis of the Proposed Project under the Department of Transportation Act and in the alternative to Plaintiffs First and Second Claims for Relief, Caltrans violated its obligations under Section 4(f) of the Transportation Act.

255.     Caltrans used a "programmatic" Section 4(f) determination for the Proposed Project, rather than conduct a complete analysis, claiming among other things that the Proposed Project is a federally funded improvement of an existing highway and that the amount and location of land used does not impair the use of the remaining section 4(f) land.  By using the programmatic Section 4(f) determination, Caltrans improperly narrowed its analysis of alternatives to conclude there would be no significant environmental impact.

256.     Caltrans further violated its obligations under Section 4(f) of the Department of Transportation Act by, among other things, using the "programmatic" Section 4(f).  By failing to properly evaluate feasible and prudent alternatives to the proposed action, Caltrans also violated Section 4(f) by failing to include all possible planning to minimize harm, and to maintain or enhance the natural beauty of the lands traversed, including by not limited to those discussed in this Complaint.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

257.    Accordingly, Caltrans took actions in the context of its consultation under Section 4(f) of the Department of Transportation Act that were arbitrary, capricious, an abuse of discretion, and/or were otherwise not in compliance with the law, including without limitation Section 4(f) of the Department of Transportation Act.

258.    Due to Caltrans' knowing and conscious acts and omissions, Plaintiffs and their members have suffered legal wrongs and have been adversely affected and aggrieved within the meaning of 5 U.S.C. § 702.

259.    Caltrans' acts and omissions are reviewable under the APA.  5 U.S.C. §§ 704, 706.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## ELEVENTH CLAIM FOR RELIEF

**Violations of APA, 5 U.S.C. § 701, *et seq*.**

**Failure to Comply with NEPA, the ESA, the MSA,**

**the Wild and Scenic Rivers Act, and the Department of Transportation Act**

**(Against All Defendants)**

260.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

261.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*., entitles a party to seek judicial review of an agency action where a legal wrong is alleged and the party alleging the violation is adversely affected or aggrieved by the agency action.  Pursuant to 5 U.S.C. § 706(2)(A), a reviewing court shall hold unlawful and set aside an agency action found to be arbitrary, capricious, or otherwise not in accordance with the law.  Defendants acted illegally for all the reasons set forth in this Complaint.

262.    In the ways described in this Complaint, Caltrans acted arbitrarily, capriciously, abused its discretion, and in violation of the law, including without limitation, NEPA, the ESA, the Wild and Scenic Rivers Act, the Department of Transportation Act, and the APA, by *inter alia* approving and adopting the EA/FONSI, the Re-Evaluation and Proposed Project that do not fully comply with NEPA and Section 4(f) of the Department of Transportation Act and issuing the 2017 BA/EFHA that does not comply with the ESA, as set forth above.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

263.    NMFS acted arbitrarily, capriciously, abused its discretion, and in violation of the law, including without limitation the ESA and the MSA, as set forth above.

264.    Due to Defendants' knowing and conscious failure to comply with NEPA, the ESA, the MSA, the Wild and Scenic Rivers Act, and/or Section 4(f) of the Department of Transportation Act, Plaintiffs have suffered legal wrongs because of agency actions and are adversely affected and aggrieved by agency actions within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702.

265.    Defendants' knowing and conscious failure to comply with NEPA, the ESA, the MSA, the Wild and Scenic Rivers Act, and/or Section 4(f) of the Department of Transportation Act, was arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2), and should therefore be declared unlawful and set aside by this Court.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## TWELFTH CLAIM FOR RELIEF

### Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202

### (Against All Defendants)

266.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

267.    Pursuant to the MOU executed between Caltrans and the US DOT Secretary, in December, 2016, under the authority of 23 U.S.C. § 327, Caltrans expressly: consented to the jurisdiction of the federal courts for the "compliance, discharge and enforcement of any responsibility of the U.S. DOT Secretary assumed by the by Caltrans under [the] MOU," MOU § 4.3.1; accepted responsibility "for the compliance, discharge and/or enforcement of any responsibilities assigned by the USDOT Secretary and assumed by Caltrans under this MOU" and waives the State's immunity under the Eleventh Amendment of the U.S. Constitution to address "matters arising out of the MOU," *id.* § 4.3.1;  is subject to the same procedural or substantive

COMPLAINT

requirements that apply to the USDOT Secretary in carrying out its responsibilities; *id.*, § 5.1.1.; and is "responsible for opposing party's attorney's fees and costs if a court awards those costs to an opposing party, or in the event those costs are part of a settlement agreement," *id.*, § 6.2.2.

268.    23 U.S.C. § 327 further provides *inter alia* that: "A civil action [such as this, pursued against a state agency that has assumed the FHWA's responsibilities under Section 327] shall be governed by the legal standards and requirements that would apply in such a civil action against the Secretary had the Secretary taken the actions in question," 23 U.S.C. § 327 (d)(2); "A State shall assume responsibility under this section subject to the same procedural and substantive requirements as would apply if that responsibility were carried out by the Secretary," 23 U.S.C. § 327(a)(2)(C); "A State that assumes responsibility under subsection (a)(2) shall be solely responsible and solely liable for carrying out, in lieu of the Secretary, the responsibilities assumed under subsection (a)(2)," 23 U.S.C. § 327(e); and that a State to whom federal highway project administration obligations have been delegated under the section, can use federal funds apportioned to it, "for attorneys' fees directly attributable to eligible activities associated with the project," 23 U.S.C. 327(a)(2)(G).

269.    California Code of Civil Procedure § 1021.5 further provides: "a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

270.    Section 1540(g)(4) of Title 16 further provides: "The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

271.    Plaintiffs contend that Defendants, under the foregoing and/or other law are liable and responsible for Plaintiffs' attorneys' fees and costs in this action.

272.    Defendants denies its responsibility to pay Plaintiffs' attorneys' fees and costs in this action.

273.    An actual, present and justiciable controversy has arisen between Plaintiffs and Defendants concerning Defendants' responsibility to pay Plaintiffs' attorneys fees and costs in this action.

274.    Plaintiffs seek declaratory judgment from this Court that Defendants, under the foregoing and/or other law is legally liable and responsible for Plaintiffs' attorneys' fees and costs in this action and Plaintiffs have corresponding legal rights.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and further relief as follows:

1.    This Court Declare that the FHWA has violated the APA as alleged herein;

2.    This Court declare that the FHWA's violations of the APA constitute agency action unlawfully withheld or unreasonably delayed;

3.    This Court declare that Caltrans has violated the APA, and, in the alternative, the ESA, NEPA, Department of Transportation Act, and the Wild and Scenic River Act as alleged herein;

4.    This Court declare that Caltrans' violations of the APA, the ESA NEPA, the Department of Transportation Act, and the Wild and Scenic Rivers Act constitute agency action unlawfully withheld or unreasonably delayed, and/or are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, under the APA;

5.    This Court declare that NMFS has violated the APA, the ESA, and the MSA, as alleged herein;

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

6.    This Court declare that NMFS' violations of the ESA and the MSA constitute illegal action, are arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law, under the APA;

7.    This Court set aside Caltrans' approval of the 197/199 Project, the EA/FONSI, Decision Notice (including certification of the Final Environmental Impact Report/Environmental Assessment and Section 4(f) Evaluation), the 2017 BA/EFHA, and all related findings and approvals, and require the FHWA or, in the alternative, Caltrans follow federal statutes and regulations, including without limitation NEPA, the ESA, the MSA, Section 4(f) of the Department of Transportation Act, and Section 7 of the Wild and Scenic Rivers Act in any review of and decision for 197/199 Project;

8.    This Court set aside NMFS' purported "concurrence" in Caltrans' findings of no likely adverse impacts on SONCC coho, green sturgeon, eulachon, and critical SONCC habitat contained the 2017 BA/EFHA and require NMFS follow federal statutes and regulations including without limitation the ESA in any review of and decision for 197/199 Project;

9.    This Court set aside NMFS determination that the Proposed Project contained measures sufficient to avoid, minimize, mitigate or otherwise offset the adverse effects of the Proposed Project on the Pacific Salmon EFH and require NMFS follow federal statutes and regulations including without limitation the MSA in any review of and decision for 197/199 Project;

10.    This Court enjoin FHWA or, in the alternative, Caltrans to engage in an analysis of, and consultation concerning, the Proposed Project that is compliant with the ESA, NEPA, the MSA, Section 7 of the Transportation Act, the Wild and Scenic Rivers Act, and the APA;

11.    This Court enjoin NFMS to engage in an analysis of, and consultation concerning, the Proposed Project that is compliant with the ESA, the MSA, and the APA;

12.    This Court grant interlocutory and permanent injunctive relief enjoining Caltrans from engaging in any activity concerning the Proposed Project until the Proposed Project complies with all applicable federal regulations and statutes, including requirements of the

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1   NEPA, the ESA, the MSA, the Department of Transportation Act, and the Wild and Scenic

2   Rivers Act;

3         13.    This Court award costs of suit herein, including attorney fees, including without

4   limitation pursuant to the Equal Access to Justice Act, the ESA, California law or other authority;

5   and

6         14.    This Court grant such other and further equitable or legal relief as the Court deems

7   just and proper.

8

9   Dated:  January 5, 2017              **GROSS & KLEIN LLP**

10

11                                  By:   */s/Stuart G. Gross*
                                         STUART G. GROSS

12

13                                       *Attorneys for Plaintiffs*

# EXHIBIT 1

**MEMORANDUM OF UNDERSTANDING BETWEEN THE FEDERAL
HIGHWAY ADMINISTRATION AND THE CALIFORNIA DEPARTMENT OF
TRANSPORTATION CONCERNING THE STATE OF CALIFORNIA'S
PARTICIPATION IN THE SURFACE TRANSPORTATION PROJECT
DELIVERY PROGRAM PURSUANT TO 23 U.S.C. 327**

THIS MEMORANDUM OF UNDERSTANDING (hereinafter "MOU"), made and
entered into by and between the FEDERAL HIGHWAY ADMINISTRATION
(hereinafter "FHWA"), an administration in the UNITED STATES DEPARTMENT OF
TRANSPORTATION (hereinafter "USDOT"), and the CALIFORNIA DEPARTMENT
OF TRANSPORTATION (hereinafter "Caltrans"), a department of the State of
California, hereby provides as follows:

WITNESSETH:

**Whereas,** Section 327 of Title 23 of the U.S. Code (U.S.C.) establishes the Surface
Transportation Project Delivery Program (hereafter "Program") that allows the Secretary
of the United States Department of Transportation (hereafter "USDOT Secretary") to
assign and States to assume the USDOT Secretary's responsibilities under
the National Environmental Policy Act of 1969 (42 U.S.C. 4321, et seq.)
(hereafter "NEPA"), and all or part of the USDOT Secretary's responsibilities for
environmental review, consultation, or other actions required under any Federal
environmental law with respect to highway public transportation, railroad, and
multimodal projects within the State; and

**Whereas,** the Program was initially established as a pilot called the Surface
Transportation Project Delivery Pilot Program (hereafter "Pilot Program") by the Safe,
Accountable, Flexible, Efficient Transportation Equity Act:  A Legacy for Users (Pub. L.
109-59 [Aug. 10, 2005]) (hereinafter "SAFETEA-LU") with a termination date that was
six years after the date of enactment of SAFETEA-LU; and

**Whereas,** 23 U.S.C. 327(b)(2) requires a State to submit an application in order to
participate in the Program; and

**Whereas,** on May 18, 2007, Caltrans submitted its application to the FHWA for
participation in the Surface Transportation Project Delivery Pilot Program
(hereafter "Pilot Program"); and

**Whereas,** the FHWA solicited the views of other appropriate Federal agencies
concerning Caltrans' application as required by 23 U.S.C. 327(b)(5); and

**Whereas,** the USDOT Secretary, acting by and through the FHWA pursuant to 49
C.F.R. 1.85(a)(3), approved Caltrans' Pilot Program application, finding that Caltrans
met all of the requirements of 23 U.S.C. 327 and 23 C.F.R. Part 773; and

**Whereas,** following the FHWA's approval of Caltrans' Pilot Program application, on
July 1, 2007, the FHWA and Caltrans entered into a Memorandum of Understanding

(hereinafter "Original MOU") under which Caltrans assumed and carried out the assigned duties and responsibilities of the USDOT Secretary under NEPA and other Federal environmental laws under the auspices of the Pilot Program; and

**Whereas**, Section 13.1.1 of the Original MOU established an August 10, 2011, termination date, which was six years after the enactment of SAFETEA-LU; and

**Whereas**, Section 2203(c) of the Continuing Appropriations and Surface Transportation Extensions Act of 2011 (Pub. L. 111-322 [Dec. 22, 2010]) extended the Pilot Program's termination date to August 10, 2012, which was seven years after the enactment of SAFETEA-LU; and

**Whereas**, on August 10, 2011, the FHWA and Caltrans entered into Amendment 1 to the Original MOU (hereinafter "Amended MOU"); and

**Whereas**, Section 5D of the Amended MOU provided that should Congress enact legislation extending the termination date of the Pilot Program, the August 10, 2012, termination date would automatically be replaced with the appropriate termination date of the Pilot Program as specified in Federal law; and

**Whereas**, Section 7 of the Amended MOU provided that as soon as practicable following the potential reauthorization of SAFETEA-LU by Congress, the FHWA and Caltrans shall review the Original MOU, the Amended MOU, and other applicable MOU amendments, to determine if any further changes were required or desirable as a result of changes in legislation; and

**Whereas**, Section 101(e) of the Temporary Surface Transportation Extension Act of 2012 (Pub. L. 112-140 [June 29, 2012]) extended the duration of the Pilot Program until September 30, 2012; and

**Whereas**, the FHWA conducted audits as required by SAFETEA-LU semiannually during the first two-year period (2007, 2008) and annually during the next two-year period (2009 and 2010) of the State's participation in the Program; and

**Whereas**, the FHWA has made the audit reports available to the public for comment through publication of notices in the *Federal Register*; and

**Whereas**, Caltrans has also conducted self-assessments and quarterly reports on its performance on the Program; and

**Whereas**, FHWA's audit reports and Caltrans's self-assessments are publicly available for inspection at http://www.dot.ca.gov/hq/env/nepa/html/documents_reports.htm; and

**Whereas**, on July 6, 2012, President Obama signed into law the Moving Ahead for Progress in the 21st Century Act (Pub. L. 112-141) (hereafter, "MAP-21"), which became effective on October 1, 2012; and

**Whereas,** Section 1313 of MAP-21 amended 23 U.S.C. 327, making the Pilot Program permanent; and

**Whereas,** MAP-21 amended 23 U.S.C. 327(b)(2) to require the USDOT Secretary to amend, as appropriate, the Program's application regulations; and

**Whereas,** on September 25, 2012, the FHWA and Caltrans entered into a Memorandum of Understanding allowing Caltrans to continue to participate in the Program under the terms of the Original MOU and Amended MOU by extending the term of Caltrans' participation to eighteen months from the effective date of the final Program application regulations (April 16, 2016); and

**Whereas,** on September 16, 2014, FHWA issued final Program application regulations implementing the changes from MAP-21 and these regulations became effective October 16, 2014; and

**Whereas,** on February 27, 2015, Caltrans notified FHWA of its intent to renew participation in the Program with respect to highway projects, and the State of California's legislature has enacted laws to allow the State to participate in the Program; and

**Whereas,** pursuant to 23 C.F.R. 773.115(b), Caltrans coordinated with the FHWA to determine if significant changes have occurred or new assignment responsibilities would be sought that would warrant a statewide notice and comment opportunity prior to the State's submission of the renewal package; and

**Whereas,** on June 16, 2015, after coordination between the agencies, FHWA determined that a statewide notice and comment opportunity was unnecessary prior to the State's submission of the renewal package; and

**Whereas,** pursuant to 23 U.S.C. 773.115(d), Caltrans submitted a renewal package to the FHWA on June 17, 2015 for approval to continue the assigned duties and responsibilities for highway projects pursuant to the Program; and

**Whereas,** on December 4, 2015, President Obama signed into law Pub. L. 114-94, the Fixing America's Surface Transportation (FAST) Act, with a retroactive effective date of October 1, 2015; and

**Whereas,** on November 16, 2016, FHWA published a *Federal Register* Notice and provided an opportunity for comment on Caltrans's renewal request and solicited the views of the public and other Federal agencies concerning Caltrans' renewal request as required by 23 CFR 773.115(f); and

**Whereas,** the USDOT Secretary, acting by and through FHWA, has considered the renewal package, comments received as a result of the *Federal Register* Notice, auditing reports, and the State's overall performance in the Program as required by 23 CFR

773.115(g) and has determined that Caltrans' renewal package meets all the requirements of 23 CFR part 773 and 23 USC 327; and

**Whereas,** on June 6, 2010, the FHWA and Caltrans executed a Memorandum of Understanding assigning Caltrans the USDOT Secretary's responsibilities for environmental reviews of highway projects that qualify for categorical exclusions (CE) pursuant to 23 U.S.C. 326 (hereinafter sec. 326 CE MOU); and

**Whereas,** on April 1, 2016, FHWA extended the terms of the NEPA assignment MOU, under the authority of 23 C.F.R. 773.115(h), from the expiration date of April 16, 2016, to December 31, 2016, to allow additional time for negotiation of the terms of the renewal MOU and to be consistent with the changes of the FAST Act; and

**Whereas,** on May 31, 2016, the FHWA and Caltrans renewed the sec. 326 CE MOU and Caltrans intends to maintain this MOU.

**Now, therefore,** the FHWA and Caltrans agree as follows:

## PART 1. PURPOSE OF MEMORANDUM OF UNDERSTANDING

### 1.1    Purpose

1.1.1    This MOU officially approves Caltrans' request to renew participation in the Program and is the written agreement required pursuant to 23 U.S.C. 327(a)(2)(A) and (c) under which the USDOT Secretary may assign, and Caltrans may assume, the responsibilities of the USDOT Secretary for Federal environmental laws with respect to one or more highway projects within the State of California.

1.1.2    The FHWA's decision to execute this MOU is based upon the information, representations, and commitments contained in Caltrans' June 17, 2015, renewal package, the auditing and monitoring reports, consideration of comments received during the comment period, and the State's overall performance in the Program since July 1, 2007. This MOU incorporates by reference the June 17, 2015, renewal package. However, this MOU shall control to the extent there is any conflict between this MOU and the June 17, 2015, renewal package.

1.1.3    This MOU shall be effective upon the date of final execution by both parties (hereinafter the "Effective Date").

1.1.4    Pursuant to 23 U.S.C. 327(d), and subpart 4.3 of this MOU, third parties may challenge Caltrans' actions in carrying out environmental review responsibilities assigned under this MOU. Otherwise, this MOU is not intended to, and does not, create any new right or benefit, substantive or procedural, enforceable at law or in equity by any third party against the State of California, its departments, agencies, or entities, its officers, employees, or agents. This MOU is not intended to, and does not, create any new right or benefit, substantive or procedural, enforceable at law or in equity by any third party

against the United States, its departments, agencies, or entities, its officers, employees, or agents.

## PART 2. [RESERVED]

## PART 3. ASSIGNMENTS AND ASSUMPTIONS OF RESPONSIBILITY

### 3.1    Assignments and Assumptions of NEPA Responsibilities

3.1.1    Pursuant to 23 U.S.C. 327(a)(2)(A), on the Effective Date, the FHWA assigns, and Caltrans assumes, subject to the terms and conditions set forth in 23 U.S.C. 327 and this MOU, all of the USDOT Secretary's responsibilities for compliance with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 et seq. with respect to the highway projects specified under subpart 3.3. This includes statutory provisions, regulations, policies, and guidance related to the implementation of NEPA for highway projects such as 23 U.S.C. 139, 40 CFR parts 1500–1508, DOT Order 5610.1C, and 23 CFR Part 771 as applicable.

3.1.2    On the cover page of each environmental assessment (EA), finding of no significant impact (FONSI), environmental impact statement (EIS), and record of decision (ROD) prepared under the authority granted by this MOU, and for any 23 U.S.C. 327 CE determination it makes, Caltrans shall insert the following language in a way that is conspicuous to the reader or include it in a CE project record:

> "The environmental review, consultation, and other actions required by applicable Federal environmental laws for this project are being, or have been, carried out by Caltrans pursuant to 23 U.S.C. 327 and a Memorandum of Understanding dated _____, and executed by FHWA and Caltrans."

3.1.3    Caltrans shall disclose to the public and agencies, as part of agency outreach and public involvement procedures, including any notice of intent or scoping meeting notice, the disclosure in subpart 3.1.2 above.

3.1.4    The assignment under this part does not alter the scope and terms of the sec. 326 CE MOU between FHWA and Caltrans.

### 3.2    Assignments and Assumptions of Federal Environmental Laws Other Than NEPA

3.2.1    Pursuant to 23 U.S.C. 327(a)(2)(B), on the Effective Date, the FHWA assigns and Caltrans assumes, subject to the terms and conditions set forth in 23 U.S.C. 327 and this MOU, all of the USDOT Secretary's responsibilities for environmental review, reevaluation, consultation, or other action pertaining to the review or approval of highway projects specified under subpart 3.3 required under the following Federal environmental laws:

> Air Quality

- Clean Air Act, 42 U.S.C. 7401-7671q, with the exception of any conformity determinations

Noise
- Noise Control Act of 1972, 42 U.S.C. 4901-4918
- FHWA noise regulations at 23 CFR Part 772

Wildlife
- Endangered Species Act of 1973, 16 U.S.C. 1531-1544
- Marine Mammal Protection Act, 16 U.S.C. 1361–1423h
- Anadromous Fish Conservation Act, 16 U.S.C. 757a-757f
- Fish and Wildlife Coordination Act, 16 U.S.C. 661-667d
- Migratory Bird Treaty Act, 16 U.S.C. 703-712
- Magnuson-Stevens Fishery Conservation and Management Act of 1976, as amended, 16 U.S.C. 1801-1891d

Historic and Cultural Resources
- National Historic Preservation Act of 1966, as amended, 54 U.S.C. 300101 et seq.
- Archeological Resources Protection Act of 1979, 16 U.S.C. 470aa-470mm
- Archeological and Historic Preservation Act, 54 U.S.C. 312501-312508
- Native American Grave Protection and Repatriation Act, 25 U.S.C. 3001-3013; 18 U.S.C. 1170

Social and Economic Impacts
- American Indian Religious Freedom Act, 42 U.S.C. 1996
- Farmland Protection Policy Act, 7 U.S.C. 4201-4209

Water Resources and Wetlands
- Clean Water Act, 33 U.S.C. 1251-1387: (Sections 319, 401, and 404)
- Coastal Barrier Resources Act, 16 U.S.C. 3501-3510
- Coastal Zone Management Act, 16 U.S.C. 1451-1466
- Safe Drinking Water Act, 42 U.S.C. 300f—300j-26
- Rivers and Harbors Act of 1899, 33 U.S.C. 403
- Wild and Scenic Rivers Act, 16 U.S.C. 1271-1287
- Emergency Wetlands Resources Act, 16 U.S.C. 3901 and 3921
- Wetlands Mitigation 23 U.S.C. 119(g), 133(b)(14)
- FHWA wetland and natural habitat mitigation regulations at 23 CFR part 777
- Flood Disaster Protection Act, 42 U.S.C. 4001-4130

Parklands and Other Special Land Uses
- Section 4(f), 23 U.S.C. 138 and 49 U.S.C. 303
- FHWA/FTA Section 4(f) Regulations at 23 CFR Part 774
- Land and Water Conservation Fund, 54 U.S.C. 200302-200310

Hazardous Materials
- Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9601-9675
- Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. 9671-9675
- Resource Conservation and Recovery Act, 42 U.S.C. 6901-6992k

Executive Orders Relating to Highway Projects
- E.O. 11990 - Protection of Wetlands
- E.O. 11988 - Floodplain Management (except approving design standards and determinations that a significant encroachment is the only practicable alternative under 23 CFR sections 650.113 and 650.115)
- E.O. 12898 - Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations
- E.O. 13112 - Invasive Species

FHWA-Specific
- Planning and Environmental Linkages, 23 U.S.C. 168, with the exception of those FHWA responsibilities associated with 23 U.S.C. 134 and 135.
- Programmatic Mitigation Plans, 23 U.S.C. 169 with the exception of those FHWA responsibilities associated with 23 U.S.C. 134 and 135

3.2.2   Any FHWA environmental review responsibility not explicitly listed above and assumed by Caltrans shall remain the responsibility of the FHWA unless the responsibility is added by written agreement of the parties through the amendment process established in Part 13 and pursuant to 23 CFR 773.113(b). This provision shall not be interpreted to abrogate Caltrans' responsibilities to comply with the requirements of any Federal environmental law that apply directly to Caltrans independent of the FHWA's involvement (through Federal assistance or approval).

3.2.3   The USDOT Secretary's responsibilities for government–to–government consultation with Indian tribes, as defined in 36 C.F.R. 800.16(m), are not assigned to or assumed by Caltrans under this MOU. The FHWA remains responsible for all government–to–government consultation, including initiation of government–to–government consultation consistent with Executive Order 13175—Consultation and Coordination with Indian Tribal Governments, unless otherwise agreed as described in this Part. A notice from Caltrans to an Indian tribe advising the tribe of a proposed activity is not considered "government–to–government consultation" within the meaning of this MOU. If a project-related concern or issue is raised in a government–to–government consultation process with an Indian tribe, as defined in 36 CFR 800.16(m),

and is related to NEPA or another Federal environmental law for which Caltrans has assumed responsibilities under this MOU, and either the Indian tribe or the FHWA determines that the issue or concern will not be satisfactorily resolved by Caltrans, then the FHWA may withdraw the assignment of all or part of the responsibilities for processing the project. In this case, the provisions of subpart 9.1 concerning the FHWA initiated withdrawal of assignment shall apply. This MOU is not intended to abrogate, or prevent future entry into, any agreement among Caltrans, the FHWA, and a tribe under which the tribe agrees to permit Caltrans to administer government–to–government consultation activities for the FHWA. However, such agreements are administrative in nature and do not relieve the FHWA of its legal responsibility for government–to–government consultation.

3.2.4   Nothing in this MOU shall be construed to permit Caltrans' assumption of the USDOT Secretary's responsibilities for conformity determinations required under section 176 of the Clean Air Act (42 U.S.C. 7506) or any responsibility under 23 U.S.C. 134 and 135, or under 49 U.S.C. 5303 or 5304 (23 U.S.C. 327(a)(2)(B)(iv)(II)).

3.2.5   The assignment under this part does not alter the scope and terms of the sec. 326 CE MOU between FHWA and Caltrans. Caltrans will engage in all environmental reviews authorized under the terms of that MOU if it elects to process the highway projects under the sec. 326 CE MOU.

3.2.6   On the cover page of each biological assessment, historic properties or cultural resources report, Section 4(f) evaluation, or other analyses prepared under the authority granted by this MOU, Caltrans shall insert the following language in a way that is conspicuous to the reader:

> "The environmental review, consultation, and any other actions required by applicable Federal laws for this project are being, or have been, carried out by Caltrans pursuant to 23 U.S.C. 327 and the Memorandum of Understanding dated _____ and executed by FHWA and Caltrans."

3.2.7   Caltrans shall disclose to the public and agencies, as part of agency outreach and public involvement procedures, the disclosure in stipulation 3.2.6 above.

3.2.8   Caltrans will continue to adhere to the original terms of Biological Opinions (BOs) coordinated between the FHWA, Caltrans, and either the U.S. Fish and Wildlife Service (USFWS) or National Marine Fisheries Service (NMFS) or both USFWS and NMFS prior to the Pilot Program so long as the original BO terms are not amended or revised. Any revisions or amendments to a BO made under assumption of FHWA's environmental responsibilities would be Caltrans' responsibility. Caltrans agrees to assume the FHWA's environmental review role and responsibilities as identified in existing interagency agreements among Caltrans, USFWS, NMFS, and the FHWA. Caltrans agrees to continue to assume the FHWA's ESA Section 7 responsibilities of consultations (formal and informal).

3.2.9    Caltrans will not make any determination that an action constitutes a constructive use of a publicly owned park, public recreation area, wildlife refuge, waterfowl refuge, or historic site under 49 U.S.C. 303/23 U.S.C. 138 (Section 4(f)) without first consulting with the FHWA and obtaining the FHWA's approval of such determination.

## 3.3    Highway Projects

3.3.1    Except as provided by subpart 3.3.2 below or otherwise specified in this subpart, the assignments and assumptions of the USDOT Secretary's responsibilities under subparts 3.1 and 3.2 above shall apply with respect to the environmental review, consultation, or other action pertaining to the review or approval of the following classes of highway projects located within the State of California.  The definition of "highway project" is found at 23 CFR 773.103, and for purposes of this MOU, "highway project" includes eligible preventative maintenance activities.  Prior to approving any CE determination under this MOU, FONSI, final EIS, or final EIS/ROD, the State of California shall ensure and document that for any proposed project the design concept, scope, and funding are consistent with the current Transportation Improvement Plan (TIP), Regional Transportation Plan (RTP), or Metropolitan Transportation Plan (MTP).

> A.    Projects requiring an EIS, both on the state highway system (SHS) and Local Assistance projects off the SHS that are funded by the FHWA or require FHWA approvals.  This assignment does not include the environmental review associated with the development and approval of the Draft EIS, Final EIS, and ROD for the following projects:
>
> i.    District 1: Eureka/Arcata Corridor Improvement

Caltrans will be responsible for any additional environmental review of this project after the expiration of the statute of limitations for this project in accordance with 23 U.S.C. 139(l).

> B.    Projects qualifying for CEs, both on the SHS and Local Assistance projects off the SHS that are funded by the FHWA or require FHWA approvals, and that do not qualify for assignment of responsibilities pursuant to the June 7, 2013 23 USC 326 MOU.
>
> C.    Projects requiring EAs, both on the SHS and Local Assistance projects off the SHS that are funded by the FHWA or require FHWA approvals with the exception of the following projects:
>
> i.    District 5: Highway 1 Congestion Management–Santa Cruz HOV Lanes
> ii.    District 9: Inyo–395 Olancha to Cartago 4 Lane

Caltrans will be responsible for any additional environmental review of these projects after the expiration of the statute of limitations for these projects in accordance with 23 U.S.C. 139(l).

D.    Projects funded by other Federal agencies [or projects without any Federal funding] that also require FHWA approvals.  For these projects, Caltrans would not assume the NEPA responsibilities of other Federal agencies. However, Caltrans may use or adopt other Federal agencies' NEPA analyses consistent with 40 CFR parts 1500–1508, and USDOT and FHWA regulations, policies, and guidance.

3.3.2    The following are specifically excluded from the list in subpart 3.3.1 of highway projects and classes of highway projects:

A.    Any highway projects authorized under 23 U.S.C. 202, 203, and 204 unless such projects will be designed and constructed by Caltrans; and

B.    Any project that crosses State boundaries and any project that crosses or is adjacent to international boundaries.  For purposes of this agreement a project is considered "adjacent to international boundaries" if it requires the issuance of a new or the modification of an existing Presidential Permit by the U.S. Department of State.

## 3.4    Limitations

3.4.1    As provided at 23 U.S.C. 327(e), Caltrans shall be solely responsible and solely liable for carrying out all of the responsibilities it has assumed under part 3 of this MOU.

3.4.2    As provided at 23 U.S.C. 327(a)(2)(D), any highway project or responsibility of the USDOT Secretary that is not explicitly assumed by Caltrans under subpart 3.3.1 in this MOU remains the responsibility of the USDOT Secretary.

## PART 4. CERTIFICATIONS AND ACCEPTANCE OF JURISDICTION

## 4.1    Certifications

4.1.1    Caltrans hereby makes the following certifications:

A.    Caltrans has the legal authority to accept all the assumptions of responsibility identified in part 3 of this MOU;

B.    Caltrans has the legal authority to take all actions necessary to carry out all of the responsibilities it has assumed under this MOU;

C.    Caltrans has the legal authority to execute this MOU;

D.    The State of California currently has laws and regulations in effect that are comparable to 5 U.S.C. 552, which are located at California Government Code § 6250, et seq.; and

E.    With respect to the public availability of any document under California Government Code § 6250, et seq., any decision regarding its release or

public availability may be legally challenged or reviewed in the courts of the State of California.

## 4.2    State Commitment of Resources

4.2.1    As provided at 23 U.S.C. 327(c)(3)(D), Caltrans will maintain the financial resources necessary to carry out the responsibilities it is assuming. Caltrans believes, and the FHWA agrees, that the financial resources contained in the renewal package appear to be adequate for this purpose. Should the FHWA determine, after consultation with Caltrans, that Caltrans' financial resources are inadequate to carry out the USDOT Secretary's responsibilities, Caltrans will take appropriate action to obtain the additional financial resources needed to carry out these responsibilities. If Caltrans is unable to obtain the necessary additional financial resources, Caltrans shall inform the FHWA, and this MOU will be amended to assign only the responsibilities that are commensurate with Caltrans' financial resources.

4.2.2    Caltrans will maintain adequate organizational and staff capability, including competent and qualified consultants where necessary or desirable, to effectively carry out the responsibilities it has assumed under this MOU. This includes, without limitation:

A.    Using appropriate environmental technical and managerial expertise;

B.    Devoting adequate staff resources; and

C.    Demonstrating, in a consistent manner, the capacity to perform Caltrans' assumed responsibilities under this MOU and applicable Federal laws.

Should the FHWA determine, after consultation with Caltrans, that Caltrans' organizational and staff capability is inadequate to carry out the USDOT Secretary's responsibilities, Caltrans will take appropriate action to obtain adequate organizational and staff capability to carry out these responsibilities. If Caltrans is unable to obtain adequate organizational and staff capability, Caltrans shall inform the FHWA and the MOU will be amended to assign only the responsibilities that are commensurate with Caltrans' available organizational and staff capability. Should Caltrans choose to meet these requirements, in whole or in part, with consultant services, including outside counsel, Caltrans shall maintain on its staff an adequate number of trained and qualified personnel, including counsel, to oversee the consulting work.

4.2.3    When carrying out the requirements of Section 106 of the National Historic Preservation Act (NHPA), as amended, Caltrans staff (including consultants) shall comply with 36 C.F.R. 800.2(a)(1). All actions that involve the identification, evaluation, analysis, recording, treatment, monitoring, or disposition of historic properties, or that involve the reporting or documentation of such actions in the form of reports, forms, or other records, shall be carried out by or under the direct supervision of a person or persons who meet the Secretary of Interior's Professional Qualifications Standards (published at 48 FR 44738-44739, Sept. 29, 1983). Caltrans shall ensure that all documentation required under 36 C.F.R. 800.11 is reviewed and approved by a staff member or consultant who meets the Professional Qualifications Standards.

### 4.3    Federal Court Jurisdiction

4.3.1    As provided at 23 U.S.C. 327(c)(3)(B), the State of California hereby consents to, and accepts, the exclusive jurisdiction of the Federal courts for the compliance, discharge, and enforcement of any responsibilities of the USDOT Secretary assumed by Caltrans under this MOU. This consent to Federal court jurisdiction shall remain valid after termination of this MOU, or FHWA's withdrawal of assignment of the USDOT Secretary's responsibilities, for any decision or approval made by Caltrans pursuant to an assumption of responsibility under this MOU. The State of California understands and agrees that this acceptance constitutes a waiver of the State's immunity under the Eleventh Amendment to the U.S. Constitution for the limited purposes of addressing matters arising out of this MOU and carrying out the USDOT Secretary's responsibilities that have been assumed under this MOU.

## PART 5. APPLICABILITY OF FEDERAL LAW

### 5.1    Procedural and Substantive Requirements

5.1.1    As provided at 23 U.S.C. 327(a)(2)(C), in assuming the USDOT Secretary's responsibilities under this MOU, Caltrans shall be subject to the same procedural and substantive requirements that apply to the USDOT Secretary in carrying out these responsibilities. Such procedural and substantive requirements include, but are not limited to, Federal statutes and regulations, Executive Orders issued by the President of the United States, USDOT Orders, Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA (40 CFR parts 1500 -1508), FHWA Orders, official guidance and policy issued by the CEQ, Office of Management and Budget (OMB), USDOT, or the FHWA (e.g. Guidance Establishing Metrics for the Permitting and Environmental Review of Infrastructure Projects), and any applicable Federal court decisions, and, subject to subpart 5.1.4 below, interagency agreements such as programmatic agreements, memoranda of understanding, memoranda of agreement, and other similar documents that relate to the environmental review process [e.g., the 2015 Red Book – Synchronizing Environmental Reviews for Transportation and Other Infrastructure Projects, etc.].

Caltrans has reviewed the 2014 MOA between the US Coast Guard (USCG) and FHWA and understands that by accepting FHWA's NEPA responsibilities, it also agrees to perform FHWA's obligations set forth in the MOU between the USDOT and the USCG and the MOA between FHWA and the USCG.

5.1.2    Official USDOT and FHWA formal guidance and policies relating to environmental review matters are posted on the FHWA's website, contained in the FHWA *Environmental Guidebook*, published in the *Federal Register*, or sent to Caltrans electronically or in hard copy.

5.1.3   After the Effective Date of this MOU, the FHWA will use its best efforts to ensure that any new or revised Federal policies and guidance that are final and applicable to the FHWA's responsibilities under NEPA and other environmental laws and that are assumed by Caltrans under this MOU are communicated to Caltrans within ten (10) calendar days of issuance.   Delivery may be accomplished by e-mail, Web posting (with email or mail to Caltrans notifying of Web posting), mail, or publication in the *Federal Register* (with email or mail notifying Caltrans of publication).   If communicated to Caltrans by e-mail or mail, such material will be sent to the Chief of Caltrans' Division of Environmental Analysis.   In the event that a new or revised FHWA policy or guidance is not made available to Caltrans as described in the preceding sentence, and if Caltrans had no actual knowledge of such policy or guidance, then a failure by Caltrans to comply with such Federal policy or guidance will not be a basis for termination under this MOU.

5.1.4   Caltrans will work with all other appropriate Federal agencies concerning the laws, guidance, and policies that such other Federal agencies are responsible for administering.

5.1.5   Upon termination of this MOU, the FHWA and Caltrans shall contact the relevant third party to any interagency agreement and determine whether the interagency agreement should be amended or reinstated as in effect on the termination date of this MOU.

## 5.2 Rulemaking

5.2.1   As provided at 23 U.S.C. 327(f), nothing in this MOU permits Caltrans to assume any rulemaking authority of the USDOT Secretary.   Additionally, Caltrans may not establish policy and guidance on behalf of the USDOT Secretary or FHWA for highway projects covered in this MOU.   Caltrans authority to establish State regulations, policy, and guidance concerning the State environmental review of State highway projects shall not supersede applicable Federal environmental review regulations, policy, or guidance established by or applicable to the USDOT Secretary or FHWA.

## 5.3   Effect of Assumption

5.3.1   For purposes of carrying out the responsibilities assumed under this MOU, and subject to the limitations contained in 23 U.S.C. 327 and this MOU, Caltrans shall be deemed to be acting as the FHWA with respect to the environmental review, consultation, and other actions required under those responsibilities.

## 5.4   Other Federal Agencies

5.4.1   As provided at 23 U.S.C. 327(a)(2)(E), nothing in this MOU preempts or interferes with any power, jurisdiction, responsibility, or authority of an agency, other than the USDOT (including the FHWA), under applicable law and regulations with respect to a project.

# PART 6. LITIGATION

## 6.1    Responsibility and Liability

6.1.1    As provided in 23 U.S.C. 327(e), Caltrans shall be solely responsible and solely liable for carrying out all of the USDOT Secretary's responsibilities it has assumed under this MOU.  The FHWA and USDOT shall have no responsibility or liability for the performance of the responsibilities assumed by Caltrans, including any decision or approval made by Caltrans while participating in the Program.

## 6.2    Litigation

6.2.1    Nothing in this MOU affects the United States Department of Justice's (hereinafter "DOJ") authority to litigate claims, including the authority to approve a settlement on behalf of the United States if either FHWA or another agency of the United States is named in such litigation, or if the United States intervenes pursuant to 23 U.S.C. 327(d)(3).  In the event FHWA or any other Federal agency is named in litigation related to matters under this MOU, or the United States intervenes in the litigation, Caltrans agrees to coordinate with DOJ in the defense of that action.

6.2.2    Caltrans shall defend all claims brought in connection with the discharge of any responsibility assumed under this MOU.  In the event of litigation, Caltrans shall provide qualified and competent legal counsel, including outside counsel if necessary.  Caltrans shall provide the defense at its own expense, subject to 23 U.S.C. 327(a)(2)(G) concerning Federal-aid participation in attorney's fees for outside counsel hired by Caltrans.  Caltrans shall be responsible for opposing party's attorney's fees and court costs if a court awards those costs to an opposing party, or in the event those costs are part of a settlement agreement.

6.2.3    Caltrans will notify the FHWA's California Division Office and DOJ's Assistant Attorney General for the Environment and Natural Resources Division, within seven (7) calendar days of Caltrans Legal Division's receipt of service of process of any complaint, concerning its discharge of any responsibility assumed under part 3 of this MOU.  Caltrans' notification to the FHWA and USDOJ shall be made prior to its response to the complaint.  In addition, Caltrans shall notify the FHWA's California Division Office within seven (7) calendar days of receipt of any notice of intent to sue concerning its discharge of any responsibility assumed under part 3 of this MOU.

6.2.4    Caltrans will provide the FHWA's California Division Office and DOJ copies of any motions, pleadings, briefs, and other such documents filed in any case concerning its discharge of any responsibility assumed under part 3 of this MOU.  Caltrans will provide such copies to the FHWA and DOJ within seven (7) calendar days of receipt of service of any document or, in the case of any documents filed by or on behalf of Caltrans, within seven (7) calendar days of the date of filing.

6.2.5    Caltrans will notify the FHWA's Division Office and DOJ prior to settling any lawsuit, in whole or in part, and shall provide the FHWA and DOJ with a reasonable amount of time of at least ten (10) calendar days, to be extended, if feasible based on the context of the lawsuit, up to a maximum of thirty (30) total calendar days, to review and comment on the proposed settlement. Caltrans will not execute any settlement agreement until FHWA and DOJ have provided comments on the proposed settlement, indicated that they will not provide comments on the proposed settlement, or the review period has expired, whichever occurs first.

6.2.6    Within seven (7) calendar days of receipt by Caltrans, Caltrans will provide notice to FHWA's Division Office and DOJ of any court decision on the merits, judgment, and notice of appeal arising out of or relating to the responsibilities Caltrans has assumed under this MOU. Caltrans shall notify FHWA's Division Office and DOJ within five (5) days of filing a notice of appeal of a court decision. Caltrans shall confer with FHWA and DOJ regarding the appeal at least forty-five (45) days before filing an appeal brief in the case.

6.2.7    Caltrans's notifications to FHWA and DOJ in subparts 6.2.3, 6.2.5, and 6.2.6 shall be made by electronic mail to *FHWA_assignment_lit@dot.gov,* and *NRSDOT.enrd@usdoj.gov,* unless otherwise specified by FHWA and DOJ. For copies of motions, pleadings, briefs, and other documents filed in a case, as identified in subpart 6.2.4, Caltrans may opt to either send the materials to the email addresses identified above, send hardcopies to the mail address below, or add to the distribution list in the court's electronic filing system (e.g., PACER) the following two email addresses: *FHWA_assignment_lit@dot.gov* and *efile_nrs.enrd@usdoj.gov.* FHWA and DOJ's comments under subpart 6.2.5 and 6.2.6 shall be made by electronic mail to Caltrans Chief Counsel, unless otherwise specified by Caltrans. In the event that regular mail is determined necessary, mail should be sent by overnight mail service to:

> For DOJ:    Assistant Attorney General for the Environment and Natural Resources Division at 950 Pennsylvania Avenue, NW, Room 2143, Washington, DC, 20530.

> For FHWA:    Division Administrator for the FHWA California Division, 650 Capitol Mall, Ste. 4-100, Sacramento, CA 95814-4708.

## 6.3    Conflict Resolution

6.3.1    In discharging any of the USDOT Secretary's responsibilities under this MOU, Caltrans agrees to comply with any applicable requirements of USDOT and FHWA statute, regulation, guidance or policy regarding conflict resolution. This includes the USDOT Secretary's responsibilities for issue resolution under 23 U.S.C. 139(h), with the exception of the USDOT Secretary's responsibilities under 23 U.S.C. 139(h)(6) regarding financial penalties.

6.3.2   Caltrans agrees to follow 40 CFR part 1504 in the event of pre-decision referrals to CEQ for Federal actions determined to be environmentally unsatisfactory.  Caltrans also agrees to coordinate and work with CEQ on matters brought to CEQ with regards the environmental review responsibilities for highway projects Caltrans has assumed.

## PART 7. INVOLVEMENT WITH OTHER AGENCIES

### 7.1   Coordination

7.1.1   Caltrans agrees to seek early coordination with all appropriate Federal, State, and local agencies in carrying out any of the responsibilities and highway projects assumed under this MOU.

### 7.2   Processes and Procedures

7.2.1   Caltrans will ensure that it has appropriate processes and procedures in place that provide for proactive and timely consultation, coordination, and communication with all appropriate Federal agencies in order to carry out any of the responsibilities assumed under this MOU, including the submission of all environmental impact statements together with comments and responses to the Environmental Protection Agency (EPA) as required at 40 C.F.R. 1506.9 and for EPA's review as required by section 309 of the Clean Air Act.  These processes and procedures shall be formally documented.  Such formal documentation may be in the form of a formal executed interagency agreement or in other such form as appropriate.

## PART 8. INVOLVEMENT WITH FHWA

### 8.1   Generally

8.1.1   Except as specifically provided otherwise in this MOU, the FHWA will not provide any project-level assistance to Caltrans in carrying out any of the responsibilities it has assumed under this MOU.  Project-level assistance shall include any advice, consultation, or document review with respect to the discharge of such responsibility for a particular highway project.  However, project–level assistance does not include process or program level assistance as provided in subpart 8.1.4, discussions concerning issues addressed in prior projects, interpretations of any applicable law contained in titles 23 or 49 of the United States Code, interpretations of any FHWA or USDOT regulation, or interpretations of FHWA or USDOT policies or guidance.

8.1.2   The FHWA will not intervene, broker, act as intermediary, or be otherwise involved in any issue involving Caltrans' consultation or coordination with another Federal agency with respect to Caltrans' discharge of any of the responsibilities it has assumed under this MOU for any particular highway project.  However, the FHWA may attend meetings between Caltrans and other Federal agencies and submit comments to Caltrans and the other Federal agency in the following extraordinary circumstances:

A.    The FHWA reasonably believes that Caltrans is not in compliance with this MOU;

B.    The FHWA determines that an issue between Caltrans and the other Federal agency concerns emerging national policy issues under development by the USDOT; or

C.    Upon request by either Caltrans or the other Federal agency and agreement by the FHWA.

The FHWA will notify both Caltrans and the relevant Federal agency prior to attending any meetings between Caltrans and such other Federal agency.

8.1.3    Other Federal agencies may raise program- or policy-level concerns regarding the compliance by Caltrans with this MOU and may communicate these concerns to the FHWA. The FHWA will review the program- or policy-level concerns and any other information provided to FHWA by such other Federal agency. If, after such review, the FHWA and such other Federal agency still have concerns regarding Caltrans' compliance, the FHWA will notify Caltrans in a timely manner of the potential compliance issue and will work with both Caltrans and the relevant Federal agency to resolve the issue and, if necessary, take appropriate action to ensure compliance with this MOU.

8.1.4    At Caltrans' request, the FHWA may assist Caltrans in evaluating its environmental program and developing or modifying any of its processes or procedures to carry out the responsibilities it has assumed under this MOU, including, but not limited to, those processes and procedures concerning Caltrans' consultation, coordination, and communication with other Federal agencies.

8.1.5    Caltrans' obligations and responsibilities under 23 CFR 1.5 are not altered in any way by executing this MOU.

**8.2 MOU Monitoring and Oversight**

8.2.1    Pursuant to 23 U.S.C. 327(h), the FHWA shall monitor Caltrans' performance in order to ensure Caltrans' compliance with the MOU and all applicable Federal laws and policies, and to evaluate whether Caltrans is meeting the performance measures listed in Part 10 of the MOU. The FHWA's monitoring program will consist of monitoring reviews, which will be coordinated with Caltrans and take into account Caltrans' self-monitoring and the FHWA California Division's annual risk assessments.

8.2.2    In order to minimize the impact of the monitoring reviews on Caltrans' day-to-day project delivery workload, the FHWA and Caltrans will coordinate when scheduling joint monitoring reviews. Normally, the FHWA expects to complete two monitoring reviews during the term of the MOU, although the FHWA may conduct additional reviews if deemed necessary. Caltrans and the FHWA California Division Office will

each designate a point of contact, who will be responsible for coordinating monitoring review schedules, requests for information and organizing meetings.

8.2.3    In order to evaluate whether Caltrans is meeting the performance measures listed in Part 10 of this MOU, Caltrans shall make available for inspection by the FHWA any project files, general administrative files, and letters or comments received from governmental agencies and the public which pertain to Caltrans' discharge of the responsibilities it has assumed under this MOU. Caltrans will work with the FHWA to provide documents electronically to the extent it does not create an undue burden. Caltrans environmental staff will be available for interviews as part of the monitoring reviews.

8.2.4    Pursuant to 23 U.S.C. 327(c)(4), Caltrans is responsible for providing to the FHWA any information the FHWA reasonably considers necessary to ensure that Caltrans is adequately carrying out the responsibilities assigned. At the request of the FHWA, Caltrans will (within five business days or a mutually agreeable time frame), provide the FHWA with any information the FHWA considers necessary to ensure that Caltrans is adequately carrying out the responsibilities assigned to Caltrans.

8.2.5    Annually from the Effective Date of this MOU, Caltrans shall provide a report to the FHWA California Division Office listing any approvals and decisions Caltrans has made with respect to the responsibilities Caltrans has assumed under part 3 of this MOU.

8.2.6    In carrying out the responsibilities assumed under Part 3 of this MOU, Caltrans agrees to carry out regular quality assurance and quality control (QA/QC) activities to ensure the assumed responsibilities are being conducted in accordance with applicable laws and this MOU. At a minimum, Caltrans' QA/QC activities will include the review and monitoring of its processes relating to project decisions, environmental analysis, project file documentation, checking for errors and omissions, legal sufficiency reviews, and taking appropriate corrective action as needed.

8.2.7    Caltrans shall perform annual monitoring of its QA/QC process to determine whether the process is working as intended, to identify any areas needing improvements in the process, and to take any corrective actions necessary to address the areas needing improvement. Caltrans shall transmit a report on the results of this self-monitoring to the FHWA California Division office and make the report available for public inspection.

8.2.8    Monitoring review reports, be they prepared by the FHWA or Caltrans, shall include a description of the scope of the monitoring reviews, the compliance areas reviewed, a description of the monitoring process, a list of areas identified as needing improvement. The FHWA reports shall identify findings that require corrective actions and the Caltrans reports shall discuss corrective actions that have been or will be implemented.

8.2.9   Prior to making any monitoring review report available to the public, the FHWA will transmit to Caltrans a draft of the report and allow Caltrans at least 14 calendar days to respond in writing.  The FHWA will grant any reasonable request by Caltrans to extend this response period up to a total of 30 calendar days. The FHWA will review the comments and revise the draft monitoring report, as appropriate.

8.2.10  Caltrans agrees to post all monitoring reports on the Caltrans Division of Environmental Analysis website in order to make them available to the public.

## 8.3    Record Retention

8.3.1   Caltrans will retain project files and general administrative files pertaining to its discharge of the responsibilities it has assumed under this MOU in accordance with 2 CFR 200.333 and the provisions below.

8.3.2   In addition to the period of time specified in subpart 8.3.1, 2 CFR 200.333(b), Caltrans will ensure that the following retention periods are maintained for each specified type of record:

   A.    **Environmental Correspondence Files**: Environmental correspondence files include correspondence between the FHWA and Caltrans relative to the interpretation, administration, and execution of environmental aspects of the Federal–aid Highway Program.  Environmental correspondence files shall be maintained by Caltrans for a period of three years after the resolution of the particular issue for which the file is created.  After three years, Caltrans shall transmit environmental correspondence files to the FHWA to be stored at the Federal Records Center.

   B.    **Environmental Impact Statements and/or Section 4(f) Statements- FHWA**: Files containing reviews and approval of EIS's and Section 4(f) statements for which Caltrans, in assuming the FHWA's responsibilities, is the lead agency shall be maintained by Caltrans for a period of eight years after approval of the final statement.  After eight years, Caltrans shall transmit its EIS and/or section 4(f) files to the FHWA.

   C.    **Environmental Impact Statements–Other Agencies**: Files containing reviews and comments furnished by Caltrans to other Federal agencies following reviews of an EIS for which another Federal agency is the lead agency shall be maintained by Caltrans for a period of five years.  After five years, Caltrans may destroy these files when no longer needed.

   D.    **Fish and Wildlife Coordination**: Files containing correspondence with the fish and wildlife resource agencies early in project development may be destroyed by Caltrans after three years.

   E.    **Noise Barriers**: To comply with 23 CFR 772.13(f) regarding noise abatement measures reporting, files containing correspondence, publications, presentations, installation reports for wall barriers, and design of different types of wall barriers by private industry shall be

maintained by Caltrans for a period of four years after the end of the
Federal fiscal year in which the particular file is closed.

8.3.3   Nothing contained in the MOU is intended to relieve Caltrans of its recordkeeping
responsibilities under 2 CFR 200.333 or other applicable laws or regulations.

## 8.4   Federal Register

8.4.1   For any documents to be published in the *Federal Register,* such as the Notice of
Intent under 23 C.F.R. 771.123(a) and Notice of Final Agency Action under 23 U.S.C.
139(l), Caltrans shall transmit such document to the FHWA's California Division Office,
and the FHWA will cause such document to be published in the *Federal Register* on
behalf of Caltrans and will submit such document to the *Federal Register* within five
calendar days of receipt of such document from Caltrans.  To the extent that the operating
procedures of the Government Printing Office and the *Federal Register* permit, Caltrans
will take over the procedures described above from the FHWA California Division
Office.

## 8.5   Participation in Resource Agency Reports

8.5.1   Caltrans agrees to provide data and information requested by the FHWA Office of
Project Development and Environmental Review and resource agencies for the
preparation of national reports to the extent that the information relates to determinations,
findings, and proceedings associated with projects processed under this MOU.  Such
reports include but are not limited to:

   A.  Information on the completion and time for completion of NEPA
       environmental documentation of all types (EIS, EA, CE);

   B.  Archeology Reports requested by the National Park Service;

   C.  Endangered Species Act Expenditure Reports requested by the U.S. Fish and
       Wildlife Service and the National Marine Fisheries Service;

   D.  NEPA Litigation Reports requested by the CEQ; and

   E.  Environmental Conflict Resolution reports, requested by the Office of
       Management and Budget, and the CEQ.

## 8.6   Conformity Determinations

8.6.1   Pursuant to 23 U.S.C. 327(a)(2)(B)(iv)(II), for any project requiring a project–
level conformity determination under the Federal Clean Air Act and its implementing
regulations, the FHWA's California Division Office will document the project level
conformity determination by transmitting a letter to Caltrans to be included in the Final

EIS or EA. The FHWA's California Division Office will restrict its review to only that data, analyses, applicable comments and responses, and other relevant documentation that enable the FHWA to make the project level conformity determination. For CE projects that have not been assumed pursuant to the 326 MOU, Caltrans shall rely upon FHWA for the project level conformity determinations. Caltrans shall rely upon a documented FHWA project-level conformity determination prior to approval of the CE by Caltrans.

## 8.7    Certification of NEPA Compliance

8.7.1    For projects funded by the FHWA, prior to the execution of any Federal–aid project agreement for a physical construction contract, a design-build contract, or a contract for final design services, the Director of Caltrans will submit a certification for each individual project to the FHWA California Division Office specifying that Caltrans has fully carried out all responsibilities assumed under this MOU in accordance with this MOU and applicable Federal laws, regulations, and policies. The Director of Caltrans may delegate the certification required under this subpart to other qualified and duly authorized Caltrans personnel.

## 8.8    Enforcement

8.8.1    Should the FHWA determine that Caltrans is not in compliance with this MOU, then the FHWA shall take appropriate action to ensure Caltrans' compliance, including appropriate remedies provided at 23 CFR 1.36 for violations of or failure to comply with Federal law or the regulations in 23 CFR Part 771 with respect to a project, withdrawing assignment of any responsibilities that have been assumed as provided in part 9 of this MOU, or terminating Caltrans' participation in the Program as provided in part 12 of this MOU.

## PART 9. WITHDRAWAL OF RESPONSIBILITIES OF ASSIGNED PROJECTS

## 9.1    FHWA-Initiated Withdrawal of Assigned Projects

9.1.1    The FHWA may, at any time, withdraw the assignment of all or part of the USDOT Secretary's responsibilities that have been assumed by Caltrans under this MOU for any highway project or highway projects upon the FHWA's determination that:

    A.    With respect to that particular highway project or those particular highway projects, Caltrans is not in compliance with a material item of this MOU or applicable Federal laws or policies; and Caltrans has not taken sufficient corrective action to the satisfaction of the FHWA;

    B.    The highway project or highway projects involve significant or unique national policy interests for which Caltrans' assumption of the Secretary's responsibilities would be inappropriate; or

    C.    Caltrans cannot satisfactorily resolve an issue or concern raised in a government–to–government consultation process, as provided in subpart 3.2.3.

9.1.2   Upon the FHWA's determination to withdraw assignment of the USDOT Secretary's responsibilities under subpart 9.1.1, the FHWA will notify Caltrans of the FHWA's determination. After notifying Caltrans of its determination, the FHWA will provide Caltrans written notice of its determination including the reasons for its determination. Upon receipt of this notice, Caltrans may submit any comments or objections to the FHWA within 30 calendar days, unless an extended period of time is agreed to by the FHWA. Upon receipt of Caltrans' comments or objections, the FHWA will make a final determination within 30 calendar days, unless extended by the FHWA for cause, and notify Caltrans of its decision. In making its determination, the FHWA will consider Caltrans' comments or objections, the effect the withdrawal of assignment will have on the Program, amount of disruption to the project concerned, the effect on other projects, confusion the withdrawal of assignment may cause to the public, the potential burden to other Federal agencies, and the overall public interest.

9.1.3   The FHWA shall withdraw assignment of the responsibilities Caltrans has assumed for any highway project when the preferred alternative that is identified in the environmental assessment or final environmental impact statement is a highway project that is specifically excluded in subpart 3.3.2. In such case, subpart 9.1.2 shall not apply.

## 9.2   Caltrans-Initiated Withdrawal of Assignment of Projects

9.2.1   Caltrans may, at any time, request the FHWA to withdraw all or part of the USDOT Secretary's responsibilities it has assumed under this MOU for any existing or future highway project or highway projects.

9.2.2   Upon Caltrans' decision to request the FHWA withdraw the assignment of the USDOT Secretary's responsibilities under subpart 9.2.1; Caltrans shall informally notify the FHWA of its desire for the FHWA to withdraw assignment of its responsibilities. After informally notifying the FHWA of its desire, Caltrans will provide the FHWA written notice of its desire, including the reasons for wanting the FHWA to withdraw assignment of the responsibilities. Upon receipt of this notice, the FHWA will have 30 calendar days, unless extended by the FHWA for cause, to determine whether it will withdraw assignment of the responsibilities requested. In making its determination, the FHWA will consider the reasons Caltrans desires the FHWA to withdraw assignment of the responsibilities, the effect the withdrawal of assignment will have on the Program, amount of disruption to the project concerned, the effect on other projects, confusion the withdrawal of assignment may cause to the public, the potential burden to other Federal agencies, and the overall public interest.

## PART 10. PERFORMANCE MEASURES

## 10.1   General

10.1.1 Both the FHWA and Caltrans have determined that it is desirable to mutually establish a set of performance measures that the FHWA can take into account in its

evaluation of Caltrans' administration of the responsibilities it has assumed under this MOU.

10.1.2 Caltrans attainment of the performance measures indicated in this Part 10 will be considered through FHWA monitoring, which is required for FHWA to comply with 23 U.S.C. 327.

10.1.3 Caltrans shall collect and maintain all necessary and appropriate data related to the attainment of the performance measures. In collecting this data, Caltrans shall monitor its progress toward meeting the performance measures and include its progress in the monitoring report provided under subpart 8.2.5 of this MOU. Caltrans shall make the monitoring report available to FHWA and the public as provided in subpart 8.2.5.

## 10.2    Performance Measures

10.2.1 The performance measures applicable to Caltrans in carrying the responsibilities it has assumed under part 3 of this MOU are as follows:

    **A.**    **Compliance with NEPA and other Federal laws and regulations:**

        i.    Maintain documented compliance with procedures and processes set forth in the MOU for the environmental responsibilities assumed under the Program.

        ii.    Maintain documented compliance with requirements of all Federal statutes and regulations being assumed (Section 106 of the NHPA, Section 7 of the ESA, etc.).

    **B.**    **Quality Control and Assurance for NEPA decisions:**

        i.    Maintain and apply internal quality control and assurance measures and processes, including a record of:

            a.    Legal sufficiency determinations made by counsel;

            b.    Compliance with FHWA and Caltrans environmental document content standards and procedures, including those related to QA/QC; and

            c.    Completeness and adequacy of documentation of project records for projects done under the Program.

    **C.**    **Relationships with agencies and the general public:**

        i.    Assess change in communication among Caltrans, Federal and state resource agencies, and the public resulting from assumption of responsibilities under this MOU.

        ii.    Maintain effective responsiveness to substantive comments received from the public, agencies and interest groups on NEPA documents and environmental concerns.

  iii. Maintain effective NEPA conflict resolution processes whenever appropriate.

**D.** **Increased efficiency and timeliness in completion of NEPA process:**

  i. Compare time of completion for NEPA approvals before and after assumption of responsibilities under this MOU.

  ii. Compare time to completion for key interagency consultation formerly requiring FHWA participation (e.g., Section 7 biological opinions) before and after assumption of responsibilities under this MOU.

## PART 11. TRAINING

### 11.1 Training

11.1.1 The FHWA will provide Caltrans available training, to the extent the FHWA and Caltrans deem necessary, with respect to the environmental responsibilities that Caltrans has assumed. Such training may be provided by either the FHWA or another Federal agency or other parties as may be appropriate. Caltrans agrees to have all appropriate employees (including consultants hired for the purpose of carrying out the USDOT Secretary's responsibilities) attend such training.

11.1.2 A training plan will be updated annually by Caltrans and the FHWA during the term of this MOU. While Caltrans and the FHWA may take other agencies' recommendations into account in determining training needs, Caltrans and the FHWA will jointly determine the training required under this MOU.

## PART 12. TERM, TERMINATION AND RENEWAL

### 12.1 Term

12.1.1 This MOU has a term of five years from the Effective Date.

### 12.2 Termination by the FHWA

12.2.1 As provided at 23 U.S.C. 327(j)(1), the FHWA may terminate Caltrans' participation in the Program, in whole or in part, at any time subject to the procedural requirements in 23 U.S.C. 327 and subpart 13.2.2 below. Failure to adequately carry out the responsibilities of the Program may include, but not be limited to:

  A. Persistent neglect of, or noncompliance with, any Federal laws, regulations, and policies;

  B. Failure to cooperate with the FHWA in conducting any oversight or monitoring activity;

C. Failure to secure or maintain adequate personnel and financial resources to carry out the responsibilities assumed;

D. Substantial noncompliance with this MOU; or

E. Persistent failure to adequately consult, coordinate, and/or take the concerns of other relevant Federal and state agencies into account in carrying out the responsibilities assumed.

12.2.2 If the FHWA determines that Caltrans is not adequately carrying out the responsibilities assigned to Caltrans, then:

A. The FHWA shall provide to Caltrans a written notification of its determination.

B. Caltrans shall have a period of not less than 120 days to take such corrective action as FHWA determines to be necessary to comply with this MOU.

   i. On the request of the Governor, FHWA shall provide a detailed description of each responsibility in need of corrective action.

C. If, after the notification and the period to take corrective action Caltrans has failed to take satisfactory corrective action as determined by FHWA, FHWA shall provide Caltrans with a notice of termination. Any responsibilities identified to be terminated in the notice that have been assumed by Caltrans pursuant to this MOU shall transfer to the FHWA.

## 12.3    Termination by Caltrans

12.3.1 Caltrans may terminate its participation in the Program, in whole or in part, at any time by providing to FHWA a notice at least 90 calendar days prior to the date that Caltrans seeks to terminate its participation in this Program, and subject to such terms and conditions, as the FHWA may provide.

12.3.2 California's consent to Federal court jurisdiction and waiver of sovereign immunity currently sunsets on January 1, 2017. Affirmative action by the State of California will be necessary to extend the State's consent and waiver. If California does not consent to Federal court jurisdiction and waive sovereign immunity, then Caltrans' participation in the Program will be suspended on January 1, 2017 for a period of up to 90 calendar days. If adequate certification (as required by 23 CFR 773.109(a)(6) and 773.115(c)(2)) is not provided within this time period, then this MOU and California's participation in the Program shall be terminated

A. During the period of suspension, Caltrans will not make any NEPA decisions or implement any of the environmental review responsibilities assigned under Part 3 of this MOU.

B.  If the necessary actions are taken to authorize a new consent to Federal court jurisdiction and waiver of sovereign immunity during the period of suspension, then California's participation in the Program will resume on the day the FHWA acknowledges receipt of adequate certification provided by Caltrans as required by 23 CFR 773.109(a)(6) and 773.115(c)(2).

12.3.3 The California State Legislature may, at any time, terminate Caltrans participation in the Program by withdrawing the State's consent to Federal court jurisdiction and waiver of sovereign immunity or taking any other legislative action withdrawing authority to Caltrans to participate in the Program.

12.3.4 The FHWA and Caltrans shall have a plan to transition the responsibilities that Caltrans has assumed back to FHWA in the event that Caltrans' participation in the program is terminated.  This plan shall be developed to minimize disruption to projects, confusion to the public, and burdens on other affected Federal, State, and local agencies. The plan shall be approved by both FHWA and Caltrans.

## 12.4    Validity of Caltrans' Actions

12.4.1  Any environmental approvals made by Caltrans pursuant to the responsibilities Caltrans has assumed under this MOU shall remain valid after termination of Caltrans' participation in the Program or withdrawal of assignment by the FHWA.  As among the USDOT Secretary, FHWA and Caltrans, and in accordance with subpart 4.3.1 and part 6, Caltrans shall remain solely responsible and solely liable for any environmental approvals it makes pursuant to any of the responsibilities it has assumed while participating in the Program.

## 12.5    Renewal

12.5.1 This MOU is renewable in accordance with 23 U.S.C. 327 and 23 C.F.R. 773.115.

A.  Caltrans shall notify FHWA at least 12 months before the expiration of this MOU of its intent to renew its participation in the Program.

B.  Prior to requesting renewal, Caltrans shall coordinate with FHWA to determine if significant changes have occurred or if new assignment responsibilities are being sought that would warrant a statewide notice and opportunity for public comment prior to Caltrans' submittal of the renewal package.

C.  Caltrans shall meet the requirements in 23 CFR 773.115(c); and

D.  Caltrans shall submit the renewal package no later than 180 days prior to the expiration date of the MOU.

## PART 13. AMENDMENTS

## 13.1   Generally

13.1.1  This MOU may be amended at any time upon mutual agreement by both the FHWA and Caltrans pursuant to 23 CFR 773.113(b).

## 13.2   Additional Projects, Classes of Projects and Environmental Review Responsibilities

13.2.1  Caltrans may assume responsibility for additional projects and additional environmental review responsibilities beyond those identified in part 3 of this MOU by executing an amendment to this MOU.

13.2.2  Should Caltrans decide to request this MOU be amended to add responsibility for additional projects or classes of projects, or additional environmental review responsibilities beyond those identified in part 3 of this MOU, then such request shall be treated as an amendment to Caltrans' renewal package that was submitted to the FHWA pursuant to 23 U.S.C. 327 and 23 CFR Part 773.115.  In developing the amendment, Caltrans shall identify the additional responsibilities and projects it wishes to assume and make any appropriate adjustments to the information contained in Caltrans' renewal package, including the verification of personnel and financial resources.  Upon receipt of Caltrans' amendment, the FHWA will consult with, and solicit the views of, other appropriate Federal agencies.

IN WITNESS THEREOF, the parties hereto have caused this MOU to be duly executed in duplicate as of the date of the last signature written below. This MOU is effective on the Effective Date as specified in subpart 1.1.4.

Date: December 23, 2016

Gregory G. Nadeau
**Administrator**
**Federal Highway Administration**

Date: Dec. 20, 2016

Malcolm Dougherty
**Director**
**California Department of Transportation**

Date: December 19, 2016

Jeanne Scherer
**Chief Counsel**
**California Department of Transportation** only as to the certifications required under subpart 4.1.1 of this MOU and as to form.

# EXHIBIT 2

# GROSS & KLEIN LLP

San Francisco | New York

The Embarcadero, Pier 9, Suite 100, San Francisco, CA 94111  ph: 415.671.4628  fx: 415.480.6688
www.grosskleinlaw.com

sender's email: sgross@grosskleinlaw.com

November 4, 2017

*Via Certified Mail – Return Receipt*
Jerry Brown
Governor of California
c/o State Capitol, Suite 1173
Sacramento, CA 95814

*Via Certified Mail – Return Receipt*
Mathew Brady
District 1 Director
California Department of Transportation
P.O. Box 3700
Eureka, CA 95502

*Via Certified Mail – Return Receipt*
Malcolm Dougherty
Director
California Department of Transportation
P.O. Box 942873
Sacramento, CA 94273-0001

*Via Certified Mail – Return Receipt*
Kim Floyd
Project Manager
California Department of Transportation
P.O. Box 3700
Eureka, CA 95502

*Via Certified Mail – Return Receipt*
Jeanne E. Scherer
Deputy Attorney
Department of Transportation Legal Division
Bay Area Legal Office
111 Grand Ave., #11-100
Oakland, CA 94612

*Via Certified Mail – Return Receipt*
Wilbur Ross
Secretary
U.S. Department of Commerce
1401 Constitution Ave., N.W.
Washington, D.C. 20230

### *Re: Notice of Intent to Sue for Violations of the Endangered Species Act*

Dear Madams and Sirs: [1]

We write on behalf of the entities and individuals listed in Section I(A) (collectively "Notifying Persons") to notify you of their intent to sue you for violating Section 7 of the Endangered Species Act (the "ESA"), 16 U.S.C. §§ 1531, *et seq.* in connection with the California Department of Transportation's ("Caltrans") 197/199 STAA Safe Access Project (the "Proposed Project"). As the Notifying Persons establish below, Caltrans failed to meet its obligations to consult with the National Marine Fisheries Service ("NMFS") to ensure that the Proposed Project is not likely to jeopardize the Southern Oregon/Northern California Coast coho salmon ("SONCC coho"), green sturgeon, and eulachon (collectively, the "Subject Fishes") or

---

[1] If you are represented by counsel in this matter, request is specifically made that this communication be directed to such counsel, and this communication shall be deemed to have been made directly to such counsel.

# GROSS & KLEIN LLP

result in the destruction or adverse modification critical habitat of SONCC coho in or around the area of the Proposed Project.

## I.    BACKGROUND

### A.    The Notifying Persons

Environmental Protection Information Center is a non-profit corporation, using an integrated, science-based approach that combines public education, citizen advocacy, and strategic litigation. It focuses in part on preserving and restoring wild salmon runs in Northern California.

The Center for Biological Diversity is a non-profit organization that through science, law, and media works to secure a future for all species, great and small, that are hovering on the brink of extinction, including wild salmon in Northern California.

Friends of Del Norte ("Friends") is a non-profit public interest group established in 1973 in Crescent City and Gasquet, California, designed to protect the local environment and educate our citizenry on the benefits of planning for living in a pristine setting. Friends' two hundred local and northern California members have tirelessly worked to protect the pristine qualities of the wild and scenic rivers of Northern California, salmon and steelhead habitat, the scenic corridors of Highways 101 and 199, ancient redwood forests, the Lake Earl Coastal Lagoon, and the wild Pacific coastline. Members of Friends recreate within and along the wild and scenic Eel River and in Richardson Grove State Park, and intend to continue doing so in the future.

### B.    SONCC Coho and SONCC Coho Critical Habitat in the Smith River and Rogue River

For background concerning SONC coho, including their status, stresses, and threats, generally, see NMFS, Final Recovery Plan for the Southern Oregon/Northern California Coast Evolutionarily Significant Unit of Coho Salmon (Oncorhynchus kisutch). National Marine Fisheries Service. Arcata, CA (2014) ("NMFS SONCC Coho 2014"), pp. E-1 to 6-22.

For background concerning the SONCC coho population in the Smith River Watershed and critical habitat of SONCC coho in the Smith River Watershed, see NMFS SONCC Coho 2014, pp. 15-1 to 15-32.

For background concerning the SONCC coho population in the relevant portion of the Rogue River Watershed and critical habitat of SONCC coho in the relevant portion of the Rogue River Watershed, see NMFS SONCC Coho 2014, pp. 31-1 to 31-36.

### C.    The Proposed Project

For background concerning the Proposed Project see Caltrans, Final Environmental Assessment for the Proposed Project, April 2003 (the "EA"), pp. 1-1 to 1-30, and Caltrans, Biological Assessment for Impacts to Coho Salmon (*Oncorhynchus kisutch*) its Designated

 **GROSS & KLEIN LLP**

Critical Habitat, Green Sturgeon (*Acipenser medirostris*), Eulachon (*Thaleichthys pacificus*) and Essential Fish Habitat Assessment for Pacific Salmon for the Proposed Project (the "BA"), pp. 1-4 and 13-59.[2]

## II.    Violation by Caltrans of ESA

Section 7 of the ESA commands all federal agencies and, as in this case, State agencies that have assumed the applicable obligations of a federal agency, "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . " 16 U.S.C. § 1536(a)(2). An agency's decision whether to take a discretionary action that may jeopardize endangered or threatened species is strictly governed by ESA-mandated inter-agency consultation procedures. First, the agency contemplating the action must request information from the appropriate federal wildlife service regarding "whether any species which is listed or proposed to be listed may be present in the area of such proposed action." 16 U.S.C. § 1536(c)(1). Here, the appropriate agency is NMFS. If the wildlife service determines that listed species may be present in the affected area, the agency preparing to act must produce a "biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." *Id.*

The biological assessment must consider all effects of the action and be based on "the best scientific... data available." 16 U.S.C §1536(a)(2). It is, furthermore, inadequate if it states an explanation for its decision that runs counter to the evidence, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

In violation of these requirements, Caltrans failed to adequately evaluate the Proposed Project's effects on the Subject Fishes or SONCC coho critical habitat and its conclusion that the Proposed Project is unlikely to adversely affect the Subject Fishes or SONCC coho critical habit is arbitrary and capricious. These failures include without limitation the following:

1.  Impacts from Collisions/Toxic Spills:

    a.  The BA's conclusion that the Potential Project would not significantly increase the risk of an accidental release of hazardous materials into the environment is arbitrary and capricious, as the conclusion was based on Caltrans' conclusion that the average number of daily truck trips would not significantly increase. However, the BA admits that the Proposed Project will increase truck traffic on 197/199, due mainly two discrete factors: (a) from lily bulb growers in the Smith River Delta; and (b) from complete closures of I-5 in the winter. Each of these factors is likely to create acute temporary increases in truck traffic. As the BA acknowledges, lily bulb growers ship their products out mainly in October and December. And complete winter closures of I-5 would, by definition, occur only

---

[2] In citing to these portions of the EA and the BA, Plaintiffs are in no way conceding to the adequacy of any portion of the EA or the BA. Furthermore, Plaintiffs do not in anyway concede that the BA qualifies as the entire biological assessment for the Proposed Project.

**GROSS & KLEIN LLP**

in the winter months and, only then, at certain particularly snowy times. Thus, while the BA bases its conclusion that there would not a significant risk of increased toxic spills based on a small daily average increase in truck traffic, the reality is that increased truck traffic would not be evenly spread out over the year but concentrated during certain particular periods. These acute periods of increased truck traffic are more likely to result in increased accidents than would a small number level of increased truck traffic spread evenly throughout the year for several reasons, including, without limitation: the narrow, windy character of 199 through the Smith River; the fact that the Proposed Project does not call for changes in 199's configuration sufficient for the road to qualify for STAA trucks without significant safety design exceptions; the fact that STAA trucks are more likely to have traveled longer distances when they reached 199; and the STAA trucks are more likely to have non-local drivers less familiar with 199 than the drivers of California legal trucks that currently use the road. The BA failed to consider that these and other factors—despite acknowledging that operating environment has a large effect on crash rates—would make it likely for accidents to increase, generally, as a result of the Proposed Project, as well as in combination with the predicted acute increases in STAA truck traffic, which the BA predicts, as opposed truck traffic spread evenly throughout the year, which the BA uses as the basis for its analysis. Furthermore, these acute periods of increased traffic would occur during periods in which 199/197 are more likely to slippery because of snow, frost, or rain, than they would be on average throughout the year. Furthermore, rock and landslides are more likely to occur in this period, and such rock and landslides increases the risk of an accident. An additional truck trip that occurs during a period in which 197/199 is subject to these conditions is more likely to result in an accident than additional truck trip that occurs during a period in which 197/199 is dry and no rockslide or land slide has occurred. Thus, for these reasons, as well as basing the conclusion that there is unlikely to be an increase in toxic spills on an average daily increase and without consideration of the road conditions during which such increases are likely to take place or the other factors discussed above, is arbitrary and capricious.

b. The BA's conclusion that any risk that the Proposed Project would create of increased toxic spills is discountable based its determination of average daily traffic numbers and the amount by which the Proposed Project is likely to increase such numbers is further arbitrary and capricious on the ground that—as the BA acknowledges—a single toxic spill would have devastating effects on the Subject Fishes and SONCC coho critical habitat. The BA's analysis is framed in terms of an annual event probability. However, the probabilities of toxic spills are inter-annually additive. Given the catastrophic nature of a single spill, it is irrelevant, as to impact, whether a spill occurs in year 2 or year 20. What is relevant, is the additional cumulative probability of a toxic spill because of an incremental increase in large truck traffic. The BA fails to consider that even slightly turning up the dial on toxic spill probability for an indefinite or permanent period—as the Proposed Project would, at the very least, do—indefinitely and permanently increases the cumulative probability of a disastrous event occurring;

**GROSS & KLEIN LLP**

thus, making arbitrary and capricious the BA's determination that the increased risk of a toxic spill from the Proposed Project is discountable.

c.  The BA's conclusion that the Potential Project would not significantly increase the risk of an accidental release of hazardous materials into the environment is further arbitrary and capricious, as the analysis on which it was based fails to take into account the likelihood that the safety design exceptions called for in the Proposed Project will result in increased accidents by STAA trucks. Caltrans admits that the increase in truck traffic on 197/199 after the Proposed Project would be attributable to increased numbers of STAA trucks using the route, and elsewhere admits that operating environmental factors have a large effect on crash likelihood. The BA, however, fails to account for the fact that—given the design exceptions built into the Proposed Project—an STAA truck using 197/199 is more likely to be involved in an accident than a non-STAA truck. The BA's conclusion that the roadway would be safer due to the reconfigurations—even with the addition of STAA truck traffic—is arbitrary and capricious given the BA's failure to analyze and examine whether, given these safety design exceptions, the roadway would, in fact, be safer with the added STAA truck traffic.

d.  The BA's conclusion that the Potential Project would not significantly increase the risk of an accidental release of hazardous materials into the environment is further arbitrary and capricious, as the analysis fails to assess the cumulative impacts of increased truck traffic caused by the Proposed Project in combination with increases in traffic that the BA predicts would occur independent of the Proposed Project. The effect of the latter qualifies as a cumulative effect under 50 CFR § 402.02; however, the BA, instead, categorizes this predicted increase as an environmental baseline condition, and so fails to analyze the cumulative effect on accident levels of this otherwise predicted increase of traffic and the predicted increase in STAA truck traffic caused by the Proposed Project. As a result, the BA fails to analyze the cumulative effect of increased accidents due to traffic increases unrelated to the Proposed Project with those due to increased STAA truck traffic due to the Proposed Project; and it further fails to analyze the effect of increased accidents due to the combination of increases of traffic unrelated to the Proposed Project and increased STAA truck traffic due to the Proposed Project.

e.  The BA's conclusion that the Potential Project would not significantly increase the risk of an accidental release of hazardous materials into the environment is further arbitrary and capricious, as the analysis fails to include any examination of the potential for Proposed Project to increase the number of STAA trucks using the southern portion of 199 that will not have changes made to it and will not be made legal for STAA trucks. This is despite acknowledging that such portions of 199 are unsafe for STAA trucks and that some STAA truck already illegally use this and other portions of 199, and despited the lack of any information in the BA to indicate measures that will be taken to prevent STAA trucks from continuing down 199 to 101, instead of taking 197. The conclusion that opening 197 to


**GROSS & KLEIN LLP**

STAA trucks would decrease the usage by STAA trucks of the southern portion of 199 is not supported by any analysis and is contradicted by the BA's admission that the number of STAA trucks using 199 would increase as a result of the Proposed Project, the lack of any information indicating that STAA trucks would be directed to use 197 via signage or the like, and the shorter travel distance using the southern portion of 199 than 197, if continuing, as most STAA trucks traveling south on 199 would be, to the south.

f.   The BA's conclusion that the Potential Project would not significantly increase the risk of an accidental release of hazardous materials into the environment is further arbitrary and capricious, as the analysis is entirely limited to an examination of the likelihood of increased accidents and spills in the Smith River Watershed without any examination of the likelihood of increased accidents and spills in the Rogue River Watershed.

g.   The BA fails to analyze the potential impact of increased toxic spills on green sturgeon, either individually or in combination with other impacts.

h.   The BA fails to analyze the potential impact of increased toxic spills on eulachon, either individually or in combination with other impacts.

i.   The BA's conclusion that there would be no increase in the number of trucks carrying hazardous materials fails to consider the traffic induction effects of the creation of loops of STAA truck access that the Proposed Project, in combination with other projects, would have.

j.   The BA's conclusion that there would be no increase in the number of trucks carrying hazardous materials and that there would be no increased risk of toxic spills is arbitrary and capricious base on the BA's failure to analyze the extent to which the Proposed Project would result in increased accidents of trucks shipping toxic chemicals used by lily bulb growers.

k.   The BA failed to consider the best available science regarding the effects of toxic spills on the Subject Fishes or SONCC coho critical habitat.

l.   The BA's failure to locate and employ data on accident frequencies, and on toxic spills associated with them makes arbitrary and capricious the BA's conclusions regarding the risk of toxic spills on the Subject Fishes or SONCC coho critical habitat.

2.   Impacts from Increased Toxic Road Runoff:

a.   The BA's conclusion that the Potential Project would not significantly increase the risk of toxic road runoff is arbitrary and capricious, as the analysis fails to assess the cumulative impacts of increased truck traffic caused by the Proposed Project and increases in traffic that the BA predicts would occur independent of the Proposed Project. The effect of the latter qualifies as a cumulative effect under

 **GROSS & KLEIN LLP**

50 CFR § 402.02; however, the BA, instead, categorizes this predicted increase as a baseline condition, and so fails to analyze the cumulative effect on toxic road runoff levels of this otherwise predicted increase of traffic and the predicted increase in STAA truck traffic caused by the Proposed Project. As a result, the BA fails to analyze the cumulative effect of increased toxic road runoff levels due to traffic increases unrelated to the Proposed Project with those due to increased STAA truck traffic due to the Proposed Project.

b. The BA's conclusion that the Potential Project would not significantly increase the risk of toxic road runoff is arbitrary and capricious, as the analysis is based on the baseless assumption that impacts below certain "thresholds" can be ignored. However, bringing the cumulative impact closer to the threshold is itself important, as it makes it more likely that future projects or natural or human-caused events will go over the threshold.

c. The BA's conclusion that the Potential Project would not significantly increase the risk of toxic road runoff is arbitrary and capricious, as the analysis is based on an admitted lack of environmental baseline information regarding toxic road runoff in the Rogue River.

d. The BA's conclusion that the Potential Project would not significantly increase the risk of toxic road runoff is arbitrary and capricious, as it is based on non-current studies that underestimate the toxicity of PAHs to larval fish. Current studies show that extremely low levels of particular PAHs have toxic effects on fish. The BA further fails to consider or address that the periods during which increased truck traffic would occur as a result of the Proposed Project coincide with the presence of larval coho in the adjacent stream bed.

e. The BA's conclusion that the Potential Project would not significantly increase the risk of toxic road runoff is arbitrary and capricious, as it is based on a summed or total PAH number rather than levels of particular PAHS, despite the BA's acknowledgement that certain PAHs are more toxic to fish than others.

f. The BA's conclusion that the Potential Project would not significantly increase the risk of toxic road runoff is arbitrary and capricious, as it nowhere analyzes the photo-enhanced toxicity of PAH components of toxic road runoff.

g. The BA's conclusion that the Potential Project would not significantly increase the risks from toxic road runoff is arbitrary and capricious, as it is premised on a baseline level analysis that examines only the current baseline of contaminants from road runoff, to the exclusion of contaminants from other sources.

h. The BA nowhere examines the synergistic toxicological effects of all of the various toxins that would be delivered to the rivers as a result of the project, both as to each other and as to toxins already in the rivers and those that are likely to be deposited there from other sources. Nor does it examine these effects from a temporally cumulative perspective.

**GROSS & KLEIN LLP**

i.  The BA fails to articulate any basis for its conclusion that the Proposed Project would not result in endocrine disruption, aside from the fact that BA concludes that current highway runoff does not present such a risk. This fails both because it does not account for other baseline sources of endocrine disruption and contains no analysis of the effect the Proposed Project may have in increasing such impacts.

j.  The BA's conclusion that, in the Rogue River basin, "under the baseline condition there may be locations where coho salmon could experience potentially harmful concentrations [of contaminants] under certain conditions in some years," makes arbitrary and capricious its conclusion that additional contaminants from increased road runoff due the project is not likely to adversely affect SONCC. If the fish, under baseline conditions, are already facing harmful conditions, the addition of more contaminants would, as a matter of logic, increase such harmfulness. This is additionally so given the toxicity of even small amounts of certain of the contaminants in question.

k.  The BA fails to analyze Proposed Project related impacts from bioaccumulation of toxins in prey species.

l.  The BA dismisses, without meaningful analysis, potential impacts of road runoff contamination based solely on the purportedly small percentage increase of such contaminants that would caused by the Proposed Project, instead of examining, as required, whether such additional contaminants when added to baseline conditions, other impacts from the Proposed Project, and cumulative effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation would place the Subject Fishes or SONCC coho critical habitat in jeopardy. Indeed, the BA fails, as a general matter, to address cumulative effects of the Proposed Project with the impacts of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation, and in context with baseline conditions.

m.  The BA's recognition that increased toxins will result from the Proposed Project but are not likely to adversely affect the Subject Fishes or SONCC Critical habitat are absurd given the sensitivity of the fishes to such toxins.

n.  The BA failed to use the best available science regarding the effects of toxic road runoff on the Subject Fishes or SONCC coho critical habitat.

3.  Impacts from Sediment Increases.

a.  The BA admits that current steep and unvegitated cut slopes along 199 are considered a chronic contributor for fine sediment/TSS to the Smith River and that such fine sedmiment/TSS has negative effects on SONCC coho and eulachon. The BA further admits that the Proposed Project would increase the amount of

 **GROSS & KLEIN LLP**

steep unvegitated cut slopes along 199, yet the BA claims that the Proposed Project will not cause significant increased long term sediment delivery loading to the Smith River, apparently based on an analysis of the proposed construction at Washington Curve, which concluded that the lower angle of the slope post construction would reduce sediment delivery. The latter conclusion is arbitrary and capricious, as to Washington Curve, as you can't reduce slope angle without drastically increasing the exposed erodible surface area of the cut slope. By decreasing erosion rate associated with slope you directly compensate by spreading a slightly lower erosion rate over a much larger erodible area. Furthermore, nothing regarding Washington Curve has bearing on whether other portions of the Proposed Project are likely to result in increased long-term sediment delivery, making it arbitrary and capricious to base an analysis of the Proposed Project's long term sediment delivery impacts on this analysis.

b.  The BA's conclusion that short and long-term increases in sediment delivery from the Proposed Project would not have significant impact on SONCC coho or their critical habitat on the basis that there are other more significant sources of sediment deliver is arbitrary and capricious. There is no safe amounts of fine sediment delivery; and if there are other significant sources of sediment delivery, it makes the impact of any increased sediment delivery from the Proposed Project additionally significant in terms of the jeopardy it poses.

c.  The BA fails to analyze the impacts of long and short term sediment delivery from the Proposed Project in combination with baseline sediment delivery conditions or cumulatively with the effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation. Even accepting the BA's conclusion that the sediment related impacts of the Proposed Project would be small, and sublethal for individual salmon when viewed in isolation, the Smith River's SONCC coho population is at an exceptionally higher level of risk due to isolation and relative low numbers. Thus, any increase in sedimentation in the Smith River could result in their extinction in that region.

d.  The BA fails to analyze how landslides could be triggered, in the short or long term, by disturbance of unstable slopes by the Proposed Project.

e.  The BA fails to adequately analyze the chronic generation of sediment as a result of the Proposed Project or the reduced capacity of the site to retain pollutants and sediment caused by displacement of vegetation.

f.  The BA over relies on the success of temporary mitigation measures in support of its conclusion of no likely adverse impact as a result of short and long term increased sediment delivery as a result of the Proposed Project, with little or no meaningful analysis and consideration of permanent mitigation measures to reduce the adverse effect of permanent environmental and human changes created by the project.

# GK GROSS & KLEIN LLP

    g.  The BA failed to use the best available science regarding the effects of sediment on the Subject Fishes or SONCC coho critical habitat.

    h.  The BA fails to address sediment contamination from chronic toxicant sources in road runoff, as an inter-annually cumulative impact concern.  The BA nowhere addresses the fact that even low but chronic levels of discharge from the road can still result in cumulative high concentrations in aquatic sediments, particular in the lower river and estuary where fine particulate organic matter is most abundant. The same is trued as to toxic road runoff, including metals and some particularly persistent forms of PAHs, the inter-annually cumulative effect of which is nowhere addressed in the BA. Nowhere does the BA either consider transfer and fate processes that account for such accumulative processes.

4.  <u>Environmental Baseline</u>.

    a.  The BA improperly focuses its analysis of baseline conditions on the current and past environmental impacts of 197 and 199, instead of the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.

    b.  The BA improperly classifies predicted increased future traffic that would occur independent of the Proposed Project as an environmental baseline condition—or "no-project baseline scenario"—rather than analyze it as a cumulative effect; and, as a result, fails to properly examine the cumulative effect of such predicted future increased traffic with predicted future increased traffic caused by the Proposed Project.

    c.  The BA improperly includes the effects of trees removed as part of the Proposed Project as an element of the environmental baseline.

    d.  The BA uses segments along 199 for comparison against state-wide collision averages that are too long to provide adequate or accurate information concerning the baseline collision risk for locations in those segments or the cumulative impacts of collision risk for the locations created by predicted non-Proposed Project related traffic growth and traffic growth caused by the Proposed Project.

    e.  The BA's analysis of bioaccumulation of contaminants in prey species contained in the environmental baseline section misgets the significance and meaning of bioaccumulation. The BA bases its conclusion that there is no baseline risk related to bioaccumulation on the fact that sensitive invertebrates are able to survive in the water column. However, that does not mean these invertebrates or other prey species do not absorb sublethal amounts of contaminants which then accumulate


**GROSS & KLEIN LLP**

up the food chain. In fact, that's the very basis of bioaccumulation. If contaminants killed them outright, there would be no accumulation up the food chain.

5. Patrick Creek Narrows Location 2 ("PCN 2").

    a. The BA's disregard of the results of Caltrans' previous snorkel survey in order to conclude that no SONCC coho are likely to be in the vicinity of PCN 2 during construction activities and thus change Caltrans' original conclusion that SONCC coho in this location may be adversely affected by construction activity is arbitrary and capricious, for reasons including, without limitation, that Caltrans did not redo the snorkel survey, but rather dismissed it's the empirical evidence from its previous findings based on circumstantial evidence.

    b. The BA's determination that the Proposed Project would not likely adversely affect SONCC coho critical habitat at PCN 2, not withstanding its previous determination that it would likely adversely affect SONCC coho critical habitat at PCN 2 is arbitrary and capricious, as nothing has changed concerning the work called for by the Proposed Project at this location; and the BA indicates a lack of analysis of the Proposed Project's impacts on high-quality habitat at this location identified by Dr. Chris Frissell.

    c. The BA contains no support for its claim that "any required dewatering at PCN 2 is proposed to occur in non-fish-bearing channels."

    d. The BA concludes solely on the basis of a study concerning the lighting of a bridge in Renton, Washington that impacts on SONCC coho from lighting "directly over and adjacent to the river" at PCN 2 would be discountable. However, according to the BA, the import of the referenced study is that when the total lux from artificial lights is equivalent to that of the full moon, there is not additional predation. It does not, as the BA suggests, indicate that in all circumstances shielding lights will eliminate impacts. The BA fails to provide any information regarding the total lux that will be present in the river in the vicinity of PCN 2 and thus its conclusion that light impacts would be discountable is arbitrary and capricious.

6. Inconsistencies Between the Scope of Work Described in the EA and the BA

    a. According to the BA, Ruby 1 area of soil disturbed will be 0.3 acres, but the EA Table 2.3.6-2 says it would be 0.2 acres.

    b. According to the BA, Washington Curve disturbed area will be 2.12 acres, while the EA says it would be a maximum of 1.0 acres.

    c. According to the BA, the Narrows area of soil disturbed will be 0.4 acres while the EA says it 0.7 acres.

 **GROSS & KLEIN LLP**

    d. The Narrows area of vegetated slope disturbed is said to be 0.46 acres in the BA, but it was only 0.05 acres in the EA (Table 2.3.1-7).

    e. At Washington Curve, the affected area of knobcone pine/Douglas fir has apparently decreased from a total of 1.0 acres (FEIR) to 0.82 acres (BA).

7. Other.

    a. The BA disregards the previous conclusion of its snorkel survey that the Smith River provides "high quality" rearing habitat for SONCC coho, without the support of contrary evidence of similar substance and with the apparent goal of disregarded data contrary to the BA's conclusion that the Proposed Project is not likely to adversely affect SONCC coho.

    b. Concerning 199 at Myrtle Creek, the BA acknowledges the possibility that juvenile coho could be impacted by contaminated runoff. However, the BA contains no evidence that any further investigation of this possibility or describe any minimization or mitigation measures that would make this impact unlikely. Rather, it states simply "this drainage should be investigated for possible remediation." This is an admission of incompleteness that makes the BA arbitrary and capricious.

    c. The BA heavily relies on dilution of contaminants to reach the conclusion of no significant impacts. This old idea ("the solution to pollution is dilution") has been understood to be fatally flawed for decades, for several reasons, including cumulative effects (inter-annually and otherwise), synergistic effects, and the fact that many pollutants (particularly endocrine disruptors) can have very serious effects at extremely low levels and do not exhibit a traditional dose-response relationship.

    d. The BA fails to consider the truck traffic induction effects of creating multiple throughway STAA routes in the area.

    e. The BA bases its conclusion regarding the increased traffic levels on the premise that "additional vehicle trips [would be] entirely made up of STAA trucks traveling to and from the area around Crescent City, California." However, not only does this conclusion ignore the traffic induction effects of creating multiple throughway routes in the area, it is also contradicted by evidence cited elsewhere in the BA that there will likely be increased traffic caused when I-5 is closed for snow, diverting onto 199 trucks destined for points South of Crescent City.

    f. The BA fails to consider the expert materials submitted by Plaintiffs in the previous preceding or as part of their comments to the EA, including without limitation the analyses by Busch Geotechnical Consultants, Dr. Chris Frissell, or Smith Engineering.

**GK GROSS & KLEIN LLP**

g.  The BA fails to analyze the impacts associated with chronic delivery of nutrients, particularly nitrogen and phosphorous, as a result of the Proposed Project, including eutrophication caused thereby.

h.  The BA fails to analyze the impacts that would be caused by the increase in impervious surfaces and reduction of riparian vegetation at Patrick Creek Narrow Location 3 as a result of the Proposed Project.

i.  The BA fails to analyze the impacts that would be caused by the increase in impervious surface area that releases polluted stormwater, diversion of polluted stormwater through a culvert rather than through permeable soils and vegetation, shortening the distance between the culvert outfall and riverbank, and permanently preventing the regrowth of vegetation from the slope surface displaced by fill and retaining wall at Patrick Creek Narrow Location 1 as a result of the Proposed Project. The BA's reliance upon a barrier retaining wall as mitigating impacts from this location is further arbitrary and capricious as such a wall would do nothing to address these un-analyzed impacts.

j.  The BA's reliance on wire mesh as a mitigation measure for the work called for by the Proposed Project at Ruby 2 is arbitrary and capricious as such mesh would only prevent rocks and small debris from falling on the road surface, and would do virtually nothing to mitigate the erosion and transport of fine sediment into runoff from the increased cut slopes called for at this location.

k.  The BA inadequately addresses the geotechnical risks posed by the Proposed Projects at the particular locations at which it calls for slope work.

l.  The BA and its conclusions were based on inadequate data and analyses concerning the Oregon/Rogue River Watershed portions of the Action Area (the "Oregon Area"), including, without limitation: the failure to search species databases for species located in the Oregon Area; the failure to conduct any kind of snorkel survey in the Oregon Area; the lack of data concerning riparian zones in the Oregon Area; the failure to conduct any analysis of the expected rate of non-Proposed Project related traffic increase in the Oregon Area, using, instead, the predicted rate of increase for the California portion, despite the very significant differences between the two area concerning factors that bear on traffic increase rates, such as differences in urbanization and population growth rates.

m.  The BA fails to use the best available science concerning the Oregon Area, the populations of Subject Fishes there, or SONCC coho critical habitat there. This includes without limitation extensive data available concerning important populations of SONCC coho salmon there.

n.  The BA fails to examine that green sturgeon, based on their distribution, are highly likely to be adversely affected by cumulative sediment contamination and/or eutrophication in the lower river and estuary.

 **GROSS & KLEIN LLP**

o.   The BA fails to examine the cumulative effect of the Proposed Project with that of climate change on the Subject Fishes and SONCC coho critical habitat.

The BA is, furthermore, independently unlawful as it is in excess of Caltrans' statutory authority under 23 U.S.C. § 327. Caltrans authority under 23 U.S.C. § 327 is defined by its memorandum of the understanding with the Federal Highway Administration (the "MOU"). Section 3.3.2 of the MOU excludes, from the responsibilities of the Federal Highway Administration that may be delegated to Caltrans, undertakings for which the Federal Highway Administration has primary responsibilities that are eligible for financial assistance under 23 U.S.C. and that cross State boundaries. The BA's analysis of the Proposed Project's effects in Oregon constitutes such an undertaking and is therefore in excess of Caltrans statutory authority and is, therefore, unlawful.

This letter serves as the Notifying Persons' notice of intent to sue Caltrans under the ESA for this violation. 16 U.S.C. § 1540(g)(2). The Notifying Persons anticipate that during the 60-day period when Caltrans considers this notice, and before they file any lawsuit, Caltrans wish to meet and confer as to its position as to these matters. The Notifying Persons welcome such an engagement, and are represented by counsel in this matter:

Stuart G. Gross
Gross & Klein LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t: 415-671-4628
f: 415-480-6688
sgross@grosskleinlaw.com

Sharron Duggan
370 Grand Avenue Suite 5
Oakland, CA 94610
t: 510-271-0825
foxsduggan@aol.com

Phil Gregory
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
t: 650-697-6000
f: 650-697-0577
pgregory@cpmlegal.com

Please contact any one of the above counsel, if Caltrans is interested in meeting or you have any questions concerning this notice.

SINCERELY,

STUART G. GROSS

cc (via email): Sharon Duggan
                Phil Gregory