UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRIENDS OF DEL NORTE, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF TRANSPORTATION, et al.,<br><br>    Defendants. | Case No. 18-cv-00129-JD<br><br>**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

This case arises out of a project proposed by defendant California Department of Transportation (Caltrans) to modify U.S. Route 199 (US 199) and California State Route 197 (SR 197) at seven sites in Del Norte County, California. At many points, the project abuts the Smith River, which is the largest free-flowing river in California and is highly valued as a wild and scenic waterway. The project is intended to improve the passage of larger-sized trucks, which are known as federal Surface Transportation Assistance Act (STAA) trucks in the acronym-rich world of environmental and transportation regulations.

Caltrans, the local agency, assumed responsibility for conducting the environmental reviews required by federal law for this project. *See Friends of Del Norte v. Cal. Dep't of Transp.*, No. 18-cv-00129-JD, 2020 WL 1812175, at *2 (N.D. Cal. Apr. 9, 2020), Dkt. No. 73. Caltrans consulted with defendant National Marine Fisheries Service (NMFS) about the potential environmental impacts of the project.

This is the Court's second review of the project. In 2014, the Court granted a preliminary injunction to enjoin Caltrans from moving forward with the project because there were serious questions about the adequacy of the review and consultation process that Caltrans and NMFS conducted under the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq. See Souza v. Cal. Dep't of Transp.*, No. 13-cv-04407-JD, 2014 WL 1760346, at *9 (N.D. Cal. May 2, 2014). The

record revealed "contradictions and critical gaps in reasoning" in the agencies' assessments of the project's effects and whether a formal consultation was required under the ESA. *See id.* at *5-6.

Caltrans declined to proceed with litigating *Souza* on the merits. Instead, in May 2014, Caltrans engaged in a fresh round of consultation with NMFS, which culminated in a revised evaluation of the project's environmental impacts. *See* Administrative Record (AR) 029660, 030809. In Caltrans' view, the ESA issues have been put to rest and the project is ready to start.

Plaintiffs Friends of Del Norte, the Environmental Protection Information Center, and the Center for Biological Diversity disagree. As relevant here, they challenge the revised work under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, the ESA, and the Magnuson-Stevens Fishery Conservation and Management Act (MSA), 16 U.S.C. § 1801 *et seq. See* Dkt. No. 1 at 57-64. Plaintiffs and defendants have filed cross-motions for summary judgment for the NEPA, ESA, and MSA claims. Dkt. Nos. 92, 93, 94.

The record demonstrates that the revised environmental and ESA assessments were reasonable and supported by evidence, and that neither Caltrans nor NMFS acted arbitrarily and capriciously with respect to the review and consultation procedures. Consequently, summary judgment is granted in favor of defendants, and against plaintiffs.

## BACKGROUND

**I.  THE NATIONAL ENVIRONMENTAL POLICY ACT**

NEPA is the "basic national charter for protection of the environment." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022) (quoting 40 C.F.R. § 1500.1(a) (2019)).[1] It is "at its heart a procedural statute," *id.*, one "intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process," *Friends of Animals v. U.S. Fish & Wildlife Serv.*, 28 F.4th 19, 24 (9th Cir. 2022) (internal quotations and

---

[1] The NEPA regulations were recently revised, with an effective date of September 14, 2020, which is after the actions at issue in this case. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304-01, 43304 (July 16, 2020). The new regulations themselves are under agency review. *See Native Village of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1210-11 (9th Cir. 2021). Citations and quotations here are to the regulations that were effective at the time of the relevant agency actions. *See Env't Def. Ctr.*, 36 F.4th at 879 n.5 ("[W]e look to the regulations in place at the time of the challenged decision.") (citation omitted). Neither side proposed a different approach.

2

citation omitted). NEPA also "ensures that the agency will inform the public" that it has taken environmental considerations into account. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). While NEPA requires agencies to follow certain procedures before taking actions that will affect the environment, it "does not require an agency to reach any particular result." *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1035 (9th Cir. 2019). The responsible agency is required to "give a hard and careful look at environmental impacts." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1047 (9th Cir. 2013).

Two types of documents are central to NEPA. One is an environmental impact statement (EIS), which is intended to be a rigorous environmental analysis of a proposed project. "NEPA requires agencies to prepare an EIS for all 'major Federal actions significantly affecting the quality of the human environment.'" *Env't Def. Ctr.*, 36 F.4th at 872 (quoting 42 U.S.C. § 4332(2)(C)). "The EIS must consider 'the environmental impact of the proposed action' and 'any adverse environmental effects which cannot be avoided should the proposal be implemented.'" *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 853 (9th Cir. 2013) (quoting 42 U.S.C. § 4332(2)(C)(i)-(ii)). An EIS must "provide full and fair discussion of significant environmental impacts" and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

An EIS "can be a time-consuming regulatory hurdle," and not every proposed federal action requires the effort. *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 674 (9th Cir. 2022). The trigger is when an action may "significantly affect" the environment. To determine whether this may be the case, an agency may start with a shorter undertaking called an environmental assessment (EA) to evaluate the potential consequences of a proposed action. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 641 (9th Cir. 2014). This is the other key NEPA document. An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). A finding of no significant impact (FONSI), which means that "the EA reveals that the action in question will not

3

have a significant effect on the human environment," eliminates the need for a more comprehensive EIS. *San Luis*, 747 F.3d at 641 (internal quotations and citation omitted). Consequently, a NEPA review typically will culminate in a concise EA with a FONSI, or a full-blown EIS.[2]

## II. THE ENDANGERED SPECIES ACT

The ESA was enacted to protect and conserve endangered and threatened species and their habitats, and embodies "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Ctr. for Biological Diversity v. EPA*, 847 F.3d 1075, 1084 (9th Cir. 2017) (quoting *TVA v. Hill*, 437 U.S. 153, 185 (1978)). It authorizes the Secretaries of Commerce and the Interior, through their agencies, to list plants and animals for protection and to designate critical habitats. *See* 16 U.S.C. § 1533.

"The ESA imposes a variety of procedural and substantive requirements to ensure that the actions of federal agencies do not harm listed species or critical habitats." *Ecological Rts. Found. v. FEMA*, 384 F. Supp. 3d 1111, 1115 (N.D. Cal. 2019); *see also Friends of Gualala River v. Gualala Redwood Timber, LLC*, 552 F. Supp. 3d 924, 931 (N.D. Cal. 2021). The centerpiece of the ESA is Section 7(a)(2), which provides that each federal agency "shall, in consultation with and with the assistance of the [Services], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2); *see also Ecological Rts. Found.*, 384 F. Supp. 3d at 1115. Implementing regulations for Section 7 state that each federal agency must review its actions at the earliest possible time to determine whether they "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Overall, these provisions require that a federal agency must

---

[2] In some cases, neither report is necessary. "[A]n agency may avoid preparing an EIS or EA if it decides that a proposed project fits within a specified categorical exclusion," *Mountain Cmtys.*, 25 F.4th at 675, and "there are no extraordinary circumstances related to the proposed action," *id.* at 680 (internal quotations and citation omitted). Categorical exclusions are "actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of [the NEPA] regulations." 40 C.F.R. § 1508.4. The exclusions do not apply here.

consult with the appropriate Service when proposing an action that may affect a listed species or designated habitat. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc); *Souza*, 2014 WL 1760346, at *4.

The purpose of the consultations is to "draw on the expertise of 'wildlife agencies to determine whether [an] action is likely to jeopardize a listed species' or its habitat, and 'to identify reasonable and prudent alternatives' to avoid those harmful impacts." *Ctr. for Biological Diversity*, 847 F.3d at 1084 (quoting *Karuk Tribe*, 681 F.3d at 1020). NMFS provides consultation on actions involving marine and anadromous species and habitats, and FWS for all other species and habitats. *See Ecological Rts. Found.*, 384 F. Supp. 3d at 1115.

Agencies begin the ESA consultation process "with an assessment of the species affected by the action." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 741 (9th Cir. 2020) [hereinafter *Liberty*]. "If a threatened or endangered species 'may be present' in the area of the proposed action" -- which is the case for the project here -- "the agency must conduct a biological assessment." *Id*. (quoting 16 U.S.C. § 1536(c)(1)). The biological assessment (BA) is "used in determining whether formal consultation . . . is necessary." 50 C.F.R. § 402.12(a). If the agency concludes in the BA "that the species [or critical habitat] is likely to be adversely affected, it must initiate formal consultation with either FWS or NMFS." *Liberty*, 982 F.3d at 741.

Formal consultations are the gold standard for ESA assessments. *See Ecological Rts. Found.*, 384 F. Supp. 3d at 1115. In a formal consultation, the action agency engages NMFS or FWS to prepare a full biological opinion to determine whether the action is likely to jeopardize a listed species or critical habitat. *See Karuk Tribe*, 681 F.3d at 1020. If the agency determines "that the proposed action is not likely to adversely affect any listed species or critical habitat," and the consulting agency, namely NMFS or FWS, concurs in writing, a formal consultation is not required. 50 C.F.R. § 402.14(b)(1). An agency may hold informal consultations with the Services to assess whether formal consultation and a biological opinion are necessary. *See id.* § 402.13.

### III. THE MAGNUSON-STEVENS ACT

The parties' MSA arguments were perfunctory and underdeveloped, and so the statute is not in meaningful play here. Mainly to provide context, the Court notes that the MSA "creates a

5

'national program for the conservation and management of the fishery resources of the United States.'" *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, 837 F.3d 1055, 1057 (9th Cir. 2016) (quoting 16 U.S.C. § 1801(a)(6)). The MSA requires agencies to consult with the Secretary of Commerce, through NMFS, with respect to actions "that may adversely affect any essential fish habitat" identified under the act. 16 U.S.C. § 1855(b)(2). If NMFS determines that an agency's proposed action "would adversely affect any essential fish habitat," NMFS is required to "recommend to such agency measures that can be taken by such agency to conserve such habitat." *Id.* § 1855(b)(4)(A). This all of only passing interest because plaintiffs did not press the MSA claim with any degree of seriousness.

## IV. THE NEW CONSULTATION

The facts in this long-running dispute were detailed in the Court's prior orders in *Souza*, and the parties' familiarity with this record is assumed. *See Souza*, 2014 WL 1760346, at *1 (preliminary injunction order); *Souza v. Cal. Dep't of Transp.*, No. 13-cv-04407-JD, 2014 WL 793644 (N.D. Cal. Feb. 26, 2014) (motion to dismiss order). The discussion here focuses on what has happened since the preliminary injunction, which enjoined the project pending further developments.

After the preliminary injunction was issued, the parties agreed to dismiss *Souza* without prejudice because Caltrans and NMFS had reinitiated the ESA consultation process in May 2014. *See Souza*, Dkt. No. 97 at 1-2. The consultation produced a new BA by Caltrans in 2017. Among other changes, the new BA placed more emphasis on locations in Oregon, including the Rogue River and Grants Pass, which was consistent with defining the project's "action area" to include "the entire SR 197 corridor, and US 199 from its junction with SR 197 to its junction with Interstate-5 at Grants Pass, Oregon" and "aquatic features within the Smith River and Rogue River basins that may be affected by the proposed action." AR 030813.

NMFS issued a letter of concurrence in which it agreed with Caltrans' conclusions about likely impacts on ESA-listed species and habitat. *See* AR 029660, 030741. NMFS stated that the project was not likely to adversely affect ESA-listed Southern Oregon/North California Coast (SONCC) coho salmon and its critical habitat, or local populations of green sturgeon and

6

eulachon, the latter being a type of smelt also known as candlefish because the dried flesh is said to be oily enough to burn like a candle. *See* AR 030753. Although NMFS found that the project would adversely affect essential fish habitat under the MSA, it concluded that Caltrans' mitigation measures were sufficient and did not require additional recommendations. *See* AR 030754-55.

Caltrans also did an internal re-evaluation of the NEPA analysis. *See* AR 029660. It concluded that the FONSI determination in the 2013 EA remained valid and that no further NEPA review was required. *See* AR 029659-60.

In January 2018, plaintiffs filed a new complaint against Caltrans, NMFS, and the Federal Highway Administration (FHWA), along with each organization's respective directors. *See* Dkt. No. 1. The complaint alleged twelve claims for relief under various federal environmental laws. *See id.* at 55-66. The case was temporarily stayed while the parties negotiated around the administrative record and potential settlement. *See* Dkt. No. 34. The claims against FHWA were dismissed on sovereign immunity grounds under Federal Rule of Civil Procedure 12(b)(1). *See Friends of Del Norte*, 2020 WL 1812175, at *3, Dkt. No. 73.

In June 2021, plaintiffs moved for summary judgment on the NEPA, ESA, and MSA claims, asking the Court to remand the matter to Caltrans to: "(a) prepare an [EIS] or, in the alternative, a supplemental [EA]; (b) conduct a new consultation with the [NMFS] pursuant to section 7 of the ESA; and (c) conduct a new consultation with NMFS pursuant to the MSA." Dkt. No. 92 at 1. The parties requested, and were granted, additional pages for their summary judgment briefs. *See* Dkt. No. 45. This may have an overindulgence because plaintiffs ended up firing a barrage of sixteen arguments against the environmental reviews conducted in this case, many of which, such as the MSA, were presented in a scant paragraph or two of severely underdeveloped discussion. *See* Dkt. No. 92 at 11-30. To cut through the dross, the Court invited plaintiffs at oral argument to identify their main points. *See* Dkt. Nos. 109, 122. Plaintiffs identified alleged NEPA violations based on (i) a lack of notice, comment, and consultation in Oregon, and (ii) arbitrary and capricious conclusions about traffic safety. *See* Dkt. No. 122. At plaintiffs' election, these are the main challenges on summary judgment.

7

**LEGAL STANDARDS**

Under the deferential standard of the Administrative Procedure Act (APA), an agency action will be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1256-57 (9th Cir. 2017). The "arbitrary and capricious" standard in Section 706 governs judicial review of an agency's actions under NEPA. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376 (1989). The ESA allows citizens to sue and does not impose a standard of review for agency action. *See* 16 U.S.C. § 1540(g)(1)(A). Even so, the Court also reviews the ESA claims under Section 706 of the APA. *See Karuk Tribe*, 681 F.3d at 1017; *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). So too for the MSA claim, such as it is here. *See United Cook Inlet*, 837 F.3d at 1061.

An agency action is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Defs. of Wildlife*, 856 F.3d at 1252 (internal quotations and citation omitted); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "The Court's deference extends to less than stellar work by an agency, so long as its analytical path and reasoning can be reasonably discerned." *Ecological Rts. Found.*, 384 F. Supp. 3d at 1119 (citing *San Luis*, 747 F.3d at 627); *see also Nat. Grocers v. Vilsack*, --- F. Supp. 3d ----, 2022 WL 4227248, at *5 (N.D. Cal. Sept. 13, 2022).

Summary judgment is an appropriate procedure for resolving plaintiffs' challenges. *See Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Ecological Rts. Found.*, 384 F. Supp. 3d at 1119; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**DISCUSSION**

**I.     EXTRA-RECORD EVIDENCE**

A threshold question is whether the Court should go beyond the administrative record and consider the declaration of an aquatic ecologist, Dr. Christopher Frissell, who was sponsored by plaintiffs. *See* Dkt. No. 92-4 (Frissell declaration); *see also* Dkt. No. 92 at 26 n.5; Dkt. No. 93 at 12; Dkt. No. 94 at 25. Plaintiffs featured Dr. Frissell's declaration extensively in their opening brief to challenge whether Caltrans and NMFS "considered all relevant factors and . . . explained [their] decision" under the ESA. Dkt. No. 92 at 26 n.5. The declaration will be considered for that purpose. *See Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010) (an "expansion of the administrative record" is permitted when "supplementation is necessary to determine if the agency has considered all factors and explained its decision"); *Kraayenbrink*, 632 F.3d at 497 (courts "may consider evidence outside the administrative record for the limited purposes of reviewing" an ESA claim brought under the ESA's citizen-suit provision).

The Court declines plaintiffs' request to take the declaration further. In a reply brief, plaintiffs suggested that Dr. Frissell's declaration should also be used to evaluate Caltrans' NEPA work. *See* Dkt. No. 101 at 12-14. But plaintiffs made no mention of this potential application in their opening brief, and did not say how the declaration might bear upon the NEPA analysis. In effect, plaintiffs waited until the reply brief to raise the issue, in contravention of procedural fairness and the Court's standing orders against "sandbagging and other inequitable conduct." *Louis v. Healthsource Glob. Staffing, Inc.*, No. 22-cv-02436-JD, 2022 WL 4866543, at *2 (N.D. Cal. Oct. 3, 2022).[3]

**II.    NEPA CLAIMS**

    **A.     Tiering**

Plaintiffs say that the 2013 EA and 2017 NEPA documents prepared by Caltrans violated NEPA by improperly "tiering" to the BAs that were conducted, including the 2017 BA. *See* Dkt.

---

[3] Plaintiffs' request for judicial notice of a news article and U.S. Forest Service Facebook post about a tar spill that reached the Smith River in April 2022, *see* Dkt. No. 115, is denied. The spill occurred well after the conclusion of the environmental and ESA reviews, and plaintiffs have not demonstrated how this information should factor into the Court's analysis.

9

No. 92 at 11. "Ordinarily, an agency can avoid some of the burdens of the NEPA process by 'tiering' to a prior document that has itself been the subject of NEPA review." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1118 (9th Cir. 2018). Tiering allows an agency preparing an EIS or EA to "avoid[] detailed discussion by referring to another document containing the required discussion." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002). It is expressly permitted by regulation, *see All. for the Wild Rockies*, 907 F.3d at 1118, and is defined as "the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.28.

It is certainly true that tiering to the BAs would be improper because they are not NEPA documents. *See All. for the Wild Rockies*, 907 F.3d at 1119 (tiering to a non-NEPA document "would be categorically improper under the [Council for Environmental Quality] regulations"). But that is not what Caltrans did here. Plaintiffs cite three pages of the administrative record to support their contention that Caltrans' EA incorporated the original BA and failed to "includ[e] a hard look analysis of the Project's impacts on the Smith or Rogue River's listed fish species." Dkt. No. 92 at 12 (citing AR 001614-16). They overlook other portions of the EA that expressly analyzed impacts on the ESA-listed species. *See, e.g.*, AR 001619-23, 001703-07. This independent analysis is not rendered a nullity merely because the 2013 EA and 2017 re-evaluation refer to the BAs that were conducted. *See Kern*, 284 F.3d at 1073-74 (to the extent there is improper tiering, the adequacy of an EIS or EA depends on the analysis contained in the document itself). Consequently, plaintiffs' tiering challenge is misdirected.

Plaintiffs make an ancillary point, in a highly cursory manner, to the effect that Caltrans violated NEPA by not mentioning any version of the BA in the 2010 and 2012 draft EAs that it circulated, instead waiting until the final EA was released in 2013. *See* Dkt. No. 92 at 12. Why this might be a procedural violation is left unstated, and plaintiffs did not cite any supporting case law to that end. Plaintiffs also did not identify material differences between the draft and final

10

EAs that might raise a concern. *See California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 794 (9th Cir. 2014) (a "final EIS may include information not cited in a draft; recirculation is required only if there is significant new information or circumstances relating to the proposed action"). This point is also unavailing for plaintiffs.

### B. Caltrans' Use of a "Re-evaluation"

As discussed, Caltrans used an internal re-evaluation process to assess "any changes in the project" arising from new consultation with NMFS. AR 29660. This process resulted in the 2017 re-evaluation report, an 11-page document that discussed the 2017 BA, considered the environmental impacts associated with the expansion of the project's action area as described in the 2017 BA, and concluded that the 2013 EA remained valid and no further NEPA review was necessary. *See* AR 029659-69. Plaintiffs say that this internal procedure was inadequate in light of the Court's order enjoining the project and identifying shortcomings in the original Caltrans-NMFS consultation, *see Souza*, 2014 WL 1760346, at *5-6, and that, at a minimum, Caltrans was required to prepare a supplemental EA to consider the significance of new information presented in the 2017 BA. *See* Dkt. No. 92 at 13-14.

The points are not well taken. To start, "NEPA and the CEQ regulations are silent on the issue of how agencies are to determine the significance of new information." *Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000). Consequently, "courts have upheld agency use of SIRs [supplemental information reports] and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." *Id.* That includes the re-evaluation procedure authorized by FHWA regulations and used by Caltrans here. *See Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997) ("[W]hen faced with a project change, the FHWA may conduct a reevaluation to determine the significance of the new design's environmental impacts and the continuing validity of its initial EA."). But "once an agency determines that new information is significant, it must prepare a supplemental EA or EIS." *Idaho Sporting Cong.*, 222 F.3d at 566. Agencies are prohibited from using SIRs or similar procedures "to present

11

information and analysis that [they were] required, but . . . failed to include in [their] original NEPA documents." *Id.* at 567.

Plaintiffs say that doing a re-evaluation was wrong because Caltrans sought to present information and analysis that it was required to include in the 2013 EA, but had omitted. *See* Dkt. No. 92 at 14. Plaintiffs' opening brief did not identify the omissions with any degree of specificity, and mentioned only those "previously identified by the Court." *Id.* The problem for plaintiffs is that the Court did not do that work for them. The Court expressed concern about "the adequacy of the [original] ESA review and consultation process," *Souza*, 2014 WL 1760346, at *6, but expressly deferred consideration of the NEPA claims, *see id.* at *2. Consequently, plaintiffs' attempt to fill in the blanks with the order is misdirected. Plaintiffs belatedly tried to remedy this shortcoming in a reply brief by naming information that was in the 2017 BA but not the 2013 EA, *see* Dkt. No. 101 at 8, but they did not explain how this information was so significant as to require a supplemental EA, or why it was arbitrary and capricious for Caltrans to conclude that a supplemental EA was unnecessary.

### C. Public Involvement and Agency Consultation

The last "fundamental" procedural problem alleged by plaintiffs goes to the public and state agency comment process. *See* Dkt. No. 92 at 11. Plaintiffs say that Caltrans violated NEPA by (i) not inviting public comment from Oregonians despite "acknowledging that the Project's impacts extend into Oregon," *id.* at 14, (ii) not providing Californians with additional opportunities to comment on "the brand new 2017 BA, and new scientific, economic, and regulatory developments," *id.* at 15, and (iii) not notifying or consulting Oregon state agencies, *see id.* at 15-16.

These concerns are also misdirected. "An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008). "[T]he level of participation required by NEPA's implementing regulations is not substantial." *Cal. Trout v. FERC*, 572 F.3d 1003, 1017 (9th Cir.

12

2009).  Although "'a complete failure to involve or even inform the public about an agency's preparation of an EA' would violate NEPA's regulations," *id.* (quoting *Citizens for Better Forestry v. USDA*, 341 F.3d 961, 970 (9th Cir. 2003)), "the circulation of a draft EA is not required in every case," *id.* (quoting *Bering Strait Citizens*, 524 F.3d at 952).

Implementing regulations make plain the comment obligations required of Caltrans.  With respect to the public, FHWA regulations provide that when a re-evaluation is conducted, "the FHWA and the State highway agency will determine whether changes in the project or new information warrant additional public involvement." *Price Rd.*, 113 F.3d at 1511 (quoting 23 C.F.R. § 771.111(h)(3)).  For agency comments, the regulations require that project applicants, "at the earliest appropriate time, begin consultation with interested agencies and others to advise them of the scope of the project."  23 C.F.R. § 771.119(b).  The regulations also provide that "[o]ther States, and Federal land management entities, that may be significantly affected by the action or by any of the alternatives shall be notified early and their views solicited by the applicant in cooperation with the [FHWA]." *Id.* § 711.111(e).

The record establishes that Caltrans' public outreach efforts were adequate and reasonable.  Caltrans held a public meeting in April 2008 while the project was in the development phase "to provide the public with an overview of the project as well as solicit comments and concerns."  AR 001747.  The meeting was publicized via a news release, and more than 100 people attended. *See id.*  Caltrans held a public scoping meeting in September 2008 "to identify concerns of both the public and agencies in order to clearly define the environmental issues and alternatives to be examined in the draft [EA]."  AR 001748.  Caltrans circulated a draft EA for public comment in 2010, held a public hearing on the draft, recirculated part of the EA in September 2012 after making revisions, and accepted comments until November 2012. *See* AR 001752.  All told, hundreds of public comments were received, which Caltrans addressed in hundreds of pages of detailed responses. *See* AR 002180.  While it is true that most of this action involved meetings in California with California residents, the record demonstrates that Oregon residents also provided meaningful comments and attended the meetings. *See, e.g.*, AR 010981-82, 010994, 011036.  Nothing in the record even remotely indicates that Caltrans discouraged Oregonians from

1 participating, or sought to hide or downplay the project in any way. Overall, Caltrans engaged in

2 a thorough and responsible public comment effort, and plaintiffs have not demonstrated otherwise.

3 So too for comments by Oregon state agencies. Nothing indicates that Caltrans sought to

4 freeze out the agencies from making comments. Plaintiffs suggest that Caltrans had some

5 unspecified outreach duties to the agencies because impacts might potentially be experienced in

6 Oregon. *See* Dkt. No. 92 at 14-15. But the governing regulations, which plaintiffs themselves

7 cite, *see id.* at 15, plainly state that Caltrans was required to consult Oregon agencies only if (1)

8 those agencies qualified as "interested agencies" under 23 C.F.R. § 771.119(b), or (2) the project

9 would significantly affect Oregon under 23 C.F.R. § 711.111(e). Plaintiffs made no effort to

10 demonstrate that either condition was satisfied.[4]

### D. Caltrans' Analysis of Environmental Impacts

As a closing claim under NEPA, plaintiffs say that Caltrans did not take a "hard look" at the environmental impacts of the project and that it should have prepared an EIS. They fault Caltrans for not examining impacts in Oregon, and for inadequately analyzing (i) traffic safety risks in California, (ii) the project's cumulative impacts, and (iii) impacts to fish and habitat. *See* Dkt. No. 92 at 16.

With respect to Oregon, plaintiffs' opening brief did not identify anything in the administrative record establishing that the project might have concrete and non-speculative impacts in Oregon that Caltrans failed to consider. *See Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir. 1998). Plaintiffs again waited until a reply brief to say that NMFS had reexamined a 2010 traffic study and suggested that Caltrans consider the potential effects of

---

[4] Caltrans focused its discussion of the issue on the two regulatory provisions that plaintiffs relied upon in their opening brief, which are part and parcel of the FHWA's procedures for implementing NEPA. *See* Dkt. No. 93 at 20. In a reply brief, plaintiffs rather oddly faulted Caltrans for responding to their own argument, asserting that Caltrans' "focus on the FHWA's regulations and whether the Project will 'significantly affect' Oregon agencies is misplaced." Dkt. No. 101 at 6. Plaintiffs' reply raised for the first time a NEPA regulation, as revised in 2020, which provides that for actions "with effects primarily of local concern, the notice may include" notice directed to "State, Tribal, and local agencies that may be interested or affected by the proposed action." 40 C.F.R. § 1506.6(b)(3)(i); *see* Dkt. No. 101 at 6. This is yet another example of plaintiffs improperly using a reply brief to raise new arguments and reshape the playing field in a way that violates principles of procedural fairness. In any event, the newly cited regulation does not undermine the conclusion that Caltrans satisfied its obligations under NEPA.

14

the STAA trucks on SONCC coho salmon in Oregon. *See* Dkt. No. 101 at 3. But those effects were analyzed in Caltrans' 2017 BA, *see, e.g.*, AR 031031-40, and Caltrans permissibly accounted for that analysis in its NEPA re-evaluation, *see* AR 029662. Consequently, plaintiffs' challenge on this score is a day late and a dollar short.

With respect to traffic safety, plaintiffs say that Caltrans inadequately analyzed the risk that the project would lead to more car accidents that would contaminate the Smith River and endanger nearby residents. *See* Dkt. No. 92 at 19. They fault the analysis for not seeking to remedy preexisting design situations along the route. *See id.* at 20-22. But the EA discussed traffic safety extensively. Citing a traffic study that Caltrans commissioned, the EA projected the number of trucks that would use the road after the project, and concluded that the number would not increase significantly and that the wider shoulders and additional off-tracking room at curves could make the roads safer. *See* AR 001516-001518. In addition, the 2017 NEPA re-evaluation cited another traffic study that estimated a minimal increase in post-project traffic, and noted that there could be "little or no increase in traffic volumes" due to an alternate STAA-accessible route that is under construction. AR 029668. Caltrans reasonably concluded that traffic would not materially increase as a result, and that the project's safety impacts would not be significant. *See Bair v. Cal. Dep't of Transp.*, 982 F.3d 569, 579-80 (9th Cir. 2020) (deferring to Caltrans' analysis of a project's traffic impacts, which properly relied upon record evidence).

Plaintiffs' remaining disagreements with Caltrans' NEPA review are of little moment. They say that Caltrans "never analyzed the cumulative traffic and safety impacts of its broader plan to expand [the] STAA network throughout Northern California," Dkt. No. 92 at 24, but the ostensible "broader plan" is based on a quote taken out of context that discusses a different project, *see* AR 023712. Caltrans did consider the cumulative effects of this project on traffic, the Smith and Rogue River basins, and air and water quality. *See* AR 001720-22. Plaintiffs did not identify any potential cumulative impacts that Caltrans failed to consider, and their "conclusory criticisms" of the robustness of the EA's cumulative effects analysis do not demonstrate that Caltrans made any procedural errors. *Ctr. for Cmty. Action & Env't Just. v. FAA*, --- F.4th ----, 2023 WL 2213470, at *11 (9th Cir. Feb. 24, 2023). Plaintiffs' suggestion that Caltrans did not

1   adequately account for impacts to fish and their habitat repeats the same unsound contention that it
2   was wrong of Caltrans to use a re-evaluation to account for updated information that was
3   presented in the 2017 BA.  *See* Dkt. No. 92 at 24-25.

4   Overall, the record demonstrates that Caltrans did not act arbitrarily and capriciously in
5   making a FONSI determination and foregoing an EIS.  It satisfied "NEPA's hard look
6   requirement, based its decision on a consideration of the relevant factors, and provided a
7   convincing statement of reasons to explain why the project's impacts are insignificant."  *Ctr. for*
8   *Cmty. Action*, 2023 WL 2213470, at *4 (cleaned up).  Consequently, the NEPA challenges are
9   denied.

## III. ESA AND MSA CLAIMS

### A. Justiciability

As a threshold matter, Caltrans says that neither the APA nor the ESA authorize plaintiffs to challenge the 2017 BA.  Caltrans believes the BA is unreviewable under the APA because it is neither an "agency action made reviewable by statute" nor a "final agency action for which there is no other adequate remedy in a court."  Dkt. No. 93 at 27 (citing 5 U.S.C. § 704).  Caltrans says that the decision to not engage in formal consultation with NMFS is not reviewable under the ESA.  *See id.* at 28.  Plaintiffs say that NMFS's letter of concurrence is a final agency action that relied upon the BA to conclude that further action was unnecessary, and consequently the BA is reviewable under the APA.  In the alternative, plaintiffs say that the ESA authorizes them to challenge the 2017 BA because Caltrans and NMFS did not engage in formal consultation.  *See* Dkt. No. 101 at 23-25.

The answer to this dispute starts with the ESA.  That is so "because the APA by its terms independently authorizes review only when 'there is no other adequate remedy in a court.'"  *Bennett v. Spear*, 520 U.S. 154, 161-62 (1997) (quoting 5 U.S.C. § 704); *see also Kraayenbrink*, 632 F.3d at 481 ("We review claims brought under the ESA under the citizen-suit provision of the ESA or, when the citizen-suit provision is unavailable, under the APA.").  Under the ESA, private individuals are authorized to bring civil suits "to enjoin any person," including a government

16

agency, "who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof."  16 U.S.C. § 1540(g)(1)(A).

Plaintiffs may challenge Caltrans' decision that formal consultation was not required. Caltrans acknowledges that its action "may affect listed species or critical habitat."  50 C.F.R. § 402.14(a); *see, e.g.*, Dkt. No. 93 at 11.  Under the regulations, Caltrans was required to engage in formal consultation.  But the regulatory scheme also allowed Caltrans to avoid initiating formal consultation "if, as a result of the preparation of a biological assessment," Caltrans determined, "with the written concurrence of [NMFS]," that its project was "not likely to adversely affect any listed species or critical habitat."  50 C.F.R. § 402.14(b).  Caltrans made that determination, secured the written concurrence of NMFS, and concluded its ESA consultation with NMFS without requesting formal consultation.  *See* AR 029661.

In effect, plaintiffs say that Caltrans' "not likely to adversely affect" finding was arbitrary and capricious because it relied on a flawed BA, and consequently its decision not to initiate formal consultation violated the law.  An agency's decision not to engage in consultation to the extent required by law is reviewable, at least when, as here, the agency has concluded its decision-making processes with respect to how and whether to consult.  *See Kraayenbrink*, 632 F.3d at 496 ("Plaintiffs argue that the [action agency's] no effect finding was arbitrary and capricious and, therefore, that the [agency's] determination that consultation was not required was not in accordance with the law.").

### B.     Adequacy of the 2017 BA

In *Souza*, the Court enjoined Caltrans from moving forward with its project in part due to confusion across the multiple BAs about the project's impact on SONCC coho salmon.  *See Souza*, 2014 WL 1760346, at \*5-6.  The 2017 BA and the NMFS letter of concurrence sufficiently resolve the issues that the Court raised when granting the injunction in *Souza*.  The agencies analyzed a broad array of potential impacts on the listed species in the area, and reasonably determined that the project is not likely to adversely affect SONCC coho salmon and its critical habitat, or the local populations of green sturgeon and eulachon.  *See* AR 030749-53, 030987-

031041. Consequently, it was not arbitrary and capricious for Caltrans and NMFS to conclude that formal consultation was unnecessary.

Plaintiffs criticize seven alleged deficiencies in the 2017 BA's analysis with respect to Section 7 of the ESA. *See* Dkt. No. 92 at 25-30. Many of plaintiffs' points are freeform musings bereft of citations to the administrative record or case law, or are only fleshed out -- that is, actually made -- in their reply brief. This will not do, and the arguments are properly denied on this basis alone. Even so, the Court reviewed plaintiffs' comments and Dr. Frissell's declaration, and concludes that plaintiffs have not established that Caltrans or NMFS acted unreasonably or capriciously.

Plaintiffs' only developed point is that Caltrans arbitrarily abandoned its prior assessment that SONCC coho salmon were present within the area of a proposed bridge replacement at a project site called Patrick Creek Narrows Location 2 (PCN 2), along the Middle Fork Smith River, in order to downplay the likelihood that the salmon would be adversely affected by the project. *See* Dkt. No. 92 at 26; *see also* AR 030931. Caltrans conducted in-water snorkel surveys in 2010 and concluded that SONCC coho salmon inhabited portions of the site. *See* AR 030931. Plaintiffs say that Caltrans' 2017 BA disregarded those surveys "without any justification." Dkt. No. 92 at 26.

The record shows otherwise. Caltrans provided a reasoned, evidence-based explanation for why the surveys were likely invalid, with input by fisheries professionals from NMFS and other agencies. *See* AR 030931-34. Plaintiffs' bare invocation of Dr. Frissell's declaration, Dkt. No. 92 at 26, fell far short of demonstrating that the agencies failed to consider all relevant factors or that they violated the ESA's "best available data" requirement. *See Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006). The Court fished through Dr. Frissell's personal observations of SONCC coho salmon and other comments, *see* Dkt. No. 92-4 at 28-36, and found nothing that warrants setting aside the agencies' assessments, especially given the "deferential standard of review." *Conservation Cong. v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014). At best, Dr. Frissell's declaration reflects that he disagrees with the agency experts' reasoning and believes that the existing habitat is more suitable for the coho salmon than they concluded. But his mere

disagreements are not enough. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1148 (9th Cir. 2016) ("Mere differences in opinion . . . are not sufficient grounds for rejecting the analysis of agency experts.").

The same goes for plaintiffs' complaints about the analysis of baseline conditions, toxic road runoff, metal impacts, car accidents, toxic spills, sediment impacts, and the use of herbicides. *See* Dkt. No. 92 at 27-30. Plaintiffs cite virtually no case law and effectively ignore the relevant portions of the administrative record, which show that the agencies adequately examined these issues and explained their analyses. Plaintiffs' main point is to say again that Dr. Frissell disagreed with the conclusions reached by Caltrans and NMFS, but plaintiffs did not demonstrate that the agencies ignored these potential impacts or disregarded better available science.

### C.     MSA Claim

As discussed, plaintiffs presented the MSA claim as an apparent afterthought and in a severely underdeveloped manner. The gist appears to be that Caltrans violated the MSA because the 2017 BA "contains no analysis of measures that could be taken to avoid, minimize, or offset" various possible effects on essential fish habitat for the SONCC coho and chinook salmon. Dkt. No. 92 at 30. As defendants have stated, this is patently incorrect. Caltrans considered measures to minimize adverse effects and incorporated them into the project. *See* Dkt. No. 94 at 24; AR 030887-98, 031053. NMFS reviewed Caltrans' proposal and concluded that there were "no additional practical measures that could be taken to minimize or avoid [the] effects." AR 030755. There is no evidence that either defendant shirked its obligations under the MSA. Plaintiffs dropped their MSA argument in a 25-page reply brief, effectively conceding that the record contradicts their account.

### CONCLUSION

Summary judgment is granted to Caltrans and NMFS on plaintiffs' NEPA, ESA, and MSA claims. The injunction enjoining Caltrans from continuing work on the project that was entered on May 2, 2014, *see Souza*, 2014 WL 1760346, at *9, is lifted.

Based on plaintiffs' summary judgment presentation, the Court understands that this order resolves the case in full.  Plaintiffs are directed to advise the Court by March 9, 2023, if they believe more is left to litigate.

**IT IS SO ORDERED.**

Dated:  March 3, 2023

JAMES DONATO
United States District Judge